## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DISABILITY RIGHTS CONNECTICUT,
   INC., on behalf of its constituents,

        Plaintiff,

        v.

CONNECTICUT DEPARTMENT OF
   CORRECTION;

ANGEL QUIROS, Acting Commissioner,
   Connecticut Department of Correction,
   in his official capacity; and

ROGER BOWLES, Warden,
   Northern Correctional Institution,
   in his official capacity,

        Defendants.

Civil Action No. 3:21-cv-_____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

February 4, 2021

## **INTRODUCTION**

1.     Disability Rights Connecticut, Inc. ("DRCT") seeks to end the persistent and deliberate abuse of people with mental illness who are incarcerated at Connecticut's super-maximum security Northern Correctional Institution ("Northern"). The Connecticut Department of Correction ("DOC") subjects prisoners with mental illness at Northern to prolonged, and often indefinite, isolation and sensory deprivation, and forcible in-cell shackling that can last for days. This inhuman treatment of persons with mental illness is physically painful, intentionally humiliating, and causes long-term psychological damage. DOC's continuing abuse of, and discrimination against, people with mental illness must come to an end.

2.     DOC's abhorrent mistreatment of prisoners with mental illness constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United

States Constitution.  DOC's failure to make reasonable modifications in policies and practices to avoid trapping these prisoners in a downward spiral of isolation and retribution also denies them virtually all opportunities for rehabilitative and other programming in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* ("ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and their respective implementing regulations.

3.      DOC routinely confines individuals with mental illness at Northern where they face prolonged isolation and abuse.  Most prisoners spend at least 22 hours per day on weekdays, and 24 hours per day on weekends, in concrete cells where they live in a world of near total social and sensory deprivation.  Their primary connection to the outside world is a small opening, or "trap," at the bottom of a solid steel door.  The only daylight and view outdoors comes through a narrow four-inch-wide slot at the back of each cell.  Meaningful social interaction is nonexistent.

4.      Northern staff also retaliate against prisoners with mental illness by shackling and chaining them alone in "strip cells" for even minor disciplinary violations that are often manifestations of their mental illness.  Northern staff shackle a prisoner's wrists and legs with metal cuffs and then bind the cuffs with a heavy, metal tether chain.  Prisoners are routinely left shackled and chained for 24 hours, and sometimes for days at a time, far longer than justified by any genuine threat to safety or security.  While shackled and chained, prisoners are served food in Styrofoam cups without utensils.  Many prisoners are unable to even lift a cup to their mouth because of the shortness of the tether chain; in these instances, the only way for them to consume the contents of the cup is to dump it out on the bed or floor and eat like a dog.  The shortness of the tether chain or the tightness of the cuffs also frequently leaves prisoners unable to wipe

themselves after using the toilet.  The experience is degrading and painful.  Many individuals

have scars on their wrists and ankles from repeatedly being subjected to in-cell shackling.

5.      DOC knowingly subjects prisoners with mental illness to Northern's harsh

conditions.  Consequently, many prisoners with mental illness commit acts of self-harm or

mutilation as a result of their near-total isolation and mistreatment.  In an attempt to quell their

anxiety caused by these inhumane living conditions, persons with mental illness cut their skin,

bang their heads, or shove sharp objects into their bodies.  These self-injurious behaviors often

cause lasting injury.  Sometimes these individuals lose all ability to cope, covering the walls and

their bodies with their own excrement.  Some prisoners try to kill themselves.  These self-

injurious behaviors and suicide attempts are a direct and predictable result of DOC's actions.

But DOC responds to these self-injurious behaviors and suicide attempts with even more

isolation and punitive in-cell shackling.

6.      DOC, Angel Quiros (Acting Commissioner, DOC), and Roger Bowles (Warden,

Northern) (collectively "Defendants") have implemented and overseen DOC's policies and

practices described herein and have not taken any effective action to remedy the longstanding

and well-known abuse of prisoners with mental illness at Northern.  For more than two decades,

DOC has known that its isolation and shackling policies and practices put persons with mental

illness at substantial risk of profound and lasting injury.  Yet, despite a federal lawsuit settlement

that expired in 2008 and years-long public pressure, Defendants have failed to take action to

protect prisoners with mental illness from abuse.  Defendants have instead acted with deliberate

indifference to the unconstitutional conditions of confinement and mistreatment of prisoners.

7.      DRCT, which is authorized by federal law to protect the rights of individuals

diagnosed with or experiencing mental illness in Connecticut, brings this action against

Defendants for declaratory and injunctive relief.  DRCT seeks to stop the prolonged isolation and in-cell shackling of prisoners with mental illness at Northern, and to stop DOC's failure to make reasonable modifications to its policies, practices, and procedures.

## JURISDICTION

8.      Subject-matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under the United States Constitution, 42 U.S.C. § 1983, the ADA, 42 U.S.C. § 12131, *et seq.*, and Section 504, 29 U.S.C. § 794(a).

## VENUE

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and because a substantial part of the events and omissions giving rise to DRCT's claims occurred in this district.

## PARTIES

**A.      Disability Rights Connecticut, Inc.**

10.      DRCT is a private, nonprofit corporation and is the authorized protection and advocacy system for the State of Connecticut under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, and its implementing regulations.  DRCT's office is located at 846 Wethersfield Avenue, Hartford, Connecticut 06114. DRCT is the successor entity to the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities ("OPA").  Conn. Gen. Stat. § 46a-10a *et seq.*

11.      The PAIMI Act provides for establishing and funding protection and advocacy systems, including DRCT, to investigate the abuse and neglect of individuals with mental illness and to advocate for and ensure that their rights are protected, including their rights under the Constitution and federal and state statutes.  42 U.S.C. §§ 10801(b)(1), 10801(b)(2)(A).

12.     DRCT is responsible for providing protection and advocacy services to individuals with mental illness and disabilities pursuant to the PAIMI Act.

13.     DRCT has statutory authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State of Connecticut.  42 U.S.C. § 10805.

14.     DRCT is pursuing this action to advocate for and protect the rights and interests of "individuals with mental illness," as defined in 42 U.S.C. § 10802, who are in DOC's custody and are currently incarcerated at Northern in Administrative Segregation, Security Risk Group, or Special Needs Management ("Special Management Programs") at Northern, or are at risk of transfer to Northern ("DRCT's Constituents").  DRCT's Constituents are the direct beneficiaries of DRCT's activities, including the declaratory and injunctive relief sought in this litigation.

15.     DRCT's Constituents have "significant mental illnesses or emotional impairments," as determined by a mental health professional qualified under the laws and regulations of the State of Connecticut.  *See* 42 U.S.C. § 10802.  The mental illness of DRCT's Constituents substantially limits their ability to perform major life activities, such as self-care, working, and interaction with others.  DRCT's Constituents are therefore individuals with mental illness for purposes of the PAIMI Act, 42 U.S.C. § 10802.  DRCT's Constituents are also individuals with disabilities for purposes of the ADA, 42 U.S.C. § 12131(2), and Section 504, 29 U.S.C. § 794.  "Mental illness" is used throughout this Complaint pursuant to its definition under the PAIMI Act.  This definition encompasses individuals with mental illness who have serious mental illness or who are at substantial risk of developing serious mental illness.

16.     DRCT's Constituents have each suffered injuries, are continuing to suffer injuries, and/or are at risk of suffering injuries that make them eligible to bring suit against Defendants in

their own right.  DRCT's Constituents all reside in "facilities" rendering care and treatment for individuals with mental illness, as that term is defined in 42 U.S.C. § 10802 and 42 C.F.R. § 51.2.

17.     Consistent with the PAIMI Act, DRCT's governing structure allows its constituents to express their collective views and protect their collective interests, and to participate in, significantly influence, and help guide DRCT's priorities and activities.

18.     DRCT has established a PAIMI Advisory Council ("Council") that advises DRCT on policies and priorities to be carried out in protecting and advocating for the rights of individuals with mental illness.  The Council complies with all requirements of 42 U.S.C. § 10805(a)(6).  The Chair of the Council sits on the Board of Directors of DRCT.

19.     The Council holds bi-monthly meetings to discuss, evaluate, and advise on DRCT's policies, priorities, procedures, and activities.  The Chair of the Council presents the substance of the Council's findings and conclusions to the Board of Directors at the monthly Board meetings.  The Council considers, nominates, and appoints its own members, including its Chairperson.  DRCT's Executive Director does not control or take part in the election of new members to the Council.  Council members may be removed only upon recommendation by the Council to the Executive Director.

20.     DRCT has established a grievance procedure whereby persons served under PAIMI or their representatives or family members may file a grievance when there is disagreement about a DRCT action or decision.  The grievance procedure is designed "to assure that individuals with mental illness have full access to the services of the system."  42 U.S.C. § 10805(a)(9).  The Council is the final decision-maker with respect to grievances filed by persons served under PAIMI or their representatives or family members.

6

21.     The Council, in conjunction with the Executive Director and Board of Directors, establishes DRCT's PAIMI priorities for each fiscal year at an annual meeting.

22.     The Council has voted to include a priority concerning DOC's in-cell shackling of prisoners with mental illness.  The Council has supported and approved DRCT's efforts to address the prolonged isolation and in-cell shackling of prisoners with mental illness.  The Council has also approved the commencement of this lawsuit to remedy that mistreatment of DRCT's Constituents.  The interests that DRCT seeks to vindicate by this lawsuit — protecting the rights of institutionalized individuals with mental illness — are germane to DRCT's central purpose and federal mandate.

23.     As demonstrated above, DRCT's Constituents have the power to participate in and exert significant influence over DRCT's policies, priorities, and activities.  DRCT provides the means by which these Constituents express their collective views and protect their collective interests.  DRCT is therefore the functional equivalent of a traditional membership organization, and DRCT's Constituents possess sufficient indicia of membership in DRCT so as to support DRCT's associational standing to sue on their behalf.

24.     DOC's continuing violations of the Eighth Amendment, ADA, and Section 504 have also directly and proximately caused injury, including economic injury and impairment, to DRCT itself.  DRCT has been forced to divert substantial resources over the past several years to investigating DOC's mistreatment of DRCT's Constituents, including DOC's actions that form the basis for the claims asserted in this litigation.  For example, and without limitation, DRCT has worked pursuant to the Council's priorities concerning prolonged isolation and restraint, including in-cell shackling, of DRCT's Constituents.  DRCT employees have spent a significant amount of time processing and reviewing DRCT's Constituents' complaints about DOC's

mistreatment of them, including the conditions that form the basis for the claims asserted in this litigation.  Given DOC's failure to remedy the situation, DRCT has also been forced to divert substantial resources to preparing to enforce the rights of DRCT's Constituents through this litigation.

