UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DISABILITY RIGHTS CONNECTICUT, INC. | : | CIVIL NO. 3:21-CV-00146 (KAD) |
| V. | : | |
| CONNECTICUT DEPARTMENT OF CORRECTION | : | MARCH 12, 2021 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

### I.    INTRODUCTION & BACKGROUND

On February 4, 2021, Disability Rights Connecticut, Inc. ("DRCT"), commenced the instant action against the Connecticut Department of Correction ("DOC"), Commissioner Angel Quiros ("Quiros"), and Warden Roger Bowles ("Bowles").  (ECF No. 1).  On February 18, 2021, DRCT filed an Amended Complaint, which is now the operative complaint, alleging violations of the Eighth and Fourteenth Amendments to the United States Constitution, and violations of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA").  (ECF No. 24).

In broad strokes, the Amended Complaint alleges that inmates with mental illness are subjected to prolonged isolation and in-cell restraints at the Northern Correctional Institution ("Northern") and "elsewhere".  DRCT is Connecticut's authorized Protection and Advocacy ("P&A") system under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI").[1]  (Id. at ¶ 10).  Through this action, DRCT seeks declaratory and injunctive relief on behalf of its "constituents," Connecticut inmates with mental illness.  (Id. at p. 59-60, ¶¶ a-h).

---

[1] 42 U.S.C. § 10801, *et seq.*

The defendants now move to dismiss the Amended Complaint.  Specifically, the defendants seek dismissal on the grounds that the instant claims are not ripe due to DRCT's failure to exhaust administrative remedies as required under PAIMI, and on the grounds that DRCT lacks standing to assert third-party claims on behalf of Connecticut inmates with mental illness.  For the reasons herein, this motion should be granted.

## II.     FACTS RELEVANT TO MOTION TO DISMISS[2]

As Connecticut's P&A, DRCT alleges that it is authorized "to pursue legal, administrative and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State of Connecticut."  (ECF No. 24, ¶ 13).  Through this action, DRCT seeks declaratory and injunctive relief "to stop DOC's prolonged isolation and in-cell shackling or prisoners with mental illness, and to stop DOC's failure to make reasonable modifications to its policies, practices, and procedures."  (Id. at ¶ 7, p. 59-60, ¶¶ a-h).

Allegations in Amended Complaint re: Conditions of Confinement

DRCT alleges that "DOC routinely subjects individuals with mental illness to prolong isolation" and "routinely subjects individuals with mental illness to in-cell

---

[2] The facts relevant to the motion to dismiss come from the allegations in the Amended Complaint, as well as the exhibits submitted in conjunction with the motion to dismiss. As detailed below, the Court may consider these exhibits in ruling on this motion as the defendants have moved for dismissal under Rule 12(b)(1) and they relate to facts concerning the exercise of the Court's jurisdiction.  See Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.") (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)); see also Cillie v. McCarthy, No. 3:19-CV-334 (VAB), 2020 U.S. Dist. LEXIS 151587, *19 (D. Conn. Aug. 21, 2020) ("On a Rule 12(b)(1) motion . . . the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits.") (quoting Karlen ex rel. J.K. v. Westport Bd. Of Educ., 638 F. Supp.2d 293, 298 (D. Conn. 2009)).

shackling." (ECF No. 24, ¶¶ 3-4). DRCT asserts that "DOC knowingly subjects prisoners with mental illness to these harsh conditions . . . [and] many prisoners with mental illness commit acts of self-harm or mutilation as a result of their near-total isolation and mistreatment." (Id. at ¶ 5). The allegations in the Amended Complaint relate almost exclusively to the conditions and certain practices at Northern.

Indeed, Bowles, the Warden of Northern, is specifically named as a defendant and is the only warden named in DRCT's complaint. Additionally, DRCT alleges that "[o]ne of the harshest of the environments in which these persons are currently mistreated by DOC is Northern—a prison that has served as a magnet for persons with mental illness and that was purpose-built to break them down." (Id. at ¶ 28). DRCT includes several photographs of Northern, (Id. at p. 10, 12-14), and alleges that "Northern was purposely designed to isolate prisoners and its conditions are singularly oppressive."[3] (Id. at ¶ 30). DRCT asserts that the defendants "have demonstrated a pattern of knowingly and deliberately incarcerating prisoners with mental illness at Northern" and "[a]lthough DOC has taken steps towards reducing the overall population at Northern in the past decade, those measures have not changed the daily reality for prisoners who remained trapped at Northern."[4] (Id. at ¶¶ 40, 46).

---

[3] "The cells at Northern are designed to exacerbate the complete social and sensory deprivation" and "[t]he experience of being under constant surveillance by faceless watchers can confuse and distress prisoners, especially prisoners with mental illness." (ECF No. 24, ¶¶ 32, 34).

[4] According to publicly available data, the population at Northern as of February 28, 2021 consisted of 48 sentenced and 22 unsentenced inmates. See https://data.ct.gov/Public-Safety/Correctional-Facility-Daily-Population-Count-By-Fa/n8x6-s299 (last accessed on March 11, 2021). Notably, DRCT's complaint makes no mention of the minimal population nor the percentage of these remaining inmates that it believes to suffer from mental illness.

DRCT alleges that inmates with mental illness end up in "[i]solative [s]tatus at Northern and elsewhere" through their assignment to various classification statuses and programs utilized by DOC to manage inmates, including Administrative Segregation, Security Risk Group, and Special Needs Management, where certain phases of these programs are completed at Northern. (Id. at ¶¶ 48-51).  Roughly one-third of the inmates currently held at Northern are unsentenced offenders held on high bonds and not subject to any of the aforementioned programming.  DRCT details the allegedly restrictive conditions in these programs, including the allegedly limited social contacts, limited recreation, and excessive strip searches, and asserts that "[t]hese extreme conditions fuel, and are fueled by, Northern's longstanding culture of violence and brutality." (Id. at ¶¶ 56-66).  The Amended Complaint also includes allegations concerning three inmates who allegedly suffer from mental illness, and these allegations generally relate to the time these inmates were confined at Northern and the alleged conditions they experienced.[5] See e.g., (Id. at ¶¶ 105, 112-115, 118-123, 125, 132-140, 142, 146-153).

DRCT further contends that DOC "not only subject prisoners with mental illness to prolonged isolation . . . but also violently extract them from these cells, shackle them, and then leave them shackled for hours or even days in filthy or freezing 'strip cells.'" (Id. at ¶ 77).  DOC has allegedly "failed to provide staff with the training required to identify and manage prisoners with mental illness" and DOC staff "respond with force rather than appropriate mental health treatment." (Id. at ¶ 78).  DRCT claims that DOC subjects inmates to in-cell restraints "far longer than is required to ensure safety and security" and

---

[5] Of these three inmates, only Kyle Lamar Pascal-Barros is alleged to currently be confined at Northern.  See (ECF No. 24, ¶¶ 104, 124, 141).

that DOC's practice "of placing and leaving prisoners with mental illness in in-cell shackling is dangerous, painful, and injurious."  (Id. at ¶¶ 82, 90-91).  DRCT further asserts that the defendants have knowledge of these conditions and their effects, but "have condoned or been deliberately indifferent to the underlying conditions and mistreatment of prisoners with mental illness."  (Id. at ¶ 157).

It must be noted that virtually all DRCT's allegations are conclusory and therefore not admitted for the purposes of this motion.  The Amended Complaint is virtually bereft of any factual allegations regarding specific incidents or other examples of interactions between inmates and staff from which a meaningful response could be offered.  In short, DRCT's complaint is less a pleading and more a press release.