### B.  Connecticut Department of Correction

25.  Defendant DOC is a public entity duly organized and existing under the laws of the State of Connecticut, and a government entity.  DOC employs more than 5,000 persons and is responsible for, and retains authority over, the operation of Northern and other Connecticut state prisons, including the housing and treatment of DRCT's Constituents.  DOC is charged with rendering care or treatment to DRCT's Constituents at Northern and other Connecticut state prisons.  DOC receives state and federal funds for the operation of Northern and other state prisons and has received such funds throughout the time period during which the acts described herein have continued.

### C.  Angel Quiros

26.  Defendant Angel Quiros is the Acting Commissioner of DOC.  Defendant Quiros, as Acting Commissioner, is the legal custodian of all prisoners confined in DOC facilities, is responsible for the safe, secure, and humane housing of those prisoners, and has authority over the assignment of prisoners to DOC's administrative statuses.  Defendant Quiros served as Warden of Northern from 2009 to 2011.  Defendant Quiros has acted within the scope of his employment and under color of state law at all times relevant hereto and in connection with all policies, procedures, practices, and conduct described herein.  Defendant Quiros is sued in his official capacity.

**D.      Roger Bowles**

27.      Defendant Roger Bowles is the Warden of Northern.  Defendant Bowles, as

Warden, is the legal custodian of all prisoners confined at Northern and is responsible for the

safe, secure, and humane housing of those prisoners.  Defendant Bowles has acted within the

scope of his employment and under color of state law at all times relevant hereto and in

connection with all policies, procedures, practices, and conduct described herein.  Defendant

Bowles is sued in his official capacity.

## FACTUAL ALLEGATIONS

**A.      DOC's Design of the Northern Supermax Prison**

28.      DOC opened Northern in March 1995 as Connecticut's first and only super-

maximum security prison.  DOC justified the enormous costs of constructing and maintaining

Northern as necessary to securely house the "worst of the worst," in the words of former DOC

Commissioner Leo Arnone.

29.      Northern was purposely designed to isolate prisoners and its conditions are

singularly oppressive.  According to John Kessler, the architect of Northern, "[w]hen we were

designing it, there was a desire that [prisoners'] first experience would make an impression —

the limited environment, the lack of stimulus. . . .  There is nothing soft.  It's hard, and they

wanted that." *The Worst of the Worst: Portrait of a Supermax* (2012) (interview with James

Kessler).  Former State Senator Joseph Crisco observed during a floor debate in 2012 that

"Northern Prison, death row . . . is hell on earth.  How one retains his sanity in an environment

like that is incomprehensible."  This Court recently determined that a special circumstances

prisoner's conditions of confinement at Northern constituted cruel and unusual punishment under the Eighth Amendment.  *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 23 (D. Conn. 2019).[1]

30.     As shown below (Figure 1), Northern's six housing units radiate outwards from a long, sloped, windowless corridor, meant to give the impression of walking underground.  Light and sound reverberate off the concrete walls and mirrored windows, which are purposefully arranged at irregular angles and create a disorienting, kaleidoscopic effect.



Figure 1
Aerial View of Northern

31.     Compounding this disorienting effect, there is a small room (the "bubble") at the center of each unit from which Northern staff control all movement and communication.  The bubble is covered with mirrored glass so that staff can see out but prisoners cannot see in.  Staff

---

[1] "Special Circumstances" is a status for prisoners sentenced to death before Connecticut abolished the death penalty.  DRCT does not, by this lawsuit, seek to address the conditions of confinement for Special Circumstances Status prisoners.  Those conditions of confinement are already at issue in *Reynolds v. Arnone*, No. 3:13-cv-1465 (SRU) (D. Conn.).

in the bubble monitor all activity within the unit from closed-circuit surveillance cameras and control all doors remotely.  Staff outside the bubble communicate via radio to move through the unit or open cell doors.  Staff inside the bubble may, at any time, be listening to prisoners in their cells.  The experience of being under constant surveillance by faceless watchers can confuse and distress prisoners, especially prisoners with mental illness, and often leads to psychosis and a significant break from reality.

32.     Each cell contains an intercom that connects with the bubble.  To speak with a staff member, a prisoner may press a button.  Staff inside the bubble may turn on the intercom at any time to speak with a prisoner.  Staff routinely ignore prisoners' calls over the intercom, which sometimes leads to prisoners covering their window, resulting in further punishment.

33.     The cells at Northern are designed to exacerbate the complete social and sensory deprivation.  The four walls of each cell are unfinished, grey concrete.  The only view outdoors comes through a narrow four-inch-wide slot at the back of each cell.

34.     Solid steel doors secure prisoners in the cells.  Each door has a small "trap" through which Northern staff pass food, medicine, and mail.  Northern staff also use the trap to handcuff prisoners, who must squat down and put their hands through to be shackled.

35.     Figures 2 through 5 (below), extracted from the documentary *The Worst of the Worst: Portrait of a Supermax* (2012), show a typical cell at Northern as viewed from the interior.  Figure 2 shows the sink and toilet.  Figure 3 shows the bed and desk.  Figure 4 shows the four-inch slot that constitutes the "window."  Figure 5 shows an example of the trap in the door.



Figure 2
Sink and Toilet



Figure 3
Bed and Desk



| Figure 4 |
| "Window" Slot |



| Figure 5 |
| Sink and Door |

36.    A prisoner's access to fresh air and direct sunlight comes from a trip to what is called the "recreation cage," a space slightly larger than a cell, surrounded by approximately fourteen-foot concrete walls and topped by a steel cage.  The only view is of the sky.  Figures 6

and 7, also taken from the documentary *The Worst of the Worst: Portrait of a Supermax* (2012),

show the "recreation cage."



Figure 6
"Recreation Cage"



Figure 7
"Recreation Cage"

**B.    DOC's Long History of Mistreating Prisoners with Mental Illness**

37.    Mental illness is prevalent at Northern.  Many prisoners there have histories of

mental illness, have been diagnosed with mental illness, and/or have been treated with

medication for mental illness.  In many cases, DOC itself has acknowledged and diagnosed the prisoners' mental illness.

38.     Northern's excessively harsh and isolating conditions cause prisoners with mental illness to suffer serious and sometimes catastrophic deterioration in their mental and physical health.  Those same harsh conditions cause previously healthy prisoners to develop mental illness.  Many prisoners swallow razors and other objects, smash their heads into the wall, and compulsively cut their own flesh.  Many prisoners hear voices, have suicidal thoughts, and attempt suicide.  Some have overdosed on drugs or hung themselves.

39.     Defendants have a demonstrated pattern of knowingly and deliberately incarcerating prisoners with mental illness at Northern since it opened twenty-six years ago. Defendants are ill-equipped and unable to provide for the mental health treatment needs for persons with mental illnesses and have knowingly imposed extraordinarily harsh living conditions although they have been on notice that doing so has had, and continues to have, deleterious effects on these individuals.

40.     On August 6, 2003, OPA, DRCT's predecessor, filed a lawsuit against DOC in the United States District Court for the District of Connecticut, alleging that prisoners and detainees with serious mental illness who were confined at Northern and Garner Correctional Institution ("Garner") were subjected to unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments.  *State of Connecticut Office of Protection and Advocacy for Persons with Disabilities v. Choinski*, No. 3:03-CV-01352 (D. Conn.) ("Choinski Litigation").

41.     On September 26, 2005, the District Court approved a Settlement Agreement in the Choinski Litigation (the "Settlement Agreement") and retained jurisdiction over the matter to enforce compliance with the Settlement Agreement.

42.     The Settlement Agreement provided that services for prisoners with serious mental illness would be consolidated at Garner, which would be designated as DOC's mental health institution.  All prisoners who met the definition of "seriously mentally ill," as determined by an independent evaluation process, had to be promptly removed from Northern.  The Settlement Agreement also called for increased staffing and changes to mental health evaluation and services.  All prisoners held in the most restrictive form of confinement at Northern were to be assessed by psychiatric experts to determine whether their placement was appropriate. Individuals with mental health scores of MH4 or MH5 (*i.e.*, a mental health disorder requiring specialized housing or ongoing intensive treatment, or crisis level mental disorder) were to be transferred to a facility with intensive psychiatric services such as Garner.  The Settlement Agreement also prohibited DOC from disciplining prisoners for actions that were the result of their mental illness.

43.     In 2008, the Settlement Agreement's judicial monitoring and compliance period ended.  The final independent audit carried out pursuant to the Settlement Agreement found substantial noncompliance by DOC, including a failure to remove prisoners with serious mental illness from Northern and a failure of doctoral-level clinicians to see prisoners within appropriate timeframes.

44.     DOC closed its independent ombudsman's office in 2009.  DOC then quickly reverted to using Northern as a heavy-handed solution for even routine and nonviolent behavioral issues, including those caused by mental illness.  While many prisoners had

documented histories and symptoms of mental illness at the time the Settlement Agreement ended, DOC, along with its employees, agents, and contractors, failed to ensure that these prisoners received meaningful mental health treatment.  Instead, under the supervision of Defendant Quiros, then Warden of Northern, staff at Northern often punished these individuals with disciplinary sanctions and in-cell shackling.

45.     Upon information and belief, people with mental illness, including those with serious mental illness and those at substantial risk of developing serious mental illness, comprise a substantial portion of Northern's population.  Although DOC has taken steps toward reducing the overall population at Northern in the past decade, those measures have not changed the daily reality for prisoners who remain trapped at Northern.

### C.     DOC's Transfer and Holding of Prisoners with Mental Illness at Northern

46.     Prisoners with mental illness, including those with serious mental illness and those at substantial risk of developing serious mental illness, end up at Northern through a variety of paths, including being assigned to one of the Special Management Programs, *i.e.*, Administrative Segregation, Security Risk Group, or Special Needs.

47.     Administrative Segregation is supposed to be reserved for individuals "whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that . . . can no longer be safely managed in general population." (Administrative Directive 9.4.)  Administrative Segregation has three phases.  Phase I occurs at Northern and lasts a minimum of 120 days.  Individuals in Phases II and III are currently housed at Garner, although some individuals complete the latter phases of the program at Northern as well.  Phases II and III last a minimum of 90 days each.

48.     Security Risk Group is supposed to be reserved for individuals whom DOC deems to have a gang affiliation.  (Administrative Directive 6.14.)  Phase I occurs at Northern and lasts

a minimum of 120 days.  But these prisoners must complete a total of five phases lasting at least

two years.  Later phases of the Security Risk Group program occur at other facilities.