DRCT's Prelitigation Actions

On November 23, 2020, DRCT sent a letter to Quiros and Bowles "expressing grave concern over the prolonged isolation and in-cell shackling of prisoners with mental illness at Northern."  (Id. at ¶ 159).  A copy of DRCT's November 23rd letter is attached as Exhibit B to this motion.[6]  In this letter, DRCT lays out its concerns regarding the use of in-cell restraints and prolonged isolation on inmates with mental illness.  See generally (Exhibit ("Ex.") B, DRCT's November 23, 2020 Letter).  The concerns raised in the November 23rd letter relate to certain conditions and practices at Northern.[7]  While

---

[6] The page numbers cited to in Exhibit B refer to the actual page numbers on DRCT's November 23, 2020 letter, not the page numbers generated by PACER.

[7] Indeed, DRCT begins the letter by stating "[w]e are writing to you on behalf of *individuals with mental illness who are incarcerated at Northern* . . . and who have been, and continued to be, subject to in-cell restraint and prolonged isolation.  We are gravely concerned that *these cruel and unusual practices continue at Northern*."   (Ex. B, p. 1) (emphasis added).

Additionally, throughout the letter, the references to investigations and practices relate specifically to Northern.  See e.g., (Id. at 1) ("Over the past two years, we have

5

DRCT's November 23rd letter details certain practices and polices that allegedly harm inmates with mental illness at Northern, it failed to identify any specific inmate with mental illness currently subjected to such conditions and failed to identify any specific inmate with mental illness in imminent risk of harm due to any of these conditions.  Further, the letter failed to refer to any specific incidents or even the practices of any individual staff persons at Northern that would bring focus to any of the letter's general complaints.

DRCT's November 23rd letter also included a list of demands for certain changes that DRCT sought DOC to implement, including ceasing the use of in-cell restraints on inmates with mental illness at Northern, cease subjecting inmates with mental illness at Northern to prolonged isolation, and cease subjecting any inmate at Northern to prolonged isolation or in-cell restraints until such time that DOC implements an independent and effective mechanism to screen out inmates with mental illness.  (Id. at 7-8).   DRCT's letter further requested that DOC: "(1) confirm in writing that it will implement these changes and (2) provide a written plan detailing the milestones towards implementing these changes and the timetable on which each milestone will be achieved."  (Id. at 7).   DRCT's letter requested that DOC provide this confirmation and plan by December 18, 2020, and indicated that if DOC does so, then DRCT is "prepared

---

worked with the Lowenstein International Human Rights Clinic *to investigate conditions at Northern*") (emphasis added); (Id. at 3) ("The Departments additional reforms over the past decade have not materially changed *the conditions for people with mental illness who remain at Northern.*") (emphasis added); (Id. 4-5) ("*DOC's policies and practices of prolonged isolation and in-cell restraint at Northern* directly harms persons with mental illness . . . .") (emphasis added); (Id. at 5) ("[D]ecades of research has established that prolonged isolation *in conditions akin to those at Northern* . . . is extremely psychologically harmful") (emphasis added); (Id. at 6-7) (detailing requested changes to be implemented, all concerning "*individuals with mental illness at Northern*") (emphasis added); (Id. at 7) ("[W]e are prepared to work with DOC . . . to protect *persons with mental illness at Northern* from further abuse") (emphasis added).

to work with DOC to implement the plan, to ensure that the milestones are timely met, and to protect persons with mental illness at Northern from further abuse." (Id.). However, if DOC does not provide such confirmation, DRCT indicated that it "will be left with no choice but to take the necessary legal recourse to protect prisoners with mental illness from continued cruel, unusual, and inhumane treatment." (Id.).

DRCT alleges that this November 23rd letter was received by DOC on November 24, 2020, (ECF No. 24, ¶ 159); however, this letter was not received in the Commissioner's office and opened until January 12, 2021.[8] (Ex. A, Declaration of Melissa Jutla, ¶¶ 7-8; Ex. B, p. 1).[9]   Despite DRCT not receiving any response or acknowledgment from DOC concerning the November 23rd letter on or before December

[8] Notably, this letter was never sent to undersigned counsel nor to staff counsel at DOC even though both offices interact regularly with both the ACLU counsel and the staff attorneys for DRCT. See (Ex. E, Declaration of Terrence M. O'Neill, ¶¶ 3-4, 6).

[9] As detailed in the Declaration of Melissa Jutla, whose duties as Secretary II to the Commissioner include the opening and processing of mail addressed to, and received in, the Commissioner's office, certain batches of mail addressed to the Commissioner's office that were received between the end of November 2020 and the beginning of January 2021, were delayed in being opened and processed due to Ms. Jutla being out of the office with a Covid-19 infection. (Ex. A, ¶¶ 2-6).

When a piece of mail is received in the Commissioner's office, it is Ms. Jutla's practice to open the piece of mail, stamp that piece of mail "Received" at the time it is opened, and review the mail in order to direct it to the appropriate department or individual. (Id. at ¶ 5). This "Received" stamp indicates the date the mail was received and opened in the Commissioner's office. (Id.).

The "Received" stamp on the first page of DRCT's November 23rd letter (Exhibit B) is the stamp Ms. Jutla places on a piece of mail when it is received and opened in the Commissioner's office, and the stamp on DRCT's November 23rd letter indicates that it was received and opened on January 12, 2021. (Id. at ¶ 7). Although Ms. Jutla has no specific recollection of receiving and opening this particular letter, based on the date of the "Received" stamp and her practice of stamping mail on the date it is received and opened, DRCT's November 23rd letter was not received and opened in the Commissioner's office until January 12, 2021. (Id. at ¶ 8).

18th , the deadline set forth in its letter, DRCT did not follow-up with DOC to confirm receipt of this letter or inquire into whether a response was forthcoming.

On January 22, 2021, Acting Deputy Commissioner Mulligan ("Mulligan") provided a written response to DRCT.  (ECF No. 24, ¶ 160; Ex. C, DOC's January 22, 2021 Letter). In this letter, Mulligan acknowledged receipt of the November 23rd letter, but indicated that "for reasons unknown it was not received in the Commissioner's office until January 12, 2021."  (Ex. C).  Mulligan further indicated that given the length of the letter and the nature of the claims, DOC needed "a little more time to . . . draft a substantive response" and that "we hope to have such a response to you in the near future."  (Id.).

On January 27, 2021, DRCT responded to DOC, acknowledging receipt of this letter, and indicating where future correspondence regarding the matter should be directed.  (Ex. D, DRCT's January 27, 2021 Letter).  DRCT's January 27th letter made no mention of DOC's delay in receiving the November 23rd letter, nor did it indicate that DOC's response, indicating that it needed more time to draft a substantive response and such a response was forthcoming, was inadequate or unreasonably delaying the process. Just as important, DRCT's response did not indicate that litigation was imminent.  Despite being aware of DOC's late receipt of the November 23rd letter and the fact that DOC was in the process of reviewing the claims and drafting a substantive response, DRCT commenced the instant action on February 4, 2021.  (ECF No. 24).  The defendants now move to dismiss the Amended Complaint for the reasons set forth below.

III.   **LEGAL STANDARD**

   **A. Rule 12(b)(1)**

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for dismissal of a case for lack of subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  "A case is

properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Eliahu v. Jewish Agency for Israel, 919 F.3d 709, 712 (2d Cir. 2019) (per curiam) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).  "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Purugganan v. AFCF Franchising, LLC, No. 3:20-CV-360 (KAD), 2021 U.S. Dist. LEXIS 34284, *3 (D. Conn. Feb. 24, 2021) (citations omitted).  However, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014) (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)); see also Cillie v. McCarthy, No. 3:19-CV-334 (VAB), 2020 U.S. Dist. LEXIS 151587, *19 (D. Conn. Aug. 21, 2020) ("On a Rule 12(b)(1) motion . . . the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits.") (quoting Karlen ex rel. J.K. v. Westport Bd. Of Educ., 638 F. Supp.2d 293, 298 (D. Conn. 2009)).