49.     Special Needs Management is an open-ended status that DOC developed to

manage individuals who "have demonstrated behavioral qualities either through the serious

nature of their crime, behavior, or through reasonable belief that they pose a threat to the safety

and security of staff, other inmates, themselves, or the public."  (Administrative Directive 9.4.)

Individuals in Special Needs Management have typically been judged by the DOC to have

"failed" the Administrative Segregation or Security Risk Group statuses.  Special Needs

prisoners are typically sent to Northern, where they will spend a minimum of six months.

Special Needs prisoners are required to be seen by a mental health professional after 30 days of

initial placement and every 90 days thereafter.

50.     The Administrative Segregation, Security Risk Group, and Special Needs

Management prisoner stay at Northern is often far more than the minimum required.  Prisoners

are commonly held back for disciplinary infractions or if Northern staff decide that they have not

completed the required programming.  For example, even Administrative Segregation prisoners

who progress out of Northern to Phase II at another facility can find themselves quickly sent

back to Phase I at Northern to begin all over again.

51.     Prisoners with mental illness have even more difficulty managing the stress of

prison life and are likely to be placed into, and held back in, Administrative Segregation.  DOC

maintains oppressive conditions of confinement at Northern.  Consequently, once isolated,

prisoners with mental illness are often unable to maintain stable behavior and find themselves

held back in the program for disciplinary violations of all kinds.  The result is that prisoners with

mental illness can languish at Northern for months, years, or even indefinitely.

52.     Even after prisoners complete Administrative Segregation, Security Risk Group, or Special Needs Management, they can be placed on "Special Monitoring" status indefinitely. DOC subjects prisoners on this status to heightened supervision and monitoring per Administrative Directive 9.4.  They can be returned to Northern for any action deemed a "threat to safety and security," a broad term that can include self-harm behaviors, without a hearing.

**D.     DOC's Prolonged Isolation of Prisoners with Mental Illness**

53.     Prisoners with mental illness at Northern, including those with serious mental illness and those at substantial risk of developing serious mental illness, are subjected to prolonged isolation and sensory deprivation.  Administrative Segregation Phase I and Security Risk Group Phase I, which constitute the majority of Northern's population, impose the most restrictive conditions on prisoners, including prisoners with mental illness.

54.     Most prisoners at Northern are locked in their cells by themselves.  Regular conversation with anyone outside of the cell is impossible: individuals must shout through metal doors, air vents, and sink drains to communicate.

55.     Most prisoners are locked in their cells at least 22 hours per day on weekdays and 24 hours per day on weekends.

56.     All physical movement is highly restricted.  Prisoners remain locked in their cells except for a shower three times per week (or four times per week during the COVID-19 pandemic) and one hour of "recreation" five times per week, when prisoners are sent to the outdoor cage.  Security Risk Group prisoners allowed to "recreate" with other prisoners spend this time shackled with their hands behind their back.

57.     Typically, each time a prisoner leaves their small cell, they must submit to a humiliating and invasive "strip search" ritual, whereby they must strip naked, squat, and cough

to expose the testicles and anus.  DOC staff visually inspect the naked prisoner's hair, ears, nose, mouth, underarms, soles of feet, and cavities between the toes, rectum, and genitalia.

58.     Most prisoners, including all prisoners in Phase I of the Administrative Segregation and Security Risk Group programs, are shackled every time they leave their cell and must crouch to be handcuffed through the trap prior to exiting.

59.     DOC policy mandates strip searches when individuals go to or from the "recreation" cage, but prisoners are often subjected to full strip searches when they leave their cell for other purposes, including for mental health treatment or legal visits.  Many prisoners choose to avoid the humiliation, and often harassment, by simply remaining in their cells, where their only contact with others is conversations through sink drains and air vents.[2]

60.     Contact with the outside world is highly restricted.  On paper, DOC's administrative directives permit weekly calls and visits, with the permitted number of calls and visits varying by status.  In practice, however, visits and even phone calls are rare.  DOC routinely revokes visitation and call privileges as punishment for disciplinary violations; many people at Northern have accrued disciplinary violations and lost visiting and phone privileges for years or even decades.  Prisoners may receive visits from immediate family only, leaving many people cut off from loved ones — aunts, girlfriends, cousins, mentors, friends — who might otherwise provide critically needed social support.  Even when social visits do occur, they are noncontact and occur via phone through a thick, Plexiglass barrier.  Most prisoners must be shackled in full restraints (wrists, ankles, and tether chain) during visits.

---

[2] Prisoners at Northern on Special Needs status are granted a few additional hours of recreation per week. But these few chances for additional time out of cell are not granted to most of the individuals incarcerated at Northern, and when accessible, they are wholly insufficient to mitigate the overarching environment of deprivation and restriction.

61.     These extreme conditions fuel, and are fueled by, Northern's longstanding culture of violence and brutality.  While many DOC staff perform their jobs with the utmost professionalism, others engage in harassment, intimidation, or outright violence against prisoners.  DOC staff have tampered with prisoners' food, threatened retaliation if prisoners file a grievance or lawsuit, and spread misinformation about prisoners, including false allegations of child rape and molestation that provoke violence against them.  Verbal harassment by staff is commonplace, either in person or via intercom.  Some have even goaded prisoners with mental illness who were having suicidal thoughts, ignoring their pleas for treatment and encouraging them to hurt themselves.

62.     DOC staff also routinely and deliberately antagonize prisoners, inciting them to act out in order to justify the use of force.  As part of their punishment, prisoners are denied access to blankets and adequate clothing for days and sometimes weeks.

63.     This punishing and prolonged isolation and mistreatment is particularly taxing and is discriminatory toward prisoners with mental illness.  The prolonged isolation of these prisoners exacerbates mental illness and can lead to cognitive deterioration and heightened stress-related symptoms.  Prolonged isolation can also exacerbate, and in some cases cause, physical or psychiatric disabilities, such as gastrointestinal disorders, insomnia, eyesight deterioration, heart palpitations, migraines, and profound fatigue.  Even those who endure the effects of isolation better than others are subjected to intolerable conditions, as they are forced to endure the hallucinations and screaming of other prisoners suffering the debilitating effects of isolation.  In addition, together with the social and sensory deprivation, the cold temperatures interfere with sleep, likely contributing to feelings of anxiety and depression.

64.     Prolonged isolation in stressful conditions also often causes prisoners with mental illness to harm themselves or attempt suicide.  DOC staff routinely make arbitrary determinations that prisoners who threaten to or actually harm themselves are "malingering" and so provide no treatment at all.  Defendants expose prisoners to a substantial risk of serious irreparable harm despite the fact that self-harm and suicide are entirely predictable consequences of placing people with mental illness in prolonged isolation.

65.     There is also a well-established culture among many Northern staff of inflicting additional gratuitous indignities and cruelties upon prisoners — acts that serve to exacerbate the misery of the ordinary conditions of confinement at Northern.  Because prisoners are locked in their cells, staff have absolute power over each prisoner's environment.  Staff can and often do use their power to play games or engage in petty disputes, for example, by withholding a food tray or toilet paper, ignoring a request for medical care, or repeatedly using the intercom to insult the prisoner or to play disruptive noises or music.

66.     When a prisoner is outside of their cell during recreation or shower time, staff often perform "shakedowns" of the cell, ostensibly to search for contraband.  In practice, however, staff often use shakedowns as a pretext to tamper with a prisoner's personal property.  On numerous occasions, Northern staff have destroyed pictures of prisoners' family members.

67.     The isolative practices at Northern cause long-term psychological harm.  The psychological effects of prolonged isolation are well-documented, severe, and "analogous to the acute reactions suffered by torture and trauma victims."  Craig Haney, *Restricting the Use of Solitary Confinement*, 2018 Ann. Rev. Criminology 285, 295 (2018).  Individuals subjected to prolonged isolation are at substantial risk of experiencing "heightened levels of anxiety and panic," "irritability, aggression, and rage," "paranoia . . . and violent fantasies," "cognitive

dysfunction, hypersensitivity to stimuli, and hallucinations," "loss of emotional control," and "increased suicidality and instances of self-harm."  Craig Haney, *Restricting the Use of Solitary Confinement*, 2018 Ann. Rev. Criminology 285, 291 (2018); *see also* Jesenia Pizarro & Vanja M. K. Stenius, *Supermax Prisons: Their Rise, Current Practices, and Effect on Inmates*, 84 Prison J. 248, 256 (2004) (noting "declines in mental functioning," "difficulties in thinking, concentration and memory problems, and problems with impulse control" in incarcerated people subject to prolonged isolation).  One leading survey of the literature on the psychological effects of prolonged isolation concluded that prisoners subjected to prolonged isolation may develop "a confusional psychosis with intense agitation, fearfulness, and disorganization" and that "the harm caused by such confinement may result in prolonged or permanent psychiatric disability."  Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y 325, 354 (2006).

68.     Many courts have recognized the psychological harm inflicted by prolonged isolation.  In fact, this Court recently acknowledged the "growing consensus among the scientific community that solitary confinement inflicts severe harm on prisoners."  *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 12 (D. Conn. 2019).  *See also Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."); *Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting) (noting the petitioner "ha[d] developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Glossip v. Gross*, 576 U.S. 863, 926 (2015) (Breyer, J., dissenting) ("[I]t is well documented that . . . prolonged solitary confinement produces numerous deleterious harms."); *Porter v. Clarke*, 923 F.3d 348, 357 (4th

Cir. 2019) (finding that, based on the scientific literature, solitary confinement poses a

"substantial risk of serious psychological and emotional harm"); *Williams v. Sec'y Pa. Dep't of*

*Corr.*, 848 F.3d 549, 566-67 (3d Cir. 2017) (noting scientific consensus that solitary confinement

"is psychologically painful, can be traumatic and harmful, and puts many of those who have

been subject to it at risk of long-term . . . damage").

      69.    Prolonged isolation is also known to cause negative long-term physiological

effects.  These effects may include "pains in the abdomen and muscle pains in the neck and

back," "dizziness and loss of appetite," "lethargy and chronic tiredness," and "a constellation of

symptoms — headaches, trembling, sweaty palms, and heart palpitations — that is commonly

associated with hypertension."  Peter Scharff Smith, *The Effects of Solitary Confinement on*

*Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441, 488-92

(2006); *see also* Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax"*

*Confinement*, 49 Crime & Delinq. 124, 133 (2003); Brie A. Williams et al., *The Cardiovascular*

*Health Burdens of Solitary Confinement*, 34 J. Gen. Internal Med. 1977, 1977 (2019).  The

physiological harm caused by prolonged isolation is closely linked to the psychological harms of

this isolation; worsened physical symptoms may aggravate psychological symptoms, and vice

versa.  Justin D. Strong et al., *The Body in Isolation: The Physical Health Impacts of*

*Incarceration in Solitary Confinement*, PLoS ONE (2020).