"[T]he party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that is exists.'"  Tandon, 752 F.3d at 243 (quoting Makarova, 201 F.3d at 113).  "If subject matter jurisdiction is lacking, the action must be dismissed."  Cavanaugh v. Geballe, No. 3:20-CV-981 (KAD), 2021 U.S. Dist. LEXIS 37050, *4 (D. Conn. Mar. 1, 2021) (citing Fed. R. Civ. P. 12(h)(3)).  Both ripeness and standing implicate the Court's jurisdiction.  See Brady v. Basic Research, L.L.C., 101 F. Supp.3d 217, 227 (E.D.N.Y. 2015) ("[T]o survive a defendant's motion to dismiss for lack

of subject matter jurisdiction [under Rule 12(b)(1)], a plaintiff must allege facts 'that affirmatively and plausibly suggest that it has standing to sue.'") (quoting Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011)); see also Phila. Indem. Ins. Co. v. Enter. Builders, No. 3:20-CV-56 (KAD), 2021 U.S. Dist. LEXIS 32159, *4 (D. Conn. Feb. 22, 2021) ("This Court has subject matter jurisdiction only over cases that are ripe for adjudication.") (quoting Sirob Imports, Inc. v. Peerless Ins. Co., 958 F. Supp.2d 384, 388 (E.D.N.Y. 2013), aff'd, 558 F. App'x. 32 (2d Cir. 2014)).

Regarding ripeness, the defendants seek dismissal of this action under the prudential ripeness doctrine.[10]  While the absence of prudential ripeness does not itself deprive the court of subject matter jurisdiction, the Court should analyze the defendants' prudential ripeness argument under Rule 12(b)(1) as the prudential ripeness inquiry informs the court whether it should exercise jurisdiction in a particular case.  See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 725 F.3d 65, 110 (2d Cir. 2013) (explaining that "prudential ripeness is drawn from prudential reasons for refusing to exercise jurisdiction" and "constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it") (Internal quotation marks and citations omitted); see also Vullo v. Office of the Comptroller of the Currency, 378 F. Supp.3d 271, 283 (S.D.N.Y. 2019) ("[P]rudential ripeness is not a 'limitation on the power of the

---

[10] As detailed further in the defendants' prudential ripeness argument, *infra* Section IV.B, there are two forms of ripeness: constitutional ripeness and prudential ripeness.  See Am. Sav. Bank, FSB v. UBS Fin. Servs., 347 F.3d 436, 439 (2d Cir. 2003) (recognizing "two forms of ripeness[,]" constitutional ripeness and "prudential ripeness") (citation omitted); see also Ollie v. Univ. of Conn., 364 F. Supp.3d 143, 148 (D. Conn. 2019) ("The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.") (quoting Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 687 (2d Cir. 2013)).

judiciary' . . . [r]ather, prudential ripeness encompasses whether a court should, in its discretion, decline to exercise jurisdiction because the 'case will be better decided later.'") (quoting Simmonds v. INS, 326 F.3d 351, 357 (2d Cir. 2003)).

Indeed, courts within this circuit have considered prudential ripeness arguments in terms of subject matter jurisdiction, including on a motion to dismiss under Rule 12(b)(1). See e.g., High Mt. Corp. v. MVP Health Care, Inc., 416 F. Supp.3d 347, 351-54 (D. Vt. 2019) (analyzing defendant's motion to dismiss raising prudential ripeness under Rule 12(b)(1)); New York v. United States HHS, No. 07-CIV-8621 (PAC), 2008 U.S. Dist. LEXIS 101064, *25-40, 49-50 (S.D.N.Y. Dec. 15, 2008) (dismissing claims under Rule 12(b)(1) for, among other reasons, finding plaintiff's claims were not ripe under the prudential ripeness doctrine); Jurist v. Long Island Power Auth., No. 19-CV-3762 (MKB) (LB), 2021 U.S. Dist. LEXIS 4122, *15-23 (E.D.N.Y. Jan. 6, 2021) (analyzing ripeness challenge raised by defendant under Rule 12(b)(1)), noting that "a ripeness determination requires analysis of whether a claim is both Constitutionally ripe *and prudentially ripe*") (emphasis added) (citing Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 687-88 (2d Cir. 2013)); see also Am. Sav. Bank, FSB v. UBS Fin. Servs., 347 F.3d 436, 439 (2d Cir. 2003) ("Before considering the District Court's denial of [plaintiff's] motion to enforce subpoenas, we first consider our jurisdiction" and proceeding to apply prudential ripeness analysis and "prudentially dismiss[ing] this appeal as unripe"); Millo v. Hanover Ins. Co., No. 3:17-CV-1533 (VLB), 2018 U.S. Dist. LEXIS 80609, *4, 7-9 (D. Conn. May 14, 2018) ("The Court cannot address the substance of these claims at this juncture, because the claims are not yet ripe and accordingly there is no subject matter jurisdiction" and proceeding to dismiss two claims as "unripe on prudential grounds").

Moreover, the prudential ripeness doctrine has been considered "[a]kin to discretionary doctrines of abstention [,]" Alliance of Auto. Mfrs. v. Currey, 984 F. Supp.2d 32, 45 (D. Conn. 2013), and courts within this circuit have analyzed motions to dismiss based on abstention under Rule 12(b)(1). See e.g., High Mt. Corp., 416 F. Supp.3d at 351 ("This court has analyzed motions to dismiss based on abstention under Rule 12(b)(1).") (citation omitted); Wilmington Trust v. Estate of McClendon, 287 F. Supp.3d 353, 360 (S.D.N.Y. 2018) ("A motion to abstain is considered as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).") (internal quotation marks & citation omitted); Stahl York Ave. Co., LLC. v. City of New York, No. 14-CIV-7665 (ER), 2015 U.S. Dist. LEXIS 66660, *20-21 (S.D.N.Y. May 21, 2015) ("A motion to dismiss based on Colorado River [abstention doctrine] is considered as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)"), aff'd, 641 Fed. App'x. 68 (2d Cir. 2016) (citations omitted); Grover v. Sattar, No. CV 18-2402 (SJF) (AKT), 2019 U.S. Dist. LEXIS 217577, *21-22 (E.D.N.Y. Dec. 16, 2019) (same).  Accordingly, the defendants' arguments seeking dismissal in this case, including on prudential ripeness grounds, should be analyzed under Rule 12(b)(1).

## IV.    DISCUSSION

### A. DRCT failed to exhaust administrative remedies prior to commencing suit as required by PAIMI.

The Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801 et seq., was enacted to protect and advocate for individuals with mental illness.  Indeed, "Congress enacted [PAIMI] in 1986 'to ensure that the rights of individuals with mental illness are protected' and 'to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will protect and

advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes.'" State Office of Prot. & Advocacy for Person with Disabilities v. Connecticut, 706 F. Supp.2d 266, 273 (D. Conn. 2010) (quoting 42 U.S.C. §§ 10801(b)(1), 10801(b)(2)(A)).  PAIMI contains several provisions concerning, *inter alia*, the establishment of P&As by States, the role and authority of P&As, as well as the ability of P&As to initiate legal actions, including the requirement that administrative remedies be exhausted.  See generally, 42 U.S.C. § 10801 *et seq.*

i.  PAIMI's Exhaustion Provision

In PAIMI, Congress expressly addressed the issue of exhaustion of administrative remedies by P&As, such as DRCT.  Indeed, 42 U.S.C. § 10807 provides in relevant part that:

(a) Prior to instituting any legal action in a Federal or State court on behalf of a [an] individual with mental illness, an eligible system [DRCT] . . . *shall exhaust in a timely manner all administrative remedies where appropriate.* If, in pursuing administrative remedies, the system . . . determines that any matter with respect to such individual will not be resolved within a reasonable time, the system . . . may pursue alternative remedies, including the initiation of a legal action.