      70.    United States and international institutions responsible for human rights and the

treatment of prisoners have recognized the devastating psychological and physiological impacts

of prolonged isolation.  These institutions agree that prolonged isolation of individuals with

mental illness violates standards of common decency.  In fact, there is broad consensus that

individuals with mental illness should not be placed in isolation unless absolutely necessary, under medical supervision, and only for brief periods of time.

(a)     The United Nations Standard Minimum Rules for the Treatment of Prisoners ("Mandela Rules") prohibit isolation of prisoners with psychiatric disabilities when those conditions would exacerbate their disabilities.  G.A. Res. 70/175 (Dec. 17, 2015).

(b)     The Inter-American Commission on Human Rights has established that isolation "should be absolutely prohibited . . . for persons with mental disabilities."  Press Release, Organization of American States, *IACHR Expresses Concern over Excessive Use of Solitary Confinement in the United States* (July 18, 2013).

(c)     American Bar Association ("ABA") standards recommend that "no prisoner diagnosed with serious mental illness should be placed in long-term segregated housing."  ABA, *ABA Standards for Criminal Justice: Treatment of Prisoners* (3d ed. 2011) ("ABA Standards").

(d)     The National Commission on Correctional Health Care states that "mentally ill individuals . . . should be excluded from solitary confinement of any duration."  Nat'l Comm. on Corr. Health Care, *Position Statement on Solitary Confinement* (Apr. 2016).

71.     Ultimately, DOC's policies and practices of prolonged isolation trap people with mental illness, including those with serious mental illness and those at substantial risk of developing serious mental illness, in a vicious cycle of deterioration and punishment.  Prolonged isolation causes prisoners' mental health to deteriorate and prompts them to act out.  Those actions, in turn, prompt DOC to respond with even harsher sanctions — including excessive use

of restraints — that cause prisoners' mental health to deteriorate still further.  Prisoners with mental illness find themselves caught in a downward spiral.

### E.     DOC's In-Cell Shackling of Prisoners with Mental Illness

72.     Defendants not only subject prisoners with mental illness to prolonged isolation in concrete cells but also violently extract them from these cells, shackle them, and then leave them shackled for hours or even days in filthy and freezing "strip cells."

73.     Northern staff routinely respond punitively with in-cell shackling when prisoners' mental illness is manifested through self-injurious or other behaviors.  Staff respond with force rather than appropriate mental health treatment.  Defendants, in fact, have failed to provide staff with the training required to identify and manage prisoners with mental illness.

74.     DOC staff also engage in violent cell extractions in order to restrain prisoners with in-cell shackling.  DOC staff routinely initiate these violent cell extractions in response to prisoners' nonviolent behaviors such as covering cell windows with paper or banging cell doors. Prisoners often engage in these behaviors as a result of the very conditions of isolation and extreme stress that DOC creates and maintains.

75.     During cell extractions, a group of DOC staff wearing body armor surround the prisoner's cell, spray chemical agent through the trap, force open the door, and restrain the prisoner, often assaulting the prisoner in the process.  DOC staff then shackle the prisoner's legs and wrists, binding their hands to their feet with a tether chain and fastening a belly chain around their waist.  DOC staff may also employ a "black box" that fastens the tether and belly chain together and prevents prisoners from having any range of motion with their hands.  Through a method of restraint called "four points," DOC staff may also shackle a prisoner's hands and feet to a metal bed.  In some instances, DOC staff employ an "upgraded status" of four-point restraints whereby they add mechanical restraints to the rubber cuffs used to shackle a prisoner.

76.     DOC staff then dump these prisoners in filthy and freezing concrete "strip cells" where they are left alone but still chained and shackled.  The cells' floors and walls are frequently covered with urine and feces, causing some prisoners to develop skin rashes and infections.  DOC staff frequently leave prisoners barefoot and wearing nothing but a one-piece smock (or "Ferguson gown"), causing prisoners to shiver for hours on end.

77.     The use of in-cell shackling and the duration of prisoners' placement in such restraints is punitive and arbitrary.  DOC staff subject prisoners to in-cell shackling despite the lack of any safety or security justification, or for far longer than is required to ensure safety and security.  Staff commonly keep prisoners in chains for a full 24 hours, and sometimes for days at a time, long after they have ceased their disruptive behavior and after any plausible safety or security justification has expired.  Prisoners are left in in-cell shackles for these extended periods of time without meaningful monitoring, in violation of DOC administrative directives and with deliberate indifference to and disregard for prisoners' safety and well-being.

78.     Significantly, pursuant to Administrative Directive 6.5, as applied by Defendants and their subordinates, restraints are used not only to prevent escape or injury, but also to "ensure compliance with an order."  This is true regardless of the order, the severity of the violation, or the reason for the behavior.  DOC staff have chained prisoners as punishment for past conduct, including for common, nonviolent infractions that predictably arise from confining people with mental illness in environments of prolonged isolation and stress.  For example, prisoners covering up a cell window with paper, a behavior that prisoners engage in as a last resort to seek the attention of staff, frequently results in in-cell shackling.

79.     DOC staff also use violent extractions and in-cell shackling to respond to self-harm and suicide attempts by prisoners with mental illness — instead of responding with appropriate options designed to safely de-escalate mental health crises.

80.     For example, DOC's own policies permit "therapeutic restraints" in response to instances where an individual poses a serious threat to his own safety.  "Therapeutic restraints" entail the use of softer restraints, in contrast to the metal chains used when prisoners are shackled, for a limited time period.

81.     However, DOC staff often choose not to use "therapeutic restraints" because they — without any medical justification — determine that individuals who engage in self-harm are merely "malingering."  Thus, DOC staff frequently subject prisoners with mental illness to violent cell extractions and in-cell shackling based on arbitrary and capricious determinations by staff lacking any medical qualifications that the prisoners are "malingering."  Prisoners subjected to in-cell shackling, unlike "therapeutic restraints," are not closely monitored by medical staff. This use of force, in turn, significantly exacerbates prisoners' mental illness, makes them more prone to self-harm or suicide, and increases the already substantial risk that they will suffer serious harm.

82.     Even when Northern staff do recognize a mental health emergency, they often respond with further isolation and punishment rather than treatment.  Mental health professionals are authorized to place individuals on Behavioral Observation Status ("BOS"), whereby individuals may be stripped of clothing and shoes, forced into a sleeveless quilted gown, deprived of all personal property, and denied all social or legal visits and calls.  A person may be confined to BOS while in in-cell restraints, or they may be confined in the medical unit, in which case they may be subjected to therapeutic restraints.

83.     BOS was originally designed to be used only for a limited period of time, on the recommendation of qualified mental health professionals, and for the purposes of ensuring a prisoner's immediate safety and security.  Today, by contrast, Northern staff regularly rely on BOS to "extinguish maladaptive behaviors," per Administrative Directive 9.4, seeking to coerce compliance among prisoners with mental illness.

84.     There is no medical or therapeutic justification for this so-called "treatment." DOC staff often impose BOS concurrently with in-cell shackling, and it is not uncommon for Northern staff to shuttle individuals between the various restrictive statuses, sometimes for weeks.

85.     Defendants' policy and practice of placing and leaving prisoners with mental illness in in-cell shackling is dangerous, painful, and injurious.  The tight shackling of hands and legs has caused bleeding on or around prisoners' wrists and ankles and has left prisoners with lasting scars, bruises, and numbness.  The "short-chaining" of the tether chain connecting hands to legs has prevented prisoners from being able to stand up straight or lie down in a fully extended manner, forcing them into a crouched position and causing significant, lasting pain.

86.     Defendants' policy and practice of placing prisoners in in-cell shackling is degrading and interferes with basic and necessary life activities.  The "strip cell" is typically very cold, yet prisoners do not have blankets, and the restraints prevent them from moving to keep themselves warm.  Shackled prisoners are also unable to properly eat or use the toilet.

87.     Subjecting prisoners to in-cell shackling falls far outside basic standards of decency and accepted professional norms.  The ABA directs that in-cell shackling should be used sparingly, and never "as a form of punishment or retaliation."  ABA Standard 23-5.9(a).  If restraints are used for "medical or mental health purposes," then it must be under the

authorization of a "qualified medical or mental health professional."  ABA Standard 23-5.9(d).

The use of restraints must also be of the "least restrictive form[]" possible, and "only as long as

the need exists."  ABA Standard 23-5.9(b).  Northern staff routinely violate these standards and

use restraints excessively and without any medical authorization.

88.     In many instances, the use of in-cell shackling at Northern rises to the level of

torture.  The Mandela Rules prohibit "[t]he use of chains, irons or other instruments of restraint

which are inherently degrading or painful," and, like the ABA Standards, prohibit the use of

restraints of any kind "as a sanction for disciplinary offenses."  *The United Nations Standard*

*Minimum Rules for the Treatment of Prisoners*, Rule 43.  Even when the use of restraints is

authorized, restraints are to be used only in the "least intrusive method" possible, and "only for

the time period required."  *Id.*, Rule 48.  When these rules are violated — as routinely happens at

Northern — the use of restraints may amount to torture.  Report of the Special Rapporteur, Theo

van Boven, ¶ 45, U.N. Doc E/CN.4/2004/56 (Dec. 23, 2003).

89.     This is particularly true if, as is the case at Northern, the person being subjected to

excessive and punitive restraints has a mental illness, because such persons are particularly

vulnerable to the mental and psychological harms of being immobilized.  Report of the Special

Rapporteur, ¶ 63, 89 U.N. Doc. A/HRC/22/53 (Feb. 1, 2013).  As recently as last year, the UN

Special Rapporteur on Torture concluded that the "Connecticut Department of Correction['s] . . .

repressive measures, such as prolonged isolation or indefinite isolation, excessive use of in-cell

shackling and needlessly intrusive strip searches . . . may well amount to torture."  Press Release,

U.N. Office of the High Comm'r for Human Rights, *United States: Prolonged Solitary*

*Confinement Amounts to Psychological Torture, Says UN Expert* (Feb. 28, 2020).

F.   **DOC's Failure to Make Reasonable Modifications to Policies, Practices, and Procedures to Avoid Discriminating Against Prisoners with Mental Illness**

90.    DOC fails to make reasonable modifications to policies, practices, and procedures that are necessary to accommodate prisoners with mental illness and that would allow those prisoners meaningful access to services, programs, and activities afforded to other prisoners. DOC has failed to reasonably modify its programs, services, and activities to provide DRCT's Constituents with needed mental health services in DOC's other facilities and instead transfers them to Northern where they are subjected to prolonged isolation and in-cell shackling.