(b) Subsection (a) does not apply to any legal action instituted to prevent or eliminate imminent serious harm to a [an] individual with mental illness.

(emphasis added).

While PAIMI contains an exhaustion requirement, as several courts have noted, there is little case law interpreting this provision and the language of the statute itself provides little guidance.  See e.g. Dunn v. Dunn, 219 F. Supp.3d 1163, 1173 (M.D. Ala. 2016) ("There is very little case law interpreting [42 U.S.C. § 10807]" and "the plain language of [42 U.S.C. § 10807] was not illuminating . . . ."); Gonzalez v. Martinez, 756 F. Supp. 1533, 1537 (S.D. Fla. 1991) (noting that "the Court's independent research fails

to reveal any relevant authority [concerning 42 U.S.C. § 10807]" and that the language of the statute "lacks plain meaning").  However, courts interpreting the PAIMI exhaustion provision have generally required P&As to first attempt to address and resolve the issues that are the subject of the litigation with the appropriate officials through administrative channels.  See Prot. & Advocacy for Persons with Disabilities v. Armstrong, 266 F. Supp.2d 303, 313 (D. Conn. 2003) (finding that P&A had satisfied PAIMI exhaustion requirement by "attempt[ing] to request" the relief sought in the litigation, which defendant "declined to provide"); Dunn, 219 F. Supp.3d at 1174-75 (finding that "the pretrial efforts of P&A to bring its claims to the attention of defendants and seek to resolve them without litigation[,]" which included a letter identifying specific staffing issues and specific inmates not receiving adequate mental health services, as well as a subsequent meeting with the Commissioner to discuss issues, prior to commencing suit, "were sufficient to satisfy § 10807"); Gonzalez, 756 F. Supp. at 1539 (finding that "Plaintiffs have presented little evidence that they took adequate measures to resolve this case extra-judicially" prior to filing suit and issuing a stay of "discovery and all further proceedings as to all issues other than exhaustion . . . pending a determination that the matter is ripe for judicial action").

Several courts examining the PAIMI exhaustion provision have turned to the legislative history of 42 U.S.C. § 10807 for further guidance.  See e.g. Gonzalez, 756 F. Supp. at 1537-1538; Dunn, 219 F. Supp.3d at 1173-74.  Indeed, as the Gonzalez Court noted, "[t]he Senate Report [concerning 42 U.S.C. § 10807] . . . unquestionably expresses a preference for informal remedies over litigation as a means of solving the problems of mentally ill individuals" and "the Senate Report states that [P&As] 'should continue the non-litigative approach to advocacy and dispute resolution and urges the continued use

14

of administrative and alternative remedies prior to the initiation of a legal action.'" Gonzalez, 756 F. Supp. at 1539 (quoting S. Rep. 109, 99th Cong., 2d Sess.).  While the legislative history indicated that "administrative remedies be exhausted before legal action is initiated[,]'" Gonzalez, 756 F. Supp. at 1538 (quoting H.R. Conf. Rep. No. 576, 99th Cong., 2d Sess.), "'[i]t is not the intention of the Committee that the administrative remedies be pursued for an unreasonable duration, but rather that whenever possible there should be timely and reasonable attempts made to mediate and negotiate appropriate administrative remedies.'" Id. at 1538 (quoting S. Rep. 109, 99th Cong., 2d Sess.).  Based on its review of the legislative history of § 10807, the Gonzalez Court found that the "legislative history supports giving the courts substantial discretion regarding exhaustion by eligible systems" and "[w]hether [a P&A] has exhausted all appropriate remedies can only be determined on a case by case basis" and cited to the portion of the legislative history that stated "'if legal action is initiated, courts retain their prerogative to determine that the issues are not ripe and to remand the matter for further administrative consideration.'" Id. at 1539 (quoting H.R. Conf. Rep. No. 576, 99th Cong., 2d Sess.).

Subsequent decisions have cited to Gonzalez to support the proposition that determining whether a particular P&A has exhausted administrative remedies should be decided by the Court on a case-by-case basis, and that the Court retains substantial discretion in determining whether a P&A has exhausted.  See Mich. Prot. & Advocacy Serv. v. Evans, 2010 U.S. Dist. LEXIS 103622, *6-7 (E.D. Mich. Sept. 30, 2010) ("[C]ourts have 'substantial discretion regarding exhaustion by eligible systems.") (citing Gonzalez, 756 F. Supp. at 1539); Dunn, 219 F. Supp.3d at 1173 (same).  Likewise, other courts, while not explicitly citing to Gonzalez, have also taken the approach of determining, on a

case-by-case basis, whether administrative remedies have been exhausted.   See Armstrong, 266 F. Supp.2d at 313 (finding that in suit alleging violation of PAIMI due to defendant refusing to provide P&A access to records, P&A's prelitigation actions in attempting to request the records at issue and defendant's refusal to provide them, were "adequate to satisfy the [PAIMI] exhaustion requirement"); Advocacy Ctr. v. Stadler, 128 F. Supp.2d 358, 365 (M.D. La. 1999) (same).

In sum, PAIMI's requires DRCT to exhaust administrative remedies prior to bringing suit, and the determination of whether DRCT has exhausted such remedies is determined on a case-by-case basis by the Court.  As detailed below, DRCT failed to adequately pursue and exhaust administrative remedies concerning the instant claims.

### ii.  Administrative Remedies DRCT was Required to Exhaust

Drawing guidance from the authorities cited above, the Court should compel DRCT to administratively exhaust its available remedy, that is, present specific instances of abuse or neglect of persons suffering from mental illness to the defendants and then demonstrate to the Court that it made reasonable efforts to engage with the defendants in a good-faith attempt to address and mediate the issues through administrative channels.  This includes providing the defendants with notice, including specific details as to the claimed violations or issues, providing the defendants a reasonable opportunity to review the claims and provide a substantive response, and engaging with the defendants in a good-faith attempt to mediate the issues.[11]  This type of prelitigation

---

[11] The exact nature of this good-faith attempt to mediate the issues will depend on what occurs in the previous two steps, including whether the defendants' review and investigation reveals the same issues, or contradicts the issues, identified by DRCT, and whether the defendants are able to offer any meaningful resolution to DRCT, which may dictate whether further efforts, including in-person meetings/mediation, further investigation, or other steps can be taken to address, limit, or resolve the identified issues.

administrative process is what Congress intended when enacting the exhaustion provision of PAIMI, and permits the parties an opportunity to address and mediate the issues, which may eliminate the need for litigation, or at a minimum, narrow the issues in dispute and focus the issues needed to be resolved by the Court.  The inclusion of an exhaustion provision in PAIMI, the legislative history, and courts' interpretation of this provision, supports the conclusion that DRCT was required to engage in this type of prelitigation process.  See Gonzalez, 756 F. Supp. at 1539 ("The Senate Report [concerning 42 U.S.C. § 10807] . . . *unquestionably expresses a preference for informal remedies over litigation as a means of solving the problems of mentally ill individuals*" and "the Senate Report states that [P&As] 'should continue the non-litigative approach to advocacy and dispute resolution and *urges the continued use of administrative and alternative remedies prior to the initiation of a legal action.*'") (emphasis added) (quoting S. Rep. 109, 99th Cong., 2d Sess.).