91.    DOC fails to reasonably modify its policies, practices, and procedures when assigning prisoners with mental illness to Administrative Segregation and housing them at Northern; subjecting prisoners with mental illness to in-cell shackling and Behavioral Observation Status ("BOS") at Northern; and disciplining prisoners with mental illness and holding them back from progression through Administrative Segregation at Northern.  DOC's failure to furnish reasonable modifications to prisoners with mental illness punishes prisoners with mental illness for disability related conduct, exacerbates existing mental illness, and, sometimes, causes development of additional mental illness and/or exacerbation of symptoms of existing mental illness.

92.    For example, DOC has a policy, practice, and procedure or excluding certain psychiatric diagnoses as being "untreatable."  DOC draws a false distinction between different types of mental disorders.  DOC differentiates between mental disorders such as schizophrenia and bipolar disorder, formerly characterized as "Axis I" disorders in the APA's Diagnostic and Statistical Manual of Mental Illness ("DSM-IV"), and Borderline Personality Disorder ("BPD") and Antisocial Personality Disorder ("ASPD"), formerly characterized as "Axis II" disorders in

the DSM-IV.  The DSM-V eliminated the Axis I and Axis II labels, but DOC's false distinction between these disorders continues.

93.     Borderline Personality Disorder ("BPD") is a serious and treatable mental illness. Symptoms of BPD include recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior; affective instability due to a marked reactivity of mood; chronic feelings of emptiness; and stress-related paranoid ideation or severe dissociative symptoms.  A BPD diagnosis may be "defined, in part, by recurrent suicidal and self-injurious behaviors."  Up to seventy percent of people living with BPD attempt suicide during their lifetime; up to ten percent of people diagnosed with BPD die of suicide.  Michelle M. Wedig et al., *Predictors of Suicide Attempts in Patients with Borderline Personality Disorder over 16 Years of Prospective Follow-up*, 42 Psychol. Med. 2395 (2012).

94.     Antisocial Personality Disorder ("ASPD") is also a serious and treatable mental illness.  Symptoms of ASPD include failure to conform to social norms with respect to lawful behaviors, impulsivity, and failure to plan ahead.  Prisoners with ASPD are more likely to attempt suicide than those without.  "Individuals with ASPD diagnoses may be at increased risk for multiple suicide attempts over the course of their lifetime."  Emily B. Ansell et al., *Personality Disorder Risk Factors for Suicide Attempts over 10 Years of Follow-up*, 6 Personality Disorders 161 (2016).

95.     As a result of DOC's policies, practices, and procedures that erroneously deem BPD, ASPD, and other mental health conditions as being "untreatable" mental illnesses, DOC refuses to provide reasonable modifications for individuals diagnosed with such mental health disabilities.  DOC does not make reasonable modifications to prevent prisoners with BPD and ASPD, or numerous other mental illnesses, from being sent to Northern.  To the contrary, DOC

characterizes these as "untreatable" conditions and regularly targets persons with BPD and ASPD for Administrative Segregation and detention at Northern.

96.     Once at Northern, DOC staff often erroneously deem people diagnosed with BPD, ASPD, and other serious mental illnesses to be "malingering" and interpret their symptoms as willful misconduct that is met with further punishment such as in-cell shackling and BOS.

97.     Many prisoners with mental illness also receive disciplinary charges for behavior that is a symptom of their mental illness.  Some prisoners have received disciplinary charges for self-harm or for merely reporting to staff that they feel suicidal.  Prisoners have also received disciplinary charges for other nonthreatening conduct that is symptomatic of their illnesses, such as shouting, kicking the doors, and smearing their feces.  In fact, when individuals with BPD and ASPD engage in extreme and horrific acts of self-harm and suicidal ideation, DOC staff paradoxically rely on those diagnoses to characterize these behaviors as disingenuous and manipulative rather than recognizing them as behavioral manifestations of diagnosed mental illness.

98.     Thus, as a result of DOC's failure to make reasonable modifications to policies, practices, and procedures, prisoners with mental illness are often held back from progression through Administrative Segregation and face extended or even indefinite stays in prolonged isolation at Northern.

### G.     Current and Former Northern Prisoners with Mental Illness Confirm the Use of Prolonged Isolation, In-Cell Shackling, and Other Discrimination

#### (1)     Kyle Lamar Paschal-Barros

99.     Deja Paschal, who legally changed his name to Kyle Lamar Paschal-Barros in February 2017, is a 26-year-old man currently confined at Northern.  Mr. Barros is a constituent

of DRCT who has mental illness, as defined in 42 U.S.C. § 10802.  He is also a qualified

individual with a disability, as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(20).

100.    Mr. Barros first entered DOC custody in 2012 when he was just seventeen years

old.  Mr. Barros has engaged in significant acts of self-harm and has attempted suicide multiple

times while in DOC custody.  Since January 2017, Mr. Barros has primarily been confined at

Northern where he has been subjected to prolonged isolation.  Mr. Barros' experiences at

Northern have severely exacerbated his mental illnesses.

101.    Mr. Barros has a long and complex history of serious mental illness, dating back

to childhood.  From the time he was eight years old, Mr. Barros has been diagnosed with and

treated for bipolar disorder, major depressive disorder, BPD, posttraumatic stress disorder

("PTSD"), attention deficit hyperactivity disorder ("ADHD"), and obsessive-compulsive

disorder.  Some of these diagnoses occurred in community treatment settings, and many of these

diagnoses resulted from evaluation by DOC mental health practitioners.  All of these diagnoses

were made by qualified Connecticut mental health practitioners.

102.    Before and during his incarceration, Mr. Barros has been prescribed numerous

medications to treat his mental illnesses, including Prozac, Vistaril, prazosin, Paxil, Ritalin,

Abilify, and lithium.  Before his incarceration, Mr. Barros received intensive individualized

treatment plans for his mental illnesses.

103.    Shortly after his admission to the Manson Youth Institution in 2012, DOC

practitioners identified Mr. Barros' profound mental health needs and transferred him to Garner,

DOC's designated facility for "male offenders with significant mental health issues."  He

remained incarcerated at Garner from approximately July 2012 to January 2017.

104.    While he was at Garner, DOC practitioners diagnosed Mr. Barros with numerous mental illnesses, including bipolar disorder, PTSD, and ADHD.  He was placed on a number of psychiatric medications that provided some relief from the symptoms of his mental illnesses.

105.    Mr. Barros discovered that books were an important tool for his mental well-being, as they provided some self-help strategies for dealing with daily challenges.  Mr. Barros became an avid reader and accumulated many books.

106.    Even so, Mr. Barros continued to struggle.  When situations became unmanageable for him, Mr. Barros decompensated.  His deteriorating mental health condition led to self-harm, *e.g.*, head-banging, and suicide attempts.

107.    In January 2017, overwhelmed by symptoms of his mental illnesses, Mr. Barros attempted suicide by hanging himself.  Garner mental health staff placed Mr. Barros on suicide watch.  Several days later, ignoring that its own staff recognized Mr. Barros was in mental health crisis, DOC placed Mr. Barros on Administrative Segregation status and transferred him to Northern.

108.    As Mr. Barros entered Phase I of Administrative Segregation at Northern, DOC staff characterized his erratic and self-injurious behaviors as short-term behavioral problems rather than symptoms of his underlying mental illnesses.  Despite his well-documented history of serious mental illness and the recent suicide attempt, DOC staff discontinued all of his psychiatric medications.  At the time that Mr. Barros was taken off his medications, the injuries from his head-banging were still fresh.

109.    Subjected to prolonged isolation in Northern's isolating and disorienting conditions, and without needed medications, Mr. Barros rapidly decompensated.  He experienced intensifying paranoia, delusions, trauma-related flashbacks, hopelessness, and despair.

110.    As the symptoms of his mental illnesses escalated, Mr. Barros began accumulating disciplinary sanctions for behaviors such as covering his cell window with paper, failing to comply with orders, and engaging in altercations with DOC staff.  Mr. Barros engaged in these behaviors as a direct response to the symptoms he was experiencing.  These infractions prevented Mr. Barros from progressing through Phase I of Administrative Segregation for approximately sixteen months, four times the minimum required time.

111.    In May 2018, Mr. Barros finally reached Phase II of Administrative Segregation and was transferred to the Walker facility ("Walker") of the MacDougall-Walker Correctional Institution.  At Walker, Mr. Barros continued experiencing debilitating symptoms of mental illness.  He hallucinated that his cell was on fire and cut his arm with a sharp lid.  Mental health personnel at Walker resumed his psychiatric medication.

112.    In the months that followed, Mr. Barros' mental state continued to decline, and he was transferred back to Garner for stabilization in September 2018.  At Garner, mental health personnel effectively calibrated his medication regime, and he was deemed stable enough to return to Phase II of Administrative Segregation at Walker.

113.    Shortly after his arrival at Walker, DOC staff informed Mr. Barros that they "lost" his books.  Mr. Barros covered his cell window with paper to communicate his distress.  When Mr. Barros refused to remove the paper, DOC staff performed a violent cell extraction and confiscated Mr. Barros' remaining books.  In October 2018, as a consequence of this episode, DOC regressed Mr. Barros back to Phase I of Administrative Segregation and transferred him back to Northern.

114.    Since October 2018, Mr. Barros has left Northern only once.  In July 2019, Mr. Barros was transferred back to Garner for two months of intensive treatment after his mental

health badly deteriorated due to his months of isolation.  Mr. Barros has remained in Phase I of Administrative Segregation and been incarcerated at Northern continuously since September 2019.  Mr. Barros is typically confined to his small cell for 22 hours per day.

115.    While at Northern, Mr. Barros has been subjected to in-cell shackling more than ten times.  On almost every occasion, he was experiencing a mental health crisis and sought treatment.  But instead of treatment, DOC responded by shackling him which served only to exacerbate his mental health crisis.  Sometimes, Mr. Barros covered his window as a desperate call for mental health intervention and was subsequently cited for a disciplinary violation and placed in in-cell shackles.  Once, in early 2018, he was shackled after a suicide attempt that DOC medical staff deemed "nonlethal."

116.    Each time he was subjected to in-cell shackling, Northern staff left Mr. Barros naked (but for a safety gown) and chained in an unsanitary and cold "strip cell."  Mr. Barros felt as though he was trapped in a "cold cement doghouse," where he was forced to dump his food onto wax paper on the floor and eat like a dog.  Mr. Barros experienced traumatic flashbacks, and staff sometimes compounded his distress by playing continuous bell sounds over the intercom into the strip cell where he lay shackled.