Moreover, based on DRCT's prelitigation conduct, it has implicitly acknowledged that this type of prelitigation administrative process is required under PAIMI.  Indeed, DRCT seemingly attempted to take the first step in this process when it sent its November 23rd letter to DOC, which outlined DRCT's concerns regarding the alleged isolation and use of in-cell restraints on inmates with mental illness at Northern.  (ECF No. 24, ¶ 159; Ex. B).  While DRCT took this initial step, for several reasons however, DRCT failed to exhaust this process and failed to give the defendants a reasonable opportunity to review and respond to the claims raised by DRCT.

### iii.   DRCT Failed to Exhaust Administrative Remedies

First, DRCT's November 23rd letter was insufficient to provide DOC with adequate notice.  In this November 23rd letter, DRCT "express[ed] grave concern over the prolong

isolation and in-cell shackling or prisoners with mental illness at Northern" and requested DOC to implement certain changes, (ECF No. 24, ¶ 159; Ex. B); however, it failed to provide DOC with sufficient detail to allow it to reasonably review and respond to DRCT's claims and demands.  Critically, DRCT's letter fails to identify any specific inmate with mental illness currently subjected to in-cell restraints or "prolonged isolation" and failed to identify any specific inmate with mental illness who DRCT believed to be in imminent risk of serious harm due to these alleged conditions.  Rather, this letter outlined, in general terms, certain practices that DRCT contends were being used on inmates with mental illness at Northern.  This is insufficient to satisfy the PAIMI exhaustion requirement.

Indeed, both the legislative history of § 10807, and reported decisions from courts examining exhaustion under PAIMI, demonstrate that P&As, like DRCT, must provide the defendants with sufficient information and detail concerning the identified issues in order to permit them a reasonable opportunity to review, investigate, and attempt to mediate such issues, prior to commencing suit.  See Armstrong, 266 F. Supp.2d at 313 (finding that P&A's pre-litigation actions of *identifying and requesting access to the records of specific individuals*, and defendant declining to provide these records, satisfied PAIMI exhaustion requirement) (emphasis added); Dunn, 219 F. Supp.3d at 1174-75 (finding that P&A's prelitigation actions, which included a letter *identifying specific staffing issues and specific inmates not receiving adequate mental health services* "were sufficient to satisfy § 10807") (emphasis added); see also Gonzalez, 756 F. Supp. at 1539 ("'The Committee intends that . . . the eligible [P&A] system for mentally ill persons under this Act continue the non-litigative approach to advocacy and dispute resolution and urges the continued use of administrative and alternative remedies prior to the initiation of a legal

action.'") (quoting S. Rep. 109, 99th Cong., 2d Sess.).  In order to give any effect to the PAIMI exhaustion provision, and the intent of Congress to have these types of disputes pursued and mediated through administrative channels, DRCT must provide sufficient detail and information to the defendants to provide them with a reasonable opportunity to review and respond to the issues identified.  Not only does this requirement comport with the intent of the PAIMI exhaustion requirement, but it also makes practical sense and furthers the goal of efficiently and effectively identifying and addressing issues impacting individuals with mental illness.

In this case, DRCT's November 23rd letter did not identify any specific inmates with mental illness who were subject to the conditions at issue at Northern, nor did it identify any specific inmates with mental illness at Northern who were in imminent risk of serious harm.  By failing to provide this important information, the ability of the parties to address these issues have been hampered.  Indeed, requiring DRCT to provide more detailed information and cite to specific examples furthers the purpose of PAIMI by benefiting the inmates with mental illness who are purportedly being harmed, as it allows the defendants to specifically review that individual's mental health status, conditions of confinement, and allows the parties to address any such issues in an efficient manner.

In fact, in practice, this type of informal administrative process has worked in a very recent situation involving DRCT.  Indeed, in the months leading up to the commencement of this action, counsel for the defendants exchanged a series of emails with DRCT's legal director regarding a specific inmate at Northern.  See (Ex. E, Declaration of Terrence M. O'Neill, ¶ 5; Ex. F, Email Chain).  Specifically, DRCT counsel sent an email on January 19, 2021, wherein he expressed concern that this inmate (who

is not mentioned in DRCT's complaint) was suicidal and in need of intensive mental health treatment. (Ex. E, ¶ 5; Ex. F, p. 3).   The undersigned immediately shared this email with appropriate staff at DOC, and over the next few weeks, DRCT counsel followed up with additional emails to ascertain whether DOC would address his agency's concerns. (Ex. E, ¶ 5; Ex. F, p. 2-3).   Shortly thereafter, this particular inmate was moved to DOC's mental health facility. (Ex. E, ¶ 5).   Not only does this recent example demonstrate that DRCT was aware of the availability and efficacy of these administrative channels, but it also demonstrates the benefit of addressing these types of issues and concerns, first, through administrative channels.   As this specific example demonstrates, within thirty days of when DRCT counsel first raised concerns related to this inmate and his mental health status (January 19, 2021), it received a response that actions were being taken and that DOC would be transferring this inmate to DOC's mental health facility.   The instant action has been pending for longer than thirty days, further demonstrating that emergent issues concerning inmates with mental illness can be more efficiently and effectively addressed through administrative channels, as opposed to litigation.[12]

In addition to DRCT's November 23rd letter failing to provide sufficient detail, DRCT never provided DOC with a reasonable opportunity to review the claims and provide a substantive response, nor did DRCT attempt to engage with DOC in a good-faith attempt to mediate the issues identified.   DRCT requested a response to the issues raised in the November 23rd letter by December 18, 2020. (Ex. B, p. 7).   While DRCT alleges that this letter was received by DOC on November 24, 2020, (ECF No. 24, ¶ 159),

---

[12] As the above example demonstrates, had DRCT identified or raised any concerns regarding specific inmates or situations with DOC through administrative channels, any such issue would have likely been addressed in the time this action has been pending.

it was not in fact received and opened in the Commissioner's office until January 12, 2021.[13]  (Ex. A, ¶¶ 7-8; Ex. B, p. 1).  On January 22, 2021, Acting Deputy Commissioner Mulligan responded to DRCT and acknowledged receipt of the letter, but noted that it was not received until January 12, 2021.  (ECF No. 24, ¶ 160; Ex. C).  Mulligan's response further indicated that due to the lengthy letter and the claims raised therein, DOC would need more time to draft a substantive response and hoped to provide such a response in the near future.[14]  (Ex. C).

On January 27, 2021, DRCT responded to DOC's January 22nd letter by acknowledging receipt of such and indicating where correspondence regarding the matter should be directed.  (Ex. D).  This January 27th letter did not address the delay in DOC receiving DRCT's letter, nor did it indicate that DOC was unreasonably delaying the process or that DOC's indication that it was reviewing the claims and would be providing a substantive response was inadequate.  Moreover, the letter was silent on DRCT's intention to commence litigation.  Despite not following up with DOC after not receiving any response by the December 18th deadline, and despite DOC's January 22nd letter

---

[13]  As previously detailed, certain batches of mail addressed to the Commissioner's office and received between the end of November 2020 and the beginning of January 2021 were delayed in being opened and processed, and based on the date of the "Received' stamp on DRCT's November 23rd letter and Ms. Jutla's practice of stamping pieces of mail on the date they are received and opened in the Commissioner's office, DRCT's November 23rd letter was not received and opened in the Commissioner's office until January 12, 2021.  See *supra* note 9.