117.    The absence of rehabilitative or other meaningful programming at Northern further impairs Mr. Barros' parole eligibility.  Under his "Offender Accountability Plan," in order to be eligible for parole, Mr. Barros is required to participate in classes on anger management, "good intentions, bad choices," and restorative relationship-building with victims. While these programs are offered at other DOC facilities, they are not offered at Northern. Further, when Mr. Barros was on Administrative Segregation status at Walker, the parole board

notified him that, so long as he is on Administrative Segregation status, Mr. Barros has no opportunity for a parole hearing.

118.    Mr. Barros has recurring nightmares about the prison and its suffocating physical structure, along with its extremely harmful and mentally damaging practices.

### (2)    Kezlyn Méndez

119.    Kezlyn Méndez is a 34-year-old man currently incarcerated in the MacDougall building ("MacDougall") of the MacDougall-Walker Correctional Institution in Suffield, Connecticut.  Mr. Méndez is a constituent of DRCT who has mental illness, as defined in 42 U.S.C. § 10802.  He is also a qualified individual with a disability, as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(20).

120.    Mr. Méndez first entered DOC custody in 2005, at age eighteen.  Mr. Méndez has engaged in acts of self-harm and has attempted suicide multiple times while in DOC custody.  Over his time in DOC custody, Mr. Méndez has spent more than five years at Northern where he was subjected to prolonged isolation and repeated in-cell shackling.

121.    Mr. Méndez has struggled with mental illness his entire life.  Beginning in early childhood, he has received many psychiatric diagnoses, including bipolar disorder and PTSD.  Many of these diagnoses were made by mental health practitioners within the State of Connecticut, and some of these diagnoses were made or confirmed by DOC mental health personnel.

122.    Mr. Méndez has a significant history of childhood trauma and mental illness that leaves him highly vulnerable to stressful triggers.

123.    At age six, Mr. Méndez was hit by a police car and sustained catastrophic physical injuries, including a head injury that left him unconscious.  He underwent over three

years of rehabilitation, and had to relearn to read, write, speak, and walk.  He has a minor speech impediment and continues to experience blackouts.

124.    Mr. Méndez received both inpatient and outpatient psychiatric treatment in several Connecticut institutions throughout his childhood.

125.    Between 2005 and the present, Mr. Méndez has served four sentences in DOC custody, totaling almost fourteen years.  Throughout his time in custody, Mr. Méndez has consistently experienced symptoms of his mental illnesses, such as attempting suicide, anxiety, paranoia, flashbacks to previous violent events, sleep disturbances, anhedonia, and depression.

126.    When Mr. Méndez initially entered DOC custody at age eighteen, DOC clinicians recognized his mental illnesses and transferred him to Garner for intensive treatment following a suicide attempt.  Mr. Méndez was at Garner from approximately December 2005 to April 2006.

127.    In July 2006, despite its awareness of Mr. Méndez's mental illnesses, DOC sent Mr. Méndez to Northern.  This transfer came less than three months after Mr. Méndez left Garner.

128.    The prolonged isolation that Mr. Méndez experienced at Northern led to a significant deterioration in his mental health.  He became ambivalent about human interaction, wavering between a strong desire for human connection and a pronounced fear and mistrust of others.  He also experienced hallucinations, hearing disembodied voices and having conversations with people that were not there.

129.    In 2012, DOC again placed Mr. Méndez at Garner in light of his deteriorating mental health.  Nonetheless, DOC returned Mr. Méndez to isolation at Northern in 2013. Mr. Méndez was most recently incarcerated at Northern from December 2017 to May 2018.

130.    All told, DOC has cycled Mr. Méndez in and out of Northern on six separate occasions, from 2005 to the present.  He has spent more than five years there.

131.    Northern's harsh environment exacerbated Mr. Méndez's mental illnesses, and he often found compliance with DOC policies more difficult.  For example, desperate for human interaction, he would put his hand through the trap of his cell door, in violation of DOC policy. In addition, Mr. Méndez accumulated disciplinary sanctions as his mental health deteriorated, ranging from disobeying direct orders to physical altercations with DOC staff.  These disciplinary violations prolonged Mr. Méndez's confinement at Northern and resulted in additional punishments, such as in-cell shackling.

132.    DOC subjected Mr. Méndez to in-cell shackling at Northern on three occasions. On each occasion, DOC left Mr. Méndez shackled for between 24 and 72 hours.  Each time, Mr. Méndez was also strip searched and left to wear only a jumper (with no boxers or socks) while chained in cold and unsanitary environments, including in a strip cell that had feces on the wall and smelled of ammonia.  While shackled, Mr. Méndez was unable to physically wipe himself after using the bathroom, and had to urinate in the sink because the toilet in the cell was left unflushed.

133.    In one particularly violent instance, DOC staff subjected him to sexual and physical abuse while forcefully restraining him after ordering him to take off his clothes.  One officer punched him in the stomach, and a second grabbed and twisted Mr. Méndez's testicles.

134.    Mr. Méndez's mental health symptoms have been exacerbated by his repeated placement in prolonged isolation at Northern and repeated in-cell shackling.  He experiences heightened anxiety and paranoia, which has led to episodes where he experiences difficulty

breathing, heart palpitations, and an inability to concentrate.  He also feels deep discomfort with living in close proximity to other people and has struggled with frequent suicidal thoughts.

135.    To this day, Mr. Méndez remains at risk of return to Northern.  The possibility of returning to Northern causes Mr. Méndez to feel fear and anxiety, as he recognizes that Northern exacerbated his mental health symptoms.  In particular, Mr. Méndez fears and expects that further deterioration of his mental health would occur should he be transferred back to Northern's harsh and isolative environment.

### (3)    Tyrone Spence

136.    Tyrone Spence is a 29-year-old man in DOC custody currently incarcerated in the Corrigan building ("Corrigan") of the Corrigan-Radgowski Correctional Institution in Uncasville, Connecticut.  Mr. Spence is a constituent of DRCT who has mental illness, as defined in 42 U.S.C. § 10802.  He is also a qualified individual with a disability, as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(20).

137.    Mr. Spence has been in DOC custody since July 2010, when he was nineteen years old.  Mr. Spence has spent over three years at Northern.  He was incarcerated at Northern for all but two months of a period from March 2011 to November 2013, and he was transferred in and out of the facility multiple times between December 2017 and September 2019.  While at Northern, Mr. Spence was subjected to prolonged isolation and repeated in-cell shackling.  He is at constant and continued risk of being transferred back to, and being confined at, Northern.

138.    Mr. Spence has a long history of serious mental illness, including PTSD, anxiety, BPD, depression, and dissociation.  His mental health symptoms include suicidal ideation, self-injurious behaviors, and he has attempted suicide on several occasions while incarcerated.

139.     Mr. Spence suffered prenatal exposure to cocaine and significant neglect and physical abuse in early childhood.  Throughout his childhood and adolescence, Mr. Spence received psychiatric care for his mental illnesses at numerous facilities, including the Institute of Living, Riverview Children's Hospital, and Yale New Haven Hospital.

140.     Before and during his incarceration, Mr. Spence had been prescribed medication to treat his mental illness, including, but not limited to chlorpromazine (Thorazine), clonazepam (Klonopin), clonidine, and guanfacine.

141.     On May 6, 2018, Mr. Spence asked to be seen by Northern mental health staff through written requests and subsequent verbal appeals to his custody officers.  But mental health staff refused to see him until the following day.  On May 7, 2018, Mr. Spence cut his wrists and ingested pills and battery acid.

142.     Staff at Northern have given Mr. Spence disciplinary sanctions for behaviors that are symptoms of his mental illness, including instances of self-harm.  The isolating conditions at Northern contributed to these symptoms.

143.     For instance, after the suicide attempt on May 7, 2018, Mr. Spence received a disciplinary ticket on the grounds that he had disrupted the health and safety of staff and other prisoners at Northern.

144.     In September 2019, Mr. Spence again attempted suicide using pills while at Northern.  He was then sent to Garner, where he completed the Administrative Segregation program.

145.     At Northern, Mr. Spence has been subjected to in-cell shackling numerous times. He recalls being shackled more than 50 times while in DOC custody and believes that a majority of these instances occurred at Northern.  Mr. Spence recalls being shackled with four-point

restraints more than ten times.  He has also been subjected to black box restraints, an experience

he remembers as "the worst": "You can't sit down without hurting your hands or your wrists.

When you sit down it pushes the chain into your wrist.  The only way you can be comfortable is

if you stand up."

146.    DOC staff subjected Mr. Spence to in-cell shackling in response to Mr. Spence's

frequent instances of self-harm, which DOC staff characterized as behavioral and not worthy of

medical intervention.  When Mr. Spence cut himself, DOC staff accused him of engaging in

attention-seeking behavior and subjected him to in-cell shackling.  In fact, Mr. Spence's

instances of self-harm were a direct outgrowth of his mental illnesses and his worsening

condition due to Northern's isolating environment.

147.    The possibility of returning to Northern continues to haunt Mr. Spence.  After

completing the Administrative Segregation program, Mr. Spence he was placed on "Special

Monitoring" status leaving him under constant threat of return to Northern.

148.    Mr. Spence has suffered from acute anxiety as a result of his experiences being

shackled.  He has found that seeing shackles or experiencing shackling can quickly trigger

feelings of anxiety.  After his experiences at Northern, he continues to fear experiencing violence

when he is around DOC staff.

149.    Mr. Spence received numerous disciplinary tickets for self-harm, a manifestation

of his mental illness.  As a result, he lost various privileges, such as phone and commissary

access.

150.    Mr. Spence has also been denied access to programs as a result of his mental

health symptoms.  While in the Administrative Segregation program, he sought access to

programming, particularly the opportunity to participate in a mental health group, but was repeatedly rebuffed by DOC staff.

### H. Defendants Have Refused to Stop the Cruel and Unusual Mistreatment of Prisoners with Mental Illness

151. The cruel and unusual conditions of confinement described above both punish individuals and exacerbate their mental illness, leading to a downward spiral of further punishment and further psychiatric deterioration.

152. Defendants have had full knowledge of those conditions and of their devastating effects on incarcerated people. Indeed, Defendants' own Restrictive Housing Matrix provides that prisoners at Northern are to be seen by a mental health professional within 30 days and then every 90 days thereafter. Nevertheless, Defendants have condoned or been deliberately indifferent to the underlying conditions and mistreatment of prisoners with mental illness.