[14] Despite the delay in the November 23rd letter being received in the Commissioner's office and DRCT not receiving any response or acknowledgement from DOC regarding it, DRCT did not follow up with DOC regarding this letter or the concerns identified therein even though more than a month had passed from the December 18th deadline identified in the letter.

indicating the delay in receiving the letter and that it would be providing a substantive response, DRCT filed the instant suit on February 4, 2021.  (ECF No. 1).

While DRCT seemingly attempted, half-heartedly, to begin this prelitigation administrative process, it is clear such process was never exhausted and DRCT never provided DOC with a reasonable opportunity to respond or engage in a good-faith effort to address or mediate any of the identified issues.  Given the broad allegations outlined in the letter, the lack of specific examples of inmates with mental illness presently subjected to such conditions, and the need for DOC to review the claims and provide a substantive response, it cannot be said that DRCT gave DOC a reasonable opportunity to respond and attempt to mediate the issues through administrative channels.  In fact, the actions of DRCT in filing this lawsuit less than a month after DOC received DRCT's letter, despite DOC's indication that a substantive response was forthcoming, indicates that DRCT had very little interest in engaging with the defendants through administrative channels in an attempt to mediate any of the identified issues.[15]

While DRCT may not have been interested in engaging with DOC through administrative channels, this type of prelitigation administrative back and forth is what Congress envisioned in enacting PAIMI's exhaustion provision and is what is required under the law.  See Gonzalez, 756 F. Supp. at 1539 ("The Senate Report [concerning 42 U.S.C. § 10807] . . . unquestionably expresses a preference for informal remedies over

---

[15] This is further bolstered by the fact that, despite DRCT counsel being in communication with the undersigned in the weeks leading up to the commencement of this lawsuit, DRCT never raised its concerns with the undersigned, nor did DRCT ever indicate that litigation was forthcoming.  This is especially puzzling given the fact that, during this very same time, DRCT counsel was working with defense counsel and DOC to address DRCT's concerns related to a specific inmate at Northern, efforts which resulted in that inmate being moved to DOC's mental health facility.  See (Ex. E, ¶¶ 5-6; Ex. F).

litigation as a means of solving the problems of mentally ill individuals" and "the Senate Report states that [P&As] 'should continue the non-litigative approach to advocacy and dispute resolution and urges the continued use of administrative and alternative remedies prior to the initiation of a legal action.'")  (quoting S. Rep. 109, 99th Cong., 2d Sess.); see also 42 U.S.C. § 10807 ("Prior to instituting any legal action in a Federal or State court . . . an eligible system [DRCT] . . . *shall exhaust in a timely manner all administrative remedies where appropriate.*") (emphasis added).

In sum, DRCT failed to exhaust administrative remedies prior to initiating this action as required by PAIMI.  As detailed below, due to DRCT's failure to exhaust its remedies, the instant claims are not ripe.

### B. Due to DRCT's failure to exhaust administrative remedies, the instant claims are not ripe.

"Ripeness is a constitutional prerequisite to exercise of jurisdiction by federal courts." Nutritional Health Alliance v. Shalala, 144 F.3d 220, 225 (2d Cir. 1998) (citations omitted).  "Ripeness is a term that has been used to describe two overlapping threshold criteria for the exercise of a federal court's jurisdiction."  In re MTBE Prods. Liab. Litig., 725 F.3d at 109 (citations omitted); see also Ollie, 364 F. Supp.3d at 148 ("The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.") (quoting Nat'l Org. for Marriage, Inc., 714 F.3d at 687).  The first, which is not at issue here, is "constitutional ripeness[,]" which "is drawn from Article III limitations on judicial power" and "prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur."  In re MTBE Prods. Liab. Litig., 725 F.3d at 109-10 (internal citations and quotation marks omitted).

The second, which is at issue here, is "prudential ripeness[,]" which "'constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it,' and allows a court to determine 'that the case will be better decided later.'" Id. at 110 (quoting Simmonds, 326 F.3d at 357); see also Am. Sav. Bank, FSB, 347 F.3d at 439 ("The . . . prudential ripeness doctrine . . . is a more flexible doctrine of judicial prudence, and constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it.") (internal quotation marks and citations omitted). As it pertains to "prudential ripeness" the Second Circuit has explained that:

> When a court declares that a case is not prudentially ripe, it means that the case will be better decided later and that the parties will not have constitutional rights undermined by the delay. It does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III. Of course, in deciding whether "better" means later, the court must consider the likelihood that some of the parties will be made worse off on account of the delay. But that, and its degree, is just one-albeit important-factor the court must consider. Prudential ripeness is, then, a tool that court may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial.

Am. Sav. Bank, FSB, 347 F.3d at 439-440 (citing Simmonds, 326 F.3d at 357). Determining whether a case is prudentially ripe involves two inquiries: "(1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld." Id. at 440 (quoting Simmonds, 326 F.3d at 359).[16]

---

[16] As this Court has recently observed regarding the doctrine of prudential ripeness, "[i]n recent years, the Supreme Court has cast doubt on the continuing viability of the prudential ripeness doctrine, on the ground that it is in some tension with the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging. But neither the Supreme Court nor the Second Circuit has abandoned the doctrine yet." Phila. Indem. Ins. Co. v. Enter. Builders, No. 3:20-CV-56 (KAD), 2021 U.S. Dist. LEXIS 32159, *5 n. 1 (D. Conn. Feb. 22, 2021) (internal quotation marks, ellipses, & citations omitted).

The first inquiry, the fitness inquiry, "is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." Id. (citations omitted). "Issues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." Id. (citations omitted). "[A] claim may also fail for ripeness when a plaintiff has not exhausted administrative remedies." New York v. United States HHS, No. 07-CIV-8621 (PAC), 2008 U.S. Dist. LEXIS 101064, *28 (S.D.N.Y. Dec. 15, 2008); see also Am. Sav. Bank, FSB, 347 F.3d at 440 ("The fact that ASB has not yet exhausted its administrative remedies counsels in favor of invoking the prudential ripeness doctrine."). "Taken together, the fitness analysis requires 'consideration of a variety of pragmatic factors: whether the agency's actions or inactions challenged in the law suit are 'final;' whether the issues presented for review are primarily legal as opposed to factual in nature; and whether administrative remedies have been exhausted at least to the extent that an adequate factual records has been established.'" United States HHS, 2008 U.S. Dist. LEXIS 101064, at *28 (quoting Seafarers Int'l Union v. United States Coast Guard, 736 F.2d 19, 26 (2d Cir. 1984)).

The second inquiry, the hardship inquiry, examines "whether and to what extent the parties will endure hardship if the decision is withheld." Simmonds, 326 F.3d at 359. "The mere possibility of hardship is not enough to make a case ripe; instead, the courts must ask 'whether the challenged action creates a direct and immediate dilemma for the parties.'" United States HHS, 2008 U.S. Dist. LEXIS 101064, at *28 (quoting New York Civil Liberties Union v. Grandeau, 528 F.3d 122, 132 (2d Cir. 2008)).

25

Application of these principles establishes that DRCT's instant claims are not ripe and should be dismissed. Specifically, the Court would benefit from further factual development, including a narrowing and focusing of the issues in dispute that require judicial resolution, which can only be done after DRCT exhausts its remedies and gives DOC a reasonable opportunity to review and respond to DRCT's claims. In fact, had DRCT fully pursued the administrative process and provided DOC an opportunity to review and respond to the issues raised, certain issues in this action may have been resolved, which would obviate the need for this litigation, or would have at least limited or narrowed the issues in dispute. This is especially true given the facts of this case.