153. Defendants have repeatedly been made aware of these conditions by lawmakers, oversight bodies, litigation, prisoners' grievances, media reporting, and other means, but have failed to take reasonable corrective action. Former DOC Commissioner Rollin Cook once said, "When you isolate people and when you lock them up and don't give them access to speak to other people or see light, that makes them worse. . . . It doesn't make them better." Whittney Evans, *Outgoing Utah Corrections Boss Wants to Make People Better than They Arrived*, KUER (Apr. 18, 2018). Unfortunately, Commissioner Cook did not do anything effectual to change the conditions and practices at Northern.

154. On November 23, 2020, DRCT sent a letter to Angel Quiros, Acting DOC Commissioner, and Roger Bowles, Northern Warden, expressing grave concern over the prolonged isolation and in-cell shackling of prisoners with mental illness at Northern. DRCT's

letter was received by DOC on November 24, 2020. In the letter, DRCT requested that DOC confirm it will implement the following changes:

      (a)    immediately and permanently cease the use of in-cell restraints on individuals with mental illness, including those at substantial risk of developing serious mental illness, at Northern;

      (b)    immediately and permanently cease subjecting individuals with mental illness, including those at substantial risk of developing serious mental illness, at Northern to prolonged isolation; and

      (c)    immediately cease subjecting any persons at Northern to prolonged isolation or in-cell restraints until such time that DOC demonstrates that it has implemented an independent and effective mechanism to screen out all persons with mental illness, including those at substantial risk of developing serious mental illness.

155.    On January 22, 2021, DOC responded that the letter had been received but was delayed in reaching the Commissioner's Office, and that the allegations were being reviewed. DRCT responded to DOC's letter but DOC has not yet provided any substantive response.

156.    The conditions described herein are likely to persist unless enjoined by this Court. DRCT has no alternative adequate remedy at law.

## CAUSES OF ACTION

### First Cause of Action
(42 U.S.C. § 1983: Eighth and Fourteenth Amendments;
prolonged isolation of individuals with serious mental illness)

157.    DRCT repeats and realleges each allegation set forth in Paragraphs 1 through 156 above as if fully set forth herein.

158.    This claim is brought against Defendants Quiros and Bowles in their official

capacity.  Defendants Quiros and Bowles acted under color of state law at all times relevant

hereto and in connection with all events described herein.

159.    Defendants Quiros and Bowles, and their agents, officials, employees, and others

acting in concert with them under color of state law, by and pursuant to DOC's policy, custom,

and practice, have violated and continue to violate the rights of DRCT's Constituents by

depriving them of their right to be free from cruel and unusual punishment guaranteed by the

Eighth Amendment to the United States Constitution, as applied to the State of Connecticut

through the Fourteenth Amendment to the United States Constitution.

160.    Defendants Quiros and Bowles, and their agents, officials, employees, and others

acting in concert with them under color of state law, by and pursuant to DOC's policy, custom,

and practice of prolonged isolation of DRCT's Constituents, have subjected DRCT's

Constituents to dangerous and degrading mistreatment, caused them serious pain and injury,

placed them at substantial risk of serious physical and psychological injury, acted contrary to

standards of decency, and denied them the minimal civilized measure of life's necessities.

Defendants Quiros and Bowles, and their agents, officials, employees and others acting in

concert with them under color of state law, by and pursuant to DOC's policy, custom, and

practice of prolonged isolation of DRCT's Constituents, continue to subject DRCT's

Constituents to dangerous and degrading mistreatment, cause them serious pain and injury, place

them at substantial risk of serious physical and psychological injury, act contrary to standards of

decency, and deny them the minimal civilized measure of life's necessities.

161.    Defendants Quiros and Bowles, and their agents, officials, employees and others

acting in concert with them under color of state law, by and pursuant to DOC's policy, custom,

and practice of subjecting DRCT's Constituents to prolonged isolation at Northern (1) have unnecessarily and wantonly inflicted, and continue to unnecessarily and wantonly inflict, pain upon them; (2) have acted and continue to act with deliberate indifference to their health, safety, and serious medical needs; and (3) knew and continue to know the risk to the health, safety, and serious medical needs of DRCT's Constituents but have disregarded that risk and failed to take any reasonable measures to abate that risk.

162.    Defendants Quiros and Bowles and their agents, officials, employees and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice have subjected and continue to subject DRCT's Constituents to prolonged isolation at Northern for punitive or retaliatory purposes, and not in a good faith effort to ensure safety or security or, at times, maintained them in prolonged isolation for longer than safety and security required.

163.    Defendants Quiros and Bowles authorized, condoned, and failed to exercise their supervisory authority to prevent the illegal prolonged isolation of DRCT's Constituents by their agents, officials, employees, and others acting in concert with them under color of state law, and are continuing to authorize, condone, and fail to exercise their supervisory authority to stop that illegal practice.

164.    Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law to subject prisoners with mental illness to prolonged isolation, have inflicted, and continue to inflict, cruel and unusual punishment on DRCT's Constituents in violation of the Eighth Amendment to the United States Constitution, as applied to the State of Connecticut through the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983.

165.    Defendants Quiros and Bowles, and their agents, officials, employees, and all persons acting in concert with them under color of state law, are the proximate cause of the ongoing deprivation of constitutional rights of DRCT's Constituents.

166.    As a result of the actions of Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, DRCT's Constituents have suffered and continue to suffer irreparable harm.

167.    Unless enjoined, Defendants Quiros and Bowles, and their agents, officials, employees and others acting in concert with them under color of state law, will continue the prolonged isolation of DRCT's Constituents in violation of the Eighth and Fourteenth Amendments, and continue to inflict injuries for which such prisoners have no adequate remedy at law.

168.    DRCT is entitled to an injunction against the prolonged isolation of DRCT's Constituents by Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law.

**<u>Second Cause of Action</u>**
(42 U.S.C. § 1983: Eighth and Fourteenth Amendments;
in-cell shackling of individuals with mental illness)

169.    DRCT repeats and realleges each allegation set forth in Paragraphs 1 through 168 above as if fully set forth herein.

170.    This claim is brought against Defendants Quiros and Bowles in their official capacity.  Defendants Quiros and Bowles acted under color of state law at all times relevant hereto and in connection with all events described herein.

171.    Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice, violated and continue to violate the rights of DRCT's Constituents by depriving

them of their right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution, as applied to the State of Connecticut through the Fourteenth Amendment to the United States Constitution.

172.     Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice of in-cell shackling of DRCT's Constituents, have subjected DRCT's Constituents to dangerous and degrading mistreatment, caused them serious pain and injury, placed them at substantial risk of serious injury, acted contrary to standards of decency, and denied them the minimal civilized measure of life's necessities.  Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law by and pursuant to DOC's policy, custom, and practice of in-cell shackling of DRCT's Constituents, continue to subject DRCT's Constituents to dangerous and degrading mistreatment, cause them serious pain and injury, place them at substantial risk of serious physical and psychological injury, deny them the minimal civilized measure of life's necessities, and act contrary to standards of decency.

173.     Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice of subjecting DRCT's Constituents to in-cell shackling (1) have unnecessarily and wantonly inflicted, and continue to unnecessarily and wantonly inflict, pain upon them; (2) have acted and continue to act with deliberate indifference to their health, safety, and serious medical needs; and (3) knew and continue to know the risk to the health, safety, and serious medical needs of DRCT's Constituents but have disregarded that risk and failed to take any reasonable measures to abate that risk.

174.    Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, by and pursuant to DOC's policy, custom, and practice, subjected and continue to subject DRCT's Constituents to in-cell shackling maliciously and sadistically, and for punitive or retaliatory purposes.  In many instances, they used in-cell shackling to punish DRCT's Constituents for behavior that predictably arises from their own actions — that is, from placing people with mental illness in prolonged isolation at Northern.

175.    Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, did not and do not instigate or continue to subject DRCT's Constituents to in-cell shackling in a good faith effort to maintain or restore discipline, to ensure the safety or security of others, or to ensure their own safety or security.

176.    Defendants Quiros and Bowles authorized, condoned, and failed to exercise their supervisory authority to prevent, the illegal in-cell shackling of DRCT's Constituents by their agents, officials, employees, and others acting in concert with them under color of state law, and continue to authorize, condone, and fail to exercise their supervisory authority to stop that illegal practice.

177.    Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law by the in-cell shackling of prisoners with mental illness, have inflicted, and continue to inflict, cruel and unusual punishment on DRCT's Constituents in violation of the Eighth Amendment to the United States Constitution, as applied to the State of Connecticut through the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983.

178.     Defendants Quiros and Bowles, and their agents, officials, employees, and all persons acting in concert with them under color of state law are the proximate cause of the ongoing deprivation of constitutional rights of DRCT's Constituents.

179.     As a result of the actions of Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law, DRCT's Constituents at Northern have suffered and continue to suffer irreparable harm.

180.     Unless enjoined, Defendants Quiros and Bowles, and their agents, officials, employees and others acting in concert with them under color of state law, will continue the in-cell shackling of DRCT's Constituents in violation of the Eighth and Fourteenth Amendments, and to inflict injuries for which such prisoners have no adequate remedy at law.

181.     DRCT is entitled to an injunction against the in-cell shackling of DRCT's Constituents by Defendants Quiros and Bowles, and their agents, officials, employees, and others acting in concert with them under color of state law.

### Third Cause of Action
(Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; failure to implement reasonable modifications for persons with mental illness)

182.     DRCT repeats and realleges each allegation set forth in Paragraphs 1 through 181 above as if fully set forth herein.

183.     This claim is asserted against DOC.

184.     DOC, by the policies and practices described herein, has violated and continues to violate the rights of DRCT's Constituents secured by the ADA.  DOC has violated, and continues to violate, the rights of DRCT's Constituents by failing to make reasonable modifications to policies, practices, and procedures needed in order for these prisoners to enjoy meaningful access to services, programs, and activities.

185.    The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

186.    The ADA has been implemented regulations promulgated by the United States Department of Justice, 28 C.F.R. § 35.101 *et seq*., providing, *inter alia*, that public entities: (a) shall not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service," 28 C.F.R. § 35.130(b)(1)(i); and (b) "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the [DOC] can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7).

187.    DRCT's Constituents are qualified individuals with disabilities within the meaning of the ADA, 42 U.S.C. §§ 12102, 12131, and 28 C.F.R. § 35.104.  DRCT's Constituents have mental impairments or illnesses that substantially limit their ability to perform major life activities, such as caring for themselves, working, concentrating, thinking, and communicating with others.  Many of DRCT's Constituents also have records of mental impairment or illness, and are regarded as having such mental impairment, or illness.