As DRCT acknowledges, the State and DOC announced the closure of Northern on February 8, 2021, only days after DRCT filed the instant suit. (ECF No. 24, ¶ 161). As DRCT's November 23rd letter and original Complaint make clear, DRCT's concerns related to the practices and treatment of inmates with mental illness at Northern. See e.g., (ECF No. 1, ¶ 1) ("[DRCT] seeks to end the persistent and deliberate abuse of *people with mental illness who are incarcerated at Connecticut's super-maximum security Northern Correctional Institution ('Northern')*. [DOC] subject *prisoners with mental illness at Northern* to prolonged, and often indefinite, isolation and sensory deprivation, and forcible in-cell shackling that can last for days.") (emphasis added); (Ex. B, p. 1) ("We are writing to you on behalf of *individuals with mental illness who are incarcerated at Northern* . . . and who have been, and continued to be, subject to in-cell restraint and prolonged isolation. We are gravely concerned that *these cruel and unusual practices continue at Northern.*") (emphasis added). Had DRCT engaged in the previously detailed prelitigation

administrative process, it would have been aware, prior to filing suit, that Northern would be closing, which impacts the scope, nature, and type of issues DRCT sought to address.

DRCT's filing of an Amended Complaint on February 18, 2021, (ECF No. 24), after the announcement of Northern's closure, further supports the argument that the instant claims need further factual development to better narrow and focus the issues in dispute. Indeed, the scope and nature of the claims in DRCT's Amended Complaint, including the requested relief, was impacted by the announcement of Northern's closure.[17]  Moreover, it is clear from DRCT's November 23rd letter that the issues it identified related to Northern specifically, and the conditions DRCT wished to change are the product of long-standing administrative practices at that facility.[18]  However, the allegations in the Amended Complaint, while acknowledging the closing of Northern, now seemingly relates to Northern and other unidentified DOC facilities.  Rather than using the prelitigation

---

[17] *Compare* (ECF No. 1, ¶ 1) ("[DRCT] seeks to end the persistent and deliberate abuse of *people with mental illness who are incarcerated at Connecticut's super-maximum security Northern Correctional Institution ('Northern').* [DOC] subject prisoners with mental illness *at Northern* to prolonged, and often indefinite, isolation and sensory deprivation, and forcible in-cell shackling that can last for days.") (emphasis added), *and* (ECF No. 1, Request for Relief, p. 58-59,  ¶¶ b, d) ("Permanently enjoin Defendants . . . from subjecting DRCT's Constituents to *prolonged isolation at Northern either by maintaining any of DRCT's Constituents at Northern or transferring any of DRCT's Constituents to Northern*" and "[p]ermanently enjoin Defendants . . . from subjecting DRCT's Constituents *to in-cell shackling at Northern*") (emphasis added), *with* (ECF No. 24, ¶ 1) ("[DRCT] seeks to end the persistent and deliberate abuse of people with mental illness *in the custody of [DOC]*—including those subjected to isolative statuses at . . . Northern *and elsewhere.*") (emphasis added), *and* (ECF No. 24, Request for Relief, p. 59-60, ¶¶ b, d) ("Permanently enjoin Defendants . . . from subjecting DRCT Constituents to prolonged isolation either by maintaining any of DRCT's Constituents in Isolative Statues (at Northern *or elsewhere*) or transferring any of DRCT's Constituents into Isolative Status (at Northern *or elsewhere*" and "[p]ermanently enjoin Defendants . . . from subjecting DRCT's Constituents to in-cell shackling") (emphasis added).

[18] See *supra* note 7.

administrative process to narrow and focus the issues in dispute for litigation, DRCT has foregone this process and has instead filed an Amended Complaint that seemingly broadens the issues it initially raised.  Given the specific concerns raised by DRCT pertaining to inmates with mental illness housed at Northern and the impending closure of Northern, this is exactly the type of situation in which further factual development through administrative channels is needed to allow the parties to address the issues raised, including determining whether any of the issues have been resolved by the closure of Northern and/or DOC's plan for housing inmates previously at Northern.

In short, DRCT's instant claims are not ripe as further factual development will assist the Court, and the parties, in narrowing and focusing the issues in dispute. Additionally, DRCT's failure to exhaust administrative remedies, remedies which would have accomplished the goal of narrowing and focusing the factual issues in dispute, also weighs in favor of the Court declining jurisdiction on prudential grounds.  See United States HHS, 2008 U.S. Dist. LEXIS 101064, at *28 ("[A] claim may also fail for ripeness when a plaintiff has not exhausted administrative remedies."); see also Am. Sav. Bank, FSB, 347 F.3d at 440 ("The fact that ASB has not yet exhausted its administrative remedies counsels in favor of invoking the prudential ripeness doctrine."); High Mt. Corp., 416 F. Supp.3d at 353 n. 3 ("As the Second Circuit has held, failure to exhaust administrative remedies can weigh in favor of invoking the prudential ripeness doctrine.") (citations omitted).  Moreover, the legislative history of PAIMI's exhaustion provision further supports the proposition that this Court may determine that the instant action is not ripe due to DRCT's failure to exhaust.  See Gonzalez, 756 F. Supp. at 1539 (observing that PAIMI's legislative history indicates that "'if legal action is initiated, courts retain their

prerogative to determine that the issues are not ripe and to remand the matter for further administrative consideration.'") (quoting H.R. Conf. Rep. No. 576, 99th Cong., 2d Sess.).[19]  A finding by this Court that the instant action is not ripe due to DRCT's failure to exhaust administrative remedies, remedies which would provide the necessary factual development to assist the parties and the Court, comports not only with Second Circuit prudential ripeness precedent, but also with the purpose of PAIMI's exhaustion provision.

In addition to DRCT's claims not being fit for review, DRCT will not endure any significant hardship if a decision on the issues were withheld while DRCT pursues administrative remedies.   If this Court were to withhold consideration of the issues to permit the parties to work through administrative channels, it would not "create a direct and immediate dilemma for [DRCT]."   In fact, withholding Court consideration would permit DRCT to work with DOC through administrative channels to address and mediate the issues raised in the instant suit, which may resolve certain issues, or at least narrow the issues in dispute.  Requiring DRCT to complete the administrative process benefits DRCT and its constituents, by not only allowing the parties to address specific issues through more efficient administrative channels, but also by limiting litigation costs through narrowing of the issues in need of judicial resolution.  In short, there is no hardship to DRCT by the Court withholding consideration while the parties work through administrative channels to address the issues raised in this lawsuit.

---

[19] In fact, the Court in <u>Gonzalez</u>, after finding that the P&A "presented little evidence that they took adequate measures to resolve this case extra-judicially[,]" issued a stay of "discovery and all further proceedings as to all issues other than exhaustion of alternative remedies . . . pending a determination by the Court that the matter is ripe for judicial action."  <u>Gonzalez</u>, 756 F. Supp. at 1539.