188.    DOC is a public entity within the meaning of and subject to Title II of the ADA. *See* 42 U.S.C. § 12131(1).  DOC is responsible for the operation and management of correctional facilities, including Northern, and subject to the ADA Regulations at 28 C.F.R. § 35.152 *et seq.* DOC is legally responsible for ADA violations committed by DOC staff and contractors who

provide programs, services, or activities, including, but not limited to, mental health services, to DOC prisoners including DRCT's Constituents. *See* 28 C.F.R. § 35.130(b)(1).

189. DOC services, programs, and activities are covered by the ADA. The services, programs, and activities that DOC provides to individuals in its custody include, but are not limited to, sleeping, eating, showering, toileting, communicating with those outside the prison by mail and telephone, exercising, entertainment, safety and security, the prison's administrative, disciplinary, and classification proceedings, medical and mental health services, the library, educational, vocational, substance abuse, and anger management classes, and discharge services.

190. DOC is, and at all times relevant hereto was, aware of the mental illness of DRCT's Constituents and has failed to implement reasonable modifications to policies, practices, or procedures needed in order for these prisoners to enjoy meaningful access to services, programs, and activities and to avoid discrimination on the basis of disability. DOC has violated, and continues to violate, the rights of DRCT's Constituents by failing to provide reasonable modifications to policies, practices, or procedures in order to proscribe discrimination against prisoners with mental illness.

191. For example, DOC fails to reasonably assess and account for mental illness or otherwise provide reasonable modifications to policies, practices, and procedures in connection with assigning DRCT's Constituents to Administrative Segregation and housing them at Northern where they are subject to prolonged isolation.

192. DOC fails to reasonably assess and account for mental illness or otherwise provide reasonable modifications to policies, practices, and procedures in connection with subjecting DRCT's Constituents to in-cell shackling and BOS at Northern.

193.    DOC fails to reasonably assess and account for mental illness or otherwise provide reasonable modifications to policies, practices, or procedures in connection with issuing disciplinary tickets to DRCT's Constituents at Northern, holding them from progression through Administrative Segregation, or otherwise maintaining them at Northern where they are subject to prolonged, or even indefinite, isolation and in-cell shackling.

194.    DOC, by subjecting prisoners with mental illness to prolonged isolation at Northern and by the use of frequent in-cell shackling and BOS, excludes these prisoners from participation in, denies them the benefits of, and discriminates against them with respect to equal access to, and the provision of, services, programs, and activities that are accessible to other prisoners.  DOC's exclusion, denial, and discrimination are solely by reason of these prisoners' mental illness.

195.    In sum, DOC has failed to make reasonable modifications to policies, practices, or procedures to ensure that prisoners with mental illness are able to enjoy meaningful access to services, programs, and activities.

196.    DOC, by virtue of the above-described discrimination and mistreatment of prisoners with mental illness, has violated the ADA, including its supporting regulations.

197.    DOC's failure to meet its obligations to prisoners with mental illness constitutes an ongoing and continuous violation of the ADA and its supporting regulations and continues to inflict irreparable harm on these prisoners.  Unless enjoined, DOC will continue to violate the ADA and to inflict injuries for which prisoners with mental illness have no adequate remedy at law.

198.    The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities.  42 U.S.C. § 12188(a)(1).

199.     DRCT is entitled to injunctive relief to prevent DOC's continued violation of the

ADA, as well as reasonable attorneys' fees and costs incurred in connection with bringing this

action.

**Fourth Cause of Action**
(Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a);
failure to provide reasonable accommodation for persons with mental illness)

200.     DRCT repeats and realleges each allegation set forth in Paragraphs 1 through 199

above as if fully set forth herein.

201.     This claim is asserted against DOC.

202.     DOC, by the policies and practices described herein, has violated and continues to

violate the rights of DRCT's Constituents secured by the Section 504 and its implementing

regulations.  DOC has violated, and continues to violate, the rights of DRCT's Constituents by

denying them reasonable modification in policies, practices, and procedures needed in order for

them to enjoy meaningful access to services, programs, and activities.

203.     Section 504 provides, in relevant part, that "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from participation in, be denied benefits of, or be subjected to discrimination under any

program or activity receiving federal financial assistance."  29 U.S.C. § 794(a).

204.     Section 504 has been implemented by DOJ-issued regulations, providing, *inter*

*alia*, that recipients of federally funded programs and activities shall not "utilize criteria or

methods of administration . . . that have the effect of subjecting qualified handicapped persons to

discrimination on the basis of handicap," 45 C.F.R. § 84.4(b)(4).

205.     DRCT's Constituents are qualified individuals with disabilities within the

meaning of Section 504, 29 U.S.C. § 705(20), 42 U.S.C. § 12102.  DRCT's Constituents have

significant mental impairments, or illnesses, that substantially limit their ability to perform major life activities, such as caring for themselves, working, concentrating, thinking, and communicating with others.  Many of DRCT's Constituents also have records of such their mental impairment or illness, and are regarded as having such mental impairment, or illness.

206.    DOC receives federal grants, contracts, and other financial assistance thereby subjecting itself to the requirements of Section 504.  29 U.S.C. § 794(a).  DOC is legally responsible for Section 504 violations committed by DOC staff and contractors who provide programs, services, or activities, including but not limited to mental health services, to DOC prisoners including DRCT's Constituents.

207.    DOC programs and activities are covered by Section 504, 29 U.S.C. § 794(b)(1). These programs and activities that DOC provides to prisoners in its custody include, but are not limited to, sleeping, eating, showering, toileting, communicating with those outside the prison by mail and telephone, exercising, entertainment, safety and security, the prison's administrative, disciplinary, and classification proceedings, medical and mental health services, the library, educational, vocational, substance abuse, and anger management classes, and discharge services.

208.    DOC is, and was at all times relevant hereto, aware of the mental illness of prisoners with mental illness and has failed to implement reasonable modification to policies, practices, or procedures needed in order for these prisoners to enjoy meaningful access to services, programs, and activities and to avoid discrimination on the basis of disability.  DOC has violated, and continues to violate, the rights of people with mental illness by failing to make reasonable accommodations to policies, practices, or procedures in order to proscribe discrimination against prisoners with mental illness.

209.    For example, DOC fails to reasonably assess and account for mental illness or otherwise make reasonable modification to policies, practices, and procedures in connection with assigning DRCT's Constituents to Administrative Segregation and housing them at Northern where they are subject to prolonged isolation.

210.    DOC fails to reasonably assess and account for mental illness or otherwise make reasonable modification to policies, practices, and procedures in connection with subjecting DRCTs Constituents to in-cell shackling and BOS at Northern.

211.    DOC fails to reasonably assess and account for mental illness or otherwise make reasonable modification to policies, practices, or procedures in connection with issuing disciplinary tickets to DRCT's Constituents, holding them from progression through Administrative Segregation, or otherwise maintaining them at Northern where they are subject to prolonged, or even indefinite, isolation and in-cell shackling.

212.    DOC, by subjecting prisoners with mental illness to prolonged isolation at Northern, and by the use of frequent in-cell shackling and BOS, excludes these prisoners from participation in, denies them the benefits of, and discriminates against them with respect to services, programs, and activities that are accessible to other prisoners.  DOC's exclusion, denial, and discrimination are solely by reason of these prisoners' mental illness.

213.    In sum, DOC has not made any reasonable modification to policies, practices, or procedures to ensure that prisoners with mental illness are able to enjoy meaningful access to services, programs, and activities.

214.    DOC, by virtue of the above-described discrimination and mistreatment of prisoners with mental illness, has violated Section 504, including its supporting regulations.

215.    DOC's failure to meet its obligations to prisoners with mental illness constitutes an ongoing and continuous violation of Section 504 and its supporting regulations and continues to inflict irreparable harm on these prisoners.  Unless enjoined, DOC will continue to violate Section 504 and to inflict injuries for which prisoners with mental illness have no adequate remedy at law.

216.    Section 504 authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities.  29 U.S.C. § 794a(a)(2).

217.    DRCT is entitled to injunctive relief to prevent DOC's continued violation of Section 504, as well as reasonable attorneys' fees and costs incurred in connection with bringing this action.

## REQUEST FOR RELIEF

WHEREFORE, in order to stop the ongoing psychological and physical tormenting of its constituents, DRCT respectfully requests that the Court:

(a)    Issue a judgment declaring that the prolonged isolation of DRCT's Constituents constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

(b)    Permanently enjoin Defendants, their subordinates, agents, employees, and all other persons acting in concert with them under color of state law from subjecting DRCT's Constituents to prolonged isolation at Northern either by maintaining any of DRCT's Constituents at Northern or transferring any of DRCT's Constituents to Northern;

(c)     Issue a judgment declaring that the in-cell shackling of DRCT's Constituents constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

(d)     Permanently enjoin Defendants, their subordinates, agents, employees, and all other persons acting in concert with them under color of state law from subjecting DRCT's Constituents to in-cell shackling at Northern;

(e)     Declare that Defendants' conduct described herein, including, without limitation, Defendants' failure to provide reasonable modifications that would allow DRCT's Constituents access to services, programs, and activities afforded to other prisoners, violates the ADA and Section 504;

(f)     Permanently enjoin Defendants, their subordinates, agents, employees, and all other persons acting in concert with them under color of state law from the continued violation of the ADA and Section 504 and further require that Defendants make reasonable modifications that would allow DRCT's Constituents meaningful access to services, programs, and activities afforded other prisoners, as required under the ADA and Section 504;

(g)     Grant Plaintiff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 12205, 28 C.F.R. § 35.175, 29 U.S.C. § 794a(b), and other applicable law; and

(h)     Grant such other relief as the Court considers just and proper.

Respectfully submitted,


/s/ Dan Barrett
Dan Barrett (ct29816)
Elana Bildner (ct30379)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 065105
Phone: (860) 471-8471
Email: e-filings@acluct.org

Hope Metcalf (ct424312)
Ify Chikezie (Law Student Intern)
Kamilyn Choi (Law Student Intern)
Luke Connell (Law Student Intern)
Zoe Rubin (Law Student Intern)
Lowenstein International Human Rights
Clinic
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Phone: (203) 432-9404
Email: hope.metcalf@ylsclinics.org

Kyle Mooney (*pro hac vice* forthcoming)
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Phone: (212) 468-8000
Fax: (212) 468-7900
Email: kmooney@mofo.com

Kasey Considine (ct30756)
Disability Rights Connecticut (DRCT)
846 Wethersfield Avenue
Hartford, CT 06114
Phone: (860) 297-4300
Fax: (860) 296-0055
Email: kasey.considine@disrightsct.org

*Counsel for Plaintiff Disability Rights
Connecticut, Inc.*