In sum, because DRCT's instant claims are not fit for judicial review and DRCT will not endure any significant hardship by the Court withholding consideration, the instant action is not ripe and should be dismissed.  See Millo v. Hanover Ins. Co., No. 3:17-CV-1533 (VLB), 2018 U.S. Dist. LEXIS 80609, *7-9 (D. Conn. May 14, 2018) (declining to exercise jurisdiction over certain claims for "prudential reasons" after Court found that "case is unripe on prudential grounds" and dismissing claims for the parties "to move to reopen should jurisdiction become appropriate").[20]

### C. DRCT lacks standing to raise third-party claims on behalf of Connecticut inmates with mental illness.

The "irreducible constitutional minimum of standing," Lujan v. Defs. Of Wildlife, 504 U.S. 555, 560 (1992), requires the party invoking federal jurisdiction to show "(1) *injury-in-fact*, which is a 'concrete and particularized' harm to a 'legally protected interest,'; (2) *causation* in the form of a 'fairly traceable; connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief."  W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP, 549 F.3d 100, 106-07 (2d Cir. 2008) (quoting Lujan, 504 U.S. at 560-61).  "In addition to these core constitutional requirements, litigants must also satisfy 'prudential standing,' which 'embodies judicially self-imposed limits on the exercise of federal jurisdiction.'"  Keepers, Inc. v. City of Milford, 807 F.3d 24, 39 (2d Cir. 2015) (quoting Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 91 (2d Cir. 2009)).

---

[20] In the alternative, if the Court determines that dismissal is inappropriate, the Court should stay all proceeding in this matter while DRCT pursues its remedies through the administrative process.  See Gonzalez, 756 F. Supp. at 1539 (finding that "Plaintiffs have presented little evidence that they took adequate measures to resolve this case extra-judicially" and staying "discovery and all further proceedings as to all issues other than exhaustion . . . pending a determination that the matter is ripe for judicial action").

"The 'prudential standing rule normally bars litigants from asserting the rights or legal interests of other in order to obtain relief from injury to themselves.'" Rajamin v. Deutsche Bank Nat'l Trust Co., 757 F.3d 79, 86 (2d Cir. 2014) (quoting Warth v. Seldin, 422 U.S. 490, 509 (1975)).  That is, a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claims to relief on the legal rights or interests of third parties." Id. (quoting Warth, 422 U.S. at 499).  This bar is not absolute, as "there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." Kowalski v. Tesmer, 543 U.S. 125, 129-130 (2004).  Indeed, "a third party can obtain standing by establishing (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." Keepers, 807 F.3d at 41 (citation omitted).  "To show hindrance, the litigant 'would need to establish that some barrier or practical obstacle (i.e. third party is unidentifiable, lacks sufficient interest, or will suffer some sanction) prevents or deters the third party from asserting his or her own interest.'" Mental Hygiene Legal Serv. v. Cuomo, 13 F. Supp.3d 289, 301 (S.D.N.Y. 2014) (quoting Congregation Rabbinical Coll. Of Tartikov, Inc. v. Vill. Of Pomona, 915 F. Supp.2d 574, 594 (S.D.N.Y. 2013)).

In this case, DRCT cannot assert third-party claims on behalf of inmates with mental illness subjected to the alleged conditions in this suit.  Even assuming for purposes of this motion that DRCT has a sufficiently close relationship with these individuals, there is no indication that these inmates are unable to assert their own rights.  DRCT has not shown, or even alleged, that their constituents would have any difficulty asserting their own interests regarding the claims in this suit.  In addition to their being no allegations to this effect, numerous lawsuits have been filed by, or on behalf of, individual inmates with

alleged mental illness challenging the conditions of confinement at Northern.[21]  In fact, each of the three inmates identified in the Amended Complaint, Kyle Lamar Paschal-Barros, Kezlyn Mendez, and Tyrone Spence, have all filed numerous lawsuits demonstrating their ability to assert their own rights through litigation, including lawsuits regarding the conditions of confinement at Northern.[22]

---

[21] See e.g., Goode v. Cook, et al., No. 3:20-CV-210 (VAB), Complaint, Doc. No. 1 (Feb. 13, 2020) (alleging that DOC's prolonged confinement of inmate with alleged mental illness at Northern and other facilities in "solitary conferment conditions on 'restrictive status'" violates the Eighth and Fourteenth Amendment); Riles v. Semple, et al., No. 3:17-CV-2178 (MPS), Complaint & Amended Complaint, Doc. Nos. 1 & 21 (Dec. 29, 2017 & July 23, 2019) (pro se inmate filed Complaint alleging violations of his constitutional rights due to conditions of confinement at Northern, which was amended by counsel and alleged that inmate had untreated mental illness that was exacerbated by inmate's confinement in "solitary confinement" at Northern); Ashby v. Quiros, et al., No. 3:19-CV-1370 (SRU), Complaint & Initial Review Order, Doc. Nos. 1 & 7 (Sept. 4, 2019 & Feb. 3, 2020) (permitting pro se inmate with alleged mental illness housed in solitary confinement at Northern to proceed on constitutional claims concerning his conditions of confinement); Campbell v. Lantz, No. 3:19-CV-1512 (CSH), Complaint & Initial Review Order, Doc. Nos. 1 & 14) (Sept. 26 & Dec. 12, 2019) (permitting pro se inmate with alleged mental illness housed in solitary confinement at Northern to proceed on constitutional claims concerning his conditions of confinement and mental health care).

[22] A review of the PACER docket reveals that Mr. Paschal-Barros has filed 13 federal lawsuits since 2016, including a lawsuit concerning the conditions of confinement in restrictive statuses, including at Northern, and its effect on his alleged mental illness.  See Kyle Lamar Paschal-Barros v. Semple, et al., No. 3:18-CV-2157 (VLB), Complaint, Doc. No. 1 (Dec. 31, 2018).  Additionally, a review of the State of Connecticut Judicial Branch website reveals that Mr. Paschal-Barros currently has a state court case pending wherein he raises constitutional claims, as well as ADA and RA claims, regarding his conditions of confinement and mental health treatment while in Administrative Segregation, including the conditions at Northern.  See Paschal-Barros v. Department of Correction, No. TTD-CV20-5013768, Complaint, filed July 20, 2020.
    The PACER docket reveals that Mr. Mendez has filed 4 federal lawsuits, while the PACER docket reveals that Mr. Spence has filed 9 federal lawsuits since 2013, including a lawsuit concerning the conditions of confinement in restrictive statuses, including at Northern, and its effect on his alleged mental illness.  See Tyrone Spence v. Maiga, No. 3:19-CV-104 (AVC), Complaint, Doc. No. 1 (Jan. 22, 2019).

As a result, DRCT cannot establish that they have standing to assert third-party claims on behalf of Connecticut inmates with mental illness.  See Keepers, 807 F.3d at 41-42 (concluding that prudential standing barred plaintiff from asserting rights of third party as plaintiff "has not shown, or even alleged, that [third party] would have any difficulty asserting their own interests"); Mental Hygiene., 13 F. Supp.3d at 301 ("Plaintiff fails to meet the second prong of the prudential test, because it has not shown that its clients are hindered from protecting their own interests.") (citation omitted).

## V.    CONCLUSION

**WHEREFORE**, based on the foregoing reasons, the Court should grant this motion and dismiss the instant action.

DEFENDANTS,
CONNECTICUT DEPARTMENT OF
CORRECTION, ET AL.

WILLIAM TONG
ATTORNEY GENERAL

BY:    _____/s/_____
Edward D. Rowley
Assistant Attorney General
Federal Bar No. ct30701
110 Sherman Street
Hartford, CT 06105
Tel: (860) 808-5450
Fax: (860) 808-5591
E-Mail: Edward.rowley@ct.gov

BY:    _____/s/_____
Terrence M. O'Neill
Assistant Attorney General
Federal Bar No. ct10835
110 Sherman Street
Hartford, CT 06105
Tel: (860) 808-5450
Fax: (860) 808-5591
E-Mail: terrence.oneill@ct.gov

## **CERTIFICATION**

I hereby certify that on March 12, 2021, a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's System.

_____/s/_____
Edward D. Rowley
Assistant Attorney General