## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DISABILITY RIGHTS CONNECTICUT, INC., on behalf of its constituents, | |
| Plaintiff, | |
| v. | Civil Action No. 3:21-cv-00146 |
| CONNECTICUT DEPARTMENT OF CORRECTION; | **SECOND AMENDED COMPLAINT** |
| ANGEL QUIROS, Commissioner, Connecticut Department of Correction, in his official capacity, | May 18, 2022 |
| Defendants. | |

### <u>INTRODUCTION</u>

1.      Disability Rights Connecticut, Inc. seeks to end the Connecticut Department of Correction's deliberate and unrelenting abuse of people with mental illness in its custody.

2.      The Connecticut Department of Correction ("DOC") punishes prisoners with mental illness by subjecting them to barbaric, physically harmful, and psychologically damaging in-cell shackling.  Prisoners with mental illness are especially vulnerable to the horrors of this abuse, and the repeated infliction of it greatly exacerbates their underlying mental illness.  Even worse, DOC routinely imposes in-cell shackling in response to symptoms of mental illness, including head-banging, cutting, and other acts of self-harm.  Consequently, these vulnerable prisoners find themselves trapped in a downward spiral of shackling that worsens their mental illness and causes more symptomatic behavior that, in turn, is punished with more shackling.

3.      The abuse of prisoners with mental illness begins with DOC's policies, practices, and procedures that channel them into so-called "restrictive statuses" — referred to by DOC as "Administrative Segregation," "Security Risk Group," and "Special Needs Management."  In

NY-2377600

these restrictive statuses, prisoners with mental illness spend 20 hours per day in almost complete sensory and social isolation.  The extreme stress of this isolation predictably causes decompensation, mental health crises, and behaviors symptomatic of their underlying mental illness, such as head-banging, cutting, and other acts of self-harm.  Many try to kill themselves. Some succeed.

4.     DOC does not respond to prisoners' decompensation, mental health crises, and symptomatic behaviors with counseling or other reasonable modifications.  To the contrary, DOC responds to symptomatic and self-injurious behaviors, and otherwise punishes prisoners with mental illness, by subjecting them to in-cell shackling.

5.     The process of in-cell shackling typically beings with DOC engaging in a violent cell extraction in which multiple DOC staff force their way into a person's cell — often using chemical spray — and restrain the person.  They then shackle the prisoner's wrists and legs with metal cuffs and bind the cuffs with a heavy metal tether chain.  DOC staff sometimes deliberately impose even more excessive and needless pain by using excessively tight shackles or "short chaining" these prisoners, *i.e.*, keeping the tether chain so short that prisoners must remain painfully hunched over.  These shackled prisoners are then dumped in cold and filthy strip cells, where they are left for hours on end.

6.     DOC's in-cell shackling of prisoners is painful, intentionally humiliating, physically harmful, and severely psychologically damaging.  Repeated in-cell shackling leaves many individuals with deep and permanent scarring on their wrists and ankles, and worsens their underlying mental illness.

7.     DOC has willfully, knowingly, and intentionally engaged in this pattern and practice of abusing prisoners with mental illness for years.  Many of these prisoners have been

2

diagnosed with a mental illness by DOC itself, and yet DOC refuses to make reasonable modifications to its policies and practices to avoid the abuse. Even where prisoners have long histories of mental illness, DOC's abusive and discriminatory treatment leads to them being treated as willfully misbehaving, disruptive, or malingering when experiencing symptoms and manifestations of their mental illness. Being repeatedly punished for symptoms and manifestations of mental illness, these prisoners enter into a cycle of repeated subjection to in-cell shackling and isolation, which leave them segregated, excluded from, and denied access to DOC's programs, services, supports, and activities.

8.    The closure of Northern Correctional Institution ("Northern"), Connecticut Governor Ned Lamont's signing of Executive Order 21-1, and the passage and signing of Public Act 22-18 have not stopped DOC's in-cell shackling of prisoners with mental illness. In fact, after Northern closed in June 2021, DOC actually **increased** its use of in-cell shackling of individuals in restrictive statuses.

9.    DOC's in-cell shackling of prisoners with mental illness constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. DOC's failure to provide reasonable modification for prisoners with mental illness to avoid subjecting them to in-cell shackling also constitutes a violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504"), and their respective implementing regulations.

10.    Disability Rights Connecticut, Inc. ("DRCT"), which is authorized by federal law to protect the rights of individuals diagnosed with or experiencing mental illness in Connecticut, brings this action against DOC and Angel Quiros (collectively, "Defendants") for declaratory

NY-2377600

and injunctive relief.  DRCT seeks to stop DOC's abusive policies and practices of subjecting incarcerated people with mental illness to in-cell shackling at Connecticut state correctional institutions, and the discriminatory treatment of them in connection with such shackling.

## JURISDICTION

11.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under the United States Constitution, 42 U.S.C. § 1983, the ADA, 42 U.S.C. § 12131, *et seq.*, and Section 504, 29 U.S.C. § 794(a).

## VENUE

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and because a substantial part of the events and omissions giving rise to DRCT's claims occurred in this district.

## PARTIES

**A.      Disability Rights Connecticut, Inc.**

13.     DRCT is a private, nonprofit corporation designated as the protection and advocacy system in Connecticut under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, and its implementing regulations. DRCT's office is located at 846 Wethersfield Avenue, Hartford, Connecticut 06114.  DRCT is the successor entity to the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities ("OPA").  Conn. Gen. Stat. § 46a-10a *et seq.*

14.     The PAIMI Act establishes and funds protection and advocacy systems, including DRCT, to investigate abuse and neglect of individuals with mental illness, to advocate for them, and to ensure that their rights are protected, including their rights under the United States Constitution and federal statutes.  42 U.S.C. §§ 10801(b)(1), 10801(b)(2)(A).

15.     Consistent with the PAIMI Act, DRCT's governing structure allows its constituents to express their collective views and protect their collective interests, and to participate in, help guide, and significantly influence DRCT's priorities and activities.

16.     DRCT has established a PAIMI Advisory Council ("Council") that advises DRCT on policies and priorities to be carried out in protecting and advocating for the rights of individuals with mental illness.  The Council complies with all requirements of 42 U.S.C. § 10805(a)(6).  The Chair of the Council sits on the Board of Directors of DRCT.

17.     The Council holds bi-monthly meetings to discuss, evaluate, and advise on DRCT's policies, priorities, procedures, and activities.  The Chair of the Council presents the substance of the Council's findings and conclusions to the Board of Directors at the monthly Board meetings.  The Council considers, nominates, and appoints its own members, including its Chair.  DRCT's Executive Director does not control or participate in the election of new members to the Council.  Council members may be removed only by the Council.  The Council, in conjunction with the Executive Director and Board of Directors, establishes DRCT's PAIMI priorities for each fiscal year at an annual meeting.  42 U.S.C. § 10805(c)(2)(B).

18.     DRCT has established a grievance procedure whereby persons served under PAIMI or their representatives or family members may file a grievance when there is disagreement about a DRCT action or decision.  The grievance procedure is designed "to assure that individuals with mental illness have full access to the services of the system." 42 U.S.C. § 10805(a)(9).  The Council is the final decision-maker with respect to grievances filed by persons served under PAIMI or their representatives or family members.

19.     DRCT is responsible for providing protection and advocacy services to individuals with mental illness pursuant to the PAIMI Act.  42 U.S.C. § 10805.

20.     DRCT has statutory authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State of Connecticut.  42 U.S.C. § 10805(a)(1)(B).

21.     DRCT is pursuing this action to advocate for and protect the rights and interests of "individuals with mental illness," as defined in 42 U.S.C. § 10802(4), who are in DOC's custody and are currently in restrictive statuses, at risk of transfer into restrictive statuses, or otherwise at risk of being subject to in-cell shackling ("DRCT's Constituents").  DRCT's Constituents are the direct beneficiaries of DRCT's activities, including the declaratory and injunctive relief sought in this litigation.

22.     DRCT's Constituents have "significant mental illness or emotional impairment," as determined by a mental health professional qualified under the laws and regulations of the State of Connecticut.  *See* 42 U.S.C. § 10802(4).  DRCT's Constituents are therefore individuals with mental illness for purposes of the PAIMI Act, 42 U.S.C. § 10802(4).  "Mental illness" is used throughout this Second Amended Complaint pursuant to its definition under the PAIMI Act.  This definition encompasses individuals with mental illness who have serious mental illness or emotional impairment, or who are at substantial risk of developing serious mental illness or emotional impairment.

23.     DRCT's Constituents' mental illness substantially limits one or more major life activities, including but not limited to thinking, concentrating, and interacting with others, which in turn includes their ability to control their behavior, self-care, and working.  DRCT's Constituents have records of having such an impairment, or they are regarded as having such an impairment.

24.     DRCT's Constituents are qualified individuals with disabilities for purposes of the ADA, 42 U.S.C. § 12131(2), and Section 504, 29 U.S.C. § 794(a).

25.     DRCT's Constituents, as persons incarcerated by DOC, meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants.  42 U.S.C. § 12131(2).

26.     DRCT's Constituents all reside in "facilities" rendering care and treatment for individuals with mental illness, as that term is defined in 42 U.S.C. § 10802(3) and 42 C.F.R. § 51.2.

27.     DRCT's Constituents are discriminated against on the basis of their disability as a result of Defendants' failure to reasonably modify their policies, practices, and procedures to ensure that they are not subject to in-cell shackling.

28.     DRCT's Constituents have each suffered injuries, are continuing to suffer injuries, and/or are at risk of suffering injuries that make them eligible to bring suit against Defendants in their own right.

29.     The Council has voted to include a priority concerning DOC's in-cell shackling of prisoners with mental illness.  The Council has supported and approved DRCT's efforts to address the in-cell shackling of prisoners with mental illness.  The Council has also approved the commencement of this lawsuit to remedy the discrimination against and mistreatment of DRCT's Constituents.  The interests that DRCT seeks to vindicate by this lawsuit — protecting the rights of institutionalized individuals with mental illness — are germane to DRCT's central purpose and federal mandate.

30.     As demonstrated above, DRCT's Constituents have the power to participate in and exert significant influence over DRCT's policies, priorities, and activities.  DRCT provides

7

the means by which these Constituents express their collective views and protect their collective interests.  DRCT is therefore the functional equivalent of a traditional membership organization, and DRCT's Constituents possess sufficient indicia of membership in DRCT to support DRCT's associational standing to sue on their behalf.

31.     DOC's continuing violations of the Eighth Amendment, ADA, and Section 504 have also directly and proximately caused injury, including economic injury and impairment, to DRCT itself.  DRCT has been forced to divert substantial resources over the past several years to investigating DOC's mistreatment of DRCT's Constituents, including DOC's actions that form the basis for the claims asserted in this litigation.  For example, and without limitation, DRCT has worked pursuant to the Council's priorities concerning the in-cell shackling of DRCT's Constituents.  DRCT employees have spent a significant amount of time processing and reviewing DRCT's Constituents' complaints about DOC's mistreatment of them, including the conditions that form the basis for the claims asserted in this litigation.  Given DOC's failure to remedy the situation, DRCT has also been forced to divert substantial resources to prepare to enforce the rights of DRCT's Constituents through this litigation.

### B.     Connecticut Department of Correction

32.     Defendant DOC is a public entity within the meaning of and subject to Title II of the ADA, 42 U.S.C. § 12131(1).  DOC administers a program or activity that receives federal financial assistance and has received such funds throughout the time period during which the acts described herein have continued.  As a recipient of federal financial assistance, DOC is obligated to comply with Section 504.29 U.S.C. § 794(a).

33.     DOC is charged with rendering care or treatment to DRCT's Constituents at Connecticut state correctional institutions.

NY-2377600

34.     DOC is responsible for the operation and management of Connecticut state correctional institutions, is subject to the ADA and its implementing regulations at 28 C.F.R. § 35.101 *et seq*., and is subject to the requirements of Section 504, 29 U.S.C. § 794(a).

35.     DOC is duly organized and exists under the laws of the State of Connecticut, and a government entity.  DOC employs more than 5,000 persons.

36.     DOC is legally responsible for ADA and Section 504 violations committed by DOC staff and contractors who provide programs, services, or activities to DOC prisoners, including DRCT's Constituents.  *See* 28 C.F.R. § 35.130(b)(1), 29 U.S.C. § 794(a).

37.     DOC programs, services, and activities are covered by the ADA, 28 C.F.R. § 35.152, and Section 504.  *See* 29 U.S.C. § 794(b)(1).  The services, programs, and activities that DOC provides to individuals in its custody, including DRCT's Constituents include, but are not limited to, sleeping, eating, showering, toileting, communicating with those outside correctional institutions by mail and telephone, recreation, exercising, entertainment, safety and security, the DOC's administrative, disciplinary, and classification proceedings, medical and mental health services, work assignments, visits, educational, substance abuse, anger management, and parenting classes, sentence credits, community release programs, and discharge services.

### C.     Angel Quiros

38.     Defendant Angel Quiros is the Commissioner of DOC.  Defendant Quiros, as Commissioner, is the legal custodian of all prisoners confined in DOC facilities; is responsible for the safe, secure, and humane housing of those prisoners; is directly responsible for the administration of all DOC correctional institutions; and has authority over the assignment of prisoners to DOC's restrictive status and the imposition of in-cell shackling.  Defendant Quiros

has acted within the scope of his employment and under color of state law at all times relevant hereto and in connection with all policies, procedures, practices, and conduct described herein. Defendant Quiros is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.     DOC Channels Prisoners with Mental Illness into Restrictive Statuses

39.     The in-cell shackling of prisoners with mental illness begins with DOC channeling them into restrictive statuses.  This practice has been ongoing since at least 1995, with the opening of Northern, and now continues almost 30 years later.

40.     In 1995, Connecticut opened the state's first and only supermax prison – Northern.  Since that time, and continuing until today, Defendants have knowingly and deliberately incarcerated prisoners with mental illness in restrictive statuses rather than recognizing and treating their disabilities, or providing reasonable modifications for them.

41.     Restrictive statuses are inherently isolating.  People in restrictive statuses, by contrast with those in "general population," are removed from prison life.  Their every move is constrained, and they are subject to constant surveillance.

42.     People in restrictive statuses spend 20 hours per day, every day, locked up in small concrete cells.  During this time, their only access to the outside world is through a small window or "trap" in their cell door.

43.     Individuals in restrictive statuses are categorically denied access to substance abuse, anger management, and parenting classes, sentence credits, and community release programs.  If they are able to leave their cells, it is only to attend to basic necessities like showering and making phone calls.  And if they are given any recreation time, it is spent in a small indoor area, often while restrained.

44.     Prisoners with mental illness are over-represented in restrictive statuses.  This is due, *inter alia*, to DOC failing to make reasonable modifications to its policies, practices, and procedures.  DOC fails to assess and account for mental illness in assigning prisoners to restrictive status, uses symptomatic behaviors as a basis for assigning them to restrictive status, issues disciplinary tickets to keep them in restrictive status, and permits them to be held in restrictive status indefinitely.

45.     DOC's restrictive statuses include Administrative Segregation, Security Risk Group, and Special Needs Management.[1]

46.     Administrative Segregation isolates prisoners by removing them from the general population and imposing restrictions on their social interactions and virtually all other aspects of prison life.  Administrative Segregation is supposed to be reserved for people DOC considers to threaten safety or security.  Admin. Directive 9.4.  Administrative Segregation has three phases. In the men's system, Phase 1 currently occurs at Walker.  Phases 2 and 3 currently occur at Garner.

47.     Security Risk Group confines certain prisoners in isolative conditions because DOC alleges that they are affiliated with a gang.  Security Risk Group has five phases.  In the men's system, Phase 1 currently occurs at Walker Correctional Institution.  Phases 2 through 5 currently occur at Corrigan.

48.     Special Needs Management is an open-ended restrictive status that DOC claims is used for individuals who threaten safety or security.  Admin. Directive 9.4.  Individuals in Special Needs Management have typically been judged by the DOC to have "failed" the Administrative Segregation or Security Risk Group statuses.

---

[1] There is one additional restrictive status, Chronic Discipline, but few people are on this status at any given time.

NY-2377600

49.     People at York Correctional Institution, Connecticut's women's prison, and Manson Youth Institution, the state's prison for children, may also be held in restrictive statuses.

50.     All of these restrictive statuses require extensive amounts of time as a minimum placement, ranging from 10 to 24 months.  The minimum amount of time in Administrative Segregation is 10 months, and individuals in Special Needs Management qualify for review only once every six months. Similarly, the minimum time for Security Risk Group status is 24 months.  Admin. Directive 6.14.

51.     Prisoners also can be held in these restrictive statuses indefinitely.  In its administrative directives, DOC identifies the "authorized length of confinement" in Administrative Segregation and Special Needs Management as indefinite.  There is also no maximum length of time for Security Risk Group status; in practice, prisoners may remain on this status indefinitely.  Admin. Directive 9.4, Attach. B.

52.     Once people are transferred into restrictive statuses, and despite the well-known harms of isolation, DOC policies do not require the provision of programming, therapeutic, or pro-social activities.  To the contrary, DOC policies preclude people on restrictive statuses from work assignments, substance abuse, anger management, and parenting classes, sentence credits, and community release programs.  In practice, DOC staff adhere to those policies and preclude people on restrictive statuses from work assignments, substance abuse, anger management, and parenting classes, sentence credits, and community release programs.

53.     The psychological effects of prolonged isolation are well-documented, severe, and "analogous to the acute reactions suffered by torture and trauma victims."  Craig Haney, *Restricting the Use of Solitary Confinement*, 2018 Ann. Rev. Criminology 285, 295 (2018).  The

excessively harsh and isolating conditions of restrictive statuses cause prisoners with mental illness to suffer serious and often catastrophic psychological and physiological deterioration.

54.     This severe isolation causes prisoners with mental illness to decompensate, suffer mental health crises, and exhibit behaviors that are symptomatic of their mental illness.  These symptomatic behaviors include head banging, compulsive cutting of their own flesh, other acts of self-harm, and even suicide attempts.  Even short of outright self-harm, the isolation manifests itself in hallucinations and other behaviors that are symptomatic of underlying mental illness but do not threaten the safety of others, *e.g.*, a person smearing feces all over the walls of their cell or covering their window with paper.  In short, the severe isolation of prisoners with mental illness exacerbates their mental illness which, in turn, leads to more frequent decompensation, mental heal crises, and symptomatic behaviors.

55.     But DOC does not respond to these symptomatic behaviors with mental health care, psychological counseling, or other support services.  Instead, DOC staff often erroneously deem those with mental illness to be "malingering" and interpret their symptoms as willful misconduct that is met with yet further isolation.

56.     DOC routinely shunts individuals in restrictive statuses who engage in symptomatic behaviors that DOC deems to be "disruptive" to a special unit, the "Restrictive Housing Unit" ("RHU") at Walker Correctional Institution ("Walker").  Individuals in the RHU at Walker suffer the same deprivations of restrictive statuses but are subjected to even more extreme social deprivation and sensory deprivation.  For example, individuals on disciplinary status in RHU can be confined for more than 20 hours per day for up to 15 days straight, or 30 of 60 days.  Any time out of cell is spent by themselves in a locked dayroom or exercise cage, and they have no opportunities to access the outdoors or sunlight.  DOC keeps some individuals with

NY-2377600

mental illness in the RHU for months on end despite that they are no longer on disciplinary status.

57.     DOC's policies, practices, and procedures of imposing extreme and unjustifiably isolating conditions trap people with mental illness, including those with serious mental illness and those at substantial risk of developing serious mental illness, in a downward spiral of increasing isolation, deterioration, and punishment.

**B.     DOC Subjects Prisoners with Mental Illness to In-Cell Shackling**

58.     DOC often responds to prisoners with mental illness in mental health crises or who are exhibiting symptomatic behaviors by subjecting them to barbaric, physically painful, and psychologically damaging in-cell shackling.  In practice, DOC routinely uses in-cell shackling as punishment.

59.     Pursuant to Administrative Directive 6.5, as applied by DOC, Defendant Quiros and his subordinates, restraints are used not only to prevent escape or injury, but also to "ensure compliance with an order."  Admin. Directive 6.5, Attach. A § 1(a)(i)(4).  This is true regardless of the order, the severity of the alleged violation, or the reason for the behavior.

60.     DOC, under these guidelines, often responds to mental health crises or behaviors symptomatic of mental illness with in-cell shackling.  At times, staff have used in-cell shackling on prisoners returning from the hospital for self-injurious behavior, even when individuals were calm and no longer posed a threat to the safety and security of themselves or anyone else.

61.     DOC staff often do not attempt to de-escalate the situation or use less restrictive means of control before imposing in-cell shackles.  DOC staff also do not assess or account for mental illness when subjecting individuals to in-cell shackles.

NY-2377600

62.     In-cell shackling often begins with a violent cell extraction.  During cell extractions, a group of DOC staff surround the prisoner's cell, spray chemical agent through the trap, force open the door, and restrain the prisoner, often assaulting the prisoner in the process.

63.     Once subdued, DOC staff place individuals in filthy and freezing concrete "strip cells" where they are left alone but still chained and shackled.  The cells' floors and walls are often covered with the urine and feces of past occupants.

64.     While in the "strip cells," DOC may use (1) three-point restraints, (2) black box restraints, and (3) four-point restraints.

65.     When using "***three-point restraints***," DOC staff shackle the prisoner's legs and wrists, bind their hands to their feet with a tether chain, and fasten a belly chain around their waist.  Although DOC's policies facially forbid it, DOC also, engages in "short chaining" these prisoners, *i.e.*, keeping the tether chain so short that prisoners must remain painfully hunched over while shackled.  The "short-chaining" of the tether chain connecting hands to legs has prevented prisoners from being able to stand up straight or lie down in a fully extended manner, forcing them into a crouched position and causing significant, lasting pain.

66.     On top of three-point restraints, DOC staff may also employ a "***black box restraint***," which fastens the tether and belly chain together and prevents prisoners from having any range of motion with their hands.

67.     DOC staff also use a method of restraint called "***four-points***."  Four-point restraints mean tying each of a prisoner's hands and feet separately to a metal bed.  Four-point restraints often constitute an "upgraded status," meaning that an individual is placed on four-point restraints if staff determine that the three-point restraints or black box have not

15

subdued the individual.  Once removed from "upgraded four-points," an individual is often "downgraded" and placed back on three-point restraints for additional time.

68.     DOC often imposes in-cell shackling as punishment in response to decompensation, mental health crises, and behaviors symptomatic of underlying mental illness. The use of in-cell shackling and the duration of prisoners' placement in such restraints is punitive, arbitrary, abusive, and discriminatory.  DOC staff subject prisoners to in-cell shackling despite the lack of any safety or security justification, and for far longer than is required to ensure safety and security.  Staff commonly keep prisoners in chains for a full eight-hour shift — and sometimes longer.  Prisoners are frequently kept chained even after they have ceased their "disruptive" behavior and after any plausible safety or security justification has expired.

69.     Defendants' policy, practice, and procedure of placing and leaving prisoners with mental illness in in-cell shackles is also dangerous, painful, and injurious.  The tight shackling of hands and legs has caused bleeding on or around prisoners' wrists and ankles and has left prisoners with lasting scars, bruises, and pain and numbness from nerve damage.

70.     Prisoners are left shackled without meaningful monitoring.  For example, medical staff are required to conduct circulatory checks every fifteen minutes and range of motion checks over two hours.  Admin. Directive 6.5, Attach. A § 2(d).  During these checks, however, staff routinely ignore overly tight restraints, even when limbs are changing color or losing feeling.

71.     Mental health assessments of shackled prisoners are similarly inadequate.  Mental health assessments are required once every eight hours that a prisoner is restrained.  Prisoners remain on restraints regardless of what they say to a clinician during these assessments.

72.      Defendants' policy, practice, and procedure of placing prisoners in in-cell restraints is also degrading and interferes with basic and necessary life activities.  Eating is

16

difficult, as prisoners cannot raise their hands to their mouths.  Likewise, prisoners are unable to easily use the toilet or wipe after defecating.

73.     If a prisoner admits to wanting to harm or kill themselves, they may simultaneously be placed on Behavior Observation Status ("BOS"), whereby individuals may be stripped of clothing and shoes, forced into a sleeveless quilted gown, deprived of all personal property, and denied all social or legal visits and calls.  Individuals receive no additional mental health treatment on this status, which may last for weeks.

74.     DOC staff can impose BOS concurrently with in-cell shackling.  In such cases, the prisoner will be left in an empty cell in a sleeveless gown, held by three- or four-point restraints, for hours on end.

75.     Mental health professionals are also authorized to place individuals on BOS after being taken off in-cell shackles or therapeutic restraints, subjecting them to extreme and unjustifiable isolation and deprivation for days or weeks in response to a mental health crisis. Rather than providing preventative or acute support, these practices contribute to prisoners' continuing deterioration.

76.     Defendants fail to divert prisoners with mental illness into alternative appropriate placements and fail to reasonably modify the environment or programming to ameliorate the brutal and inhumane in-cell shackling of these prisoners.

77.     Subjecting DRCT's Constituents to in-cell shackling falls far outside basic standards of decency and accepted professional norms.

78.     The American Bar Association ("ABA") directs that in-cell shackling never be used "as a form of punishment or retaliation."  ABA Standard 23-5.9(a).  If restraints are used for "medical or mental health purposes," then it must be under the authorization of a "qualified

NY-2377600

medical or mental health professional."  ABA Standard 23-5.9(d).  The restraints must also be of

the "least restrictive form[]" possible and used "only as long as the need exists."

ABA Standard 23-5.9(b).

79.     The Mandela Rules prohibit "[t]he use of chains, irons, or other instruments of

restraint which are inherently degrading or painful," and, like the ABA Standards, prohibit the

use of restraints of any kind "as a sanction for disciplinary offenses."  The United Nations

Standard Minimum Rules for the Treatment of Prisoners, Rule 43.  Even when the use of

restraints is authorized, restraints are to be used only in the "least intrusive method" possible and

"only for the time period required."  *Id.*, Rule 48.  When these rules are violated, the use of

restraints may amount to torture.  Report of the Special Rapporteur, Theo van Boven, ¶ 45, U.N.

Cod E/CN.r/2004/56 (Dec. 23, 2003).

80.     In 2020, the UN Special Rapporteur on Torture concluded that the "Connecticut

Department of Correction['s] . . . repressive measures, such as prolonged isolation . . . , excessive

use of in-cell shackling . . . may well amount to torture."  Press Release, U.N. Office of the High

Comm'r for Human Rights, United States: Prolonged Solitary Confinement Amounts to

Psychological Torture, Says UN Expert.

81.     Shackling is particularly harmful if the person being subjected to excessive and

punitive restraints has a mental illness, because such persons are particularly vulnerable to the

mental and psychological harms of being immobilized.  Report of the Special Rapporteur, ¶ 63,

89 U.N. Doc. A/HRC/22/53 (Feb. 1, 2013).

82.     Prisoners with certain conditions, including anxiety and post-traumatic stress

disorder ("PTSD"), experience particular harm from the prolonged use of restraints by increasing

the individual's risk of traumatic re-experiencing or sensory deprivation.  Jeffrey L. Metzner *et*

*al.*, Resources Document on the Use of Restraint and Seclusion in Correctional Mental Health Care, 35 J. Am. Acad. Psychiatry & Law 417, 421-22 (2007).

83.     The Department of Justice has also concluded that subjecting prisoners with mental illness to prolonged restraints "in response to behaviors derivative of their illness does nothing but accelerate their mental deterioration and intensify their mental torment and anguish." U.S. Dep't of Justice, Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation 19 (May 31, 2013).

84.     In-cell shackling violates basic standards of decency and inflicts lasting psychological and physiological harm on prisoners with mental illness.  Punitive shackling on individuals experiencing acute mental crises, continuing restraints for hours after any crisis has passed, and confining people in filthy and degrading conditions make DOC's use of in-cell shackling especially dangerous and discriminatory.

85.     DOC's shackling of people with mental illness in restrictive statuses condemns them to unceasing downward spirals.  Prisoners with mental illness decompensate, suffer mental health crises, and exhibit symptomatic behaviors under the extreme stress of restrictive status. DOC responds with barbaric in-cell shackling, which worsens the underlying mental illness and leads to further decompensation, mental health crises, and symptomatic behaviors.  DOC then responds with even more or longer in-cell shackling.

86.     The cruel and unusual abuse and discriminatory treatment described above punishes prisoners with mental illness, exacerbates their mental illness, and leads to a downward spiral of further punishment and psychiatric deterioration.

87.     Defendants have had full knowledge of these conditions and of their devastating effects on incarcerated people.  Nevertheless, Defendants have condoned or been deliberately indifferent to the underlying conditions and mistreatment of prisoners with mental illness.

**C.     DOC Discriminates Against DRCT's Constituents By Reason of Their Mental Illness**

88.     DOC fails to make reasonable modifications to its policies, practices and/or procedures when such modifications are necessary to avoid discrimination on the basis of disability.

89.     DOC discriminates against DRCT's Constituents on the basis of their mental illness by implementing a systemic policy, practice, and/or procedure of placing DRCT's Constituents in restrictive status, subjecting them to in-cell shackling, and punishing their symptomatic behaviors with still more in-cell shackling.

90.     Defendants' policies, practices, and procedures of allowing DRCT's Constituents to be disciplined and punished for conduct that is a direct result of their mental illness constitutes discrimination on the basis of their disability.

91.     As a result of Defendants' actions and inactions, DRCT's Constituents are, because of their disability-related behaviors, at a greater risk of being subjected to in-cell shackling, which in turn inflicts additional harm on their mental health.  This constitutes discrimination against DRCT's Constituents.

**D.     Prisoners with Mental Illness Confirm the Use of Unjustifiable Isolation, In-Cell Shackling, and Other Discrimination**

**(1)     Gregory McLaurin**

92.     Gregory McLaurin is a 26-year-old man in DOC custody currently incarcerated at Cheshire Correctional Institution.  Mr. McLaurin is a constituent of DRCT who has mental

illness, as defined in 42 U.S.C. § 10802.  He is also a qualified individual with a disability, as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(20).

93.     Mr. McLaurin has been in DOC custody since January 2018, when he was 22-years-old.  Throughout his time in custody, Mr. McLaurin has been subjected to prolonged isolation and repeated in-cell shackling, often in response to mental health crises.

94.     DOC placed Mr. McLaurin in Administrative Segregation at Northern Correctional Institution in September 2020.  Mr. McLaurin spent the next 17 months at Northern, until the prison's eventual closure.

95.     At Northern, DOC staff punished Mr. McLaurin for covering his window while in mental health crisis.  Mr. McLaurin covered his window as a plea for mental health support when he felt he might harm himself.  It was a desperate act reflecting a moment of serious need, which DOC refused to recognize as a genuine symptom of his illness.

96.     For covering his window at Northern, Mr. McLaurin was given a disciplinary ticket, subjected to BOS, and then isolated in RHU.

97.     Mr. McLaurin was also hospitalized for attempting suicide while at Northern.

98.     Mr. McLaurin's mental health further deteriorated as a result of harassment and violence by correctional officers.  The threat of future verbal and physical abuse made him feel constantly unsafe and on edge.

99.     Due to the impending closure of Northern, Mr. McLaurin was moved to Walker Correctional Institution in May 2021.

100.    At Walker, like at Northern, Mr. McLaurin had no access to programming or meaningful social activities.

NY-2377600

101.    To make matters worse, DOC staff frequently locked down the facility during recreation hours, preventing Mr. McLaurin and others from taking recreation.  Even when Mr. McLaurin was permitted to leave his cell for recreation, he spent outdoor recreation time alone in an empty cage.

102.    Mr. McLaurin severely decompensated when subjected to this harsh environment. He engaged in self-harm and attempted suicide multiple times as a result.

103.    One month after his transfer, Mr. McLaurin attempted suicide by drinking cleaning fluid.  He was hospitalized and then isolated in BOS.

104.    After approximately three months at Walker, Mr. McLaurin entered a downward cycle of deepening depression and punishment.  Mr. McLaurin recalls this period as "the darkest point in his life" and "absolutely unbearable."

105.    In late August 2021, Mr. McLaurin attempted suicide by trying to throw himself off the unit's upper tier.  Staff tackled him to the floor and restrained him.  As staff restrained Mr. McLaurin and moved him to the RHU, he repeatedly told them he wanted to die.  In response, staff mocked Mr. McLaurin for failing to kill himself properly.

106.    Staff placed Mr. McLaurin on BOS status.  He was stripped of all personal effects and his regular clothes and placed in a cold cell to face complete social and sensory deprivation.

107.    Although BOS is purportedly to be used for mental health crises, staff did not take Mr. McLaurin to the medical unit for observation or treatment.  Instead, they took him to the RHU.

108.    Isolated and in severe mental distress, Mr. McLaurin covered his cell window with the mattress to seek assistance.

109.     Instead of responding to his concerns or providing a mental health intervention at this moment of escalating despair, staff forced Mr. McLaurin into in-cell shackles.

110.     Staff also issued Mr. McLaurin a disciplinary ticket for allegedly "interfering with safety and security" for this incident.

111.     Mr. McLaurin's mental health deteriorated further over the next two weeks.  He swallowed a nail, drank cleaning fluid, and covered his window multiple times.

112.     During this same period, DOC staff gave Mr. McLaurin nine disciplinary tickets for allegedly "interfering with safety and security".

113.     During this same period, DOC staff subjected Mr. McLaurin to in-cell shackling at least five times.

114.     Throughout his time at Walker, Mr. McLaurin was hospitalized multiple times for serious self-harm and suicide attempts.

115.     Mr. McLaurin's experiences of in-cell shackling at Walker Correctional Institution were degrading and painful.

116.     While being placed on in-cells, DOC staff performed strip searches on Mr. McLaurin.  During these searches, staff made Mr. McLaurin remove his clothes and made him bend over to perform a visual body cavity search.  Staff made sexual comments as they searched him.

117.     On multiple occasions, DOC staff sprayed chemical agents before placing Mr. McLaurin on in-cells, even when he was calm and did not present a threat.

118.     Staff frequently made the in-cell shackles too short, forcing Mr. McLaurin to crouch and hobble around while chained.  While shackled, Mr. McLaurin's shoulders often felt

like they were about to pop out of their sockets and that the chains strained his back. Mr. McLaurin continues to have chronic neck and back pain from the short-shackling.

119.    Staff also made the in-cell shackles too tight.  Mr. McLaurin's wrists have been cut and he has experienced swelling as a result of tight handcuffs.  Despite these visible indications, medical staff repeatedly dismissed Mr. McLaurin's complaints that the restraints are too tight when they checked the shackles.  Mr. McLaurin has scarring on his ankles and wrists from tight shackling.

120.    The cells used for in-cell shackling were often unsanitary and smeared with the feces of other incarcerated individuals who had themselves been in mental crises.  DOC staff did not clean these cells before placing other individuals in them.

121.    DOC staff did not give Mr. McLaurin breaks to use the bathroom or eat while on in-cell shackles.  Rather, he had to perform these tasks while restrained as best he could.

122.    While shackled, Mr. McLaurin frequently became disoriented, losing track of time and crying.

123.    After being taken off in-cell shackles, Mr. McLaurin consistently experienced continued mental and physical distress.  Mr. McLaurin felt a sense of euphoria from being taken off of in-cells, which quickly turned into guilt, anger, and self-loathing.  This contributed to the cycle of decompensation, self-harm, and punishment.

124.    Mr. McLaurin was transferred to Phase 3 of Administrative Segregation at Garner Correctional Institution in November 2021.

125.    In December 2021, Mr. McLaurin was placed on four-point therapeutic restraints after returning from a hospitalization for a suicide attempt by drinking bleach.

126.     DOC restrained Mr. McLaurin in this instance despite his returning from the hospital in a calm and stable condition.

127.     Throughout his time in DOC custody, mental health clinicians have routinely approved in-cell shackles and ignored Mr. McLaurin's acute mental health needs.

128.     Mental health staff did not intervene to stop Mr. McLaurin from going on in-cells or to dismiss a disciplinary ticket because it stemmed from a mental health issue.

129.     Mental health staff also frequently escalated and dismissed Mr. McLaurin's distress, accusing him of faking his mental illness.

130.     Ultimately, DOC's repeated use of shackling in response to Mr. McLaurin's mental health crises, as well as the surrounding continuing conditions of isolation, caused Mr. McLaurin's serious decompensation while in DOC custody.

### (2)     Kyle Lamar Paschal-Barros

131.     Kyle Lamar Paschal-Barros[2] is a 27-year-old man currently confined at Walker in Suffield, Connecticut.  Mr. Barros is a DRCT Constituent who has mental illness, as defined in 42 U.S.C. § 10802(2)(4).  He is also a qualified individual with a disability, as defined in 42 U.S.C. § 12131 and 29 U.S.C. § 705(20).

132.     Mr. Barros entered DOC custody in 2012, when he was 17 years old.  Since 2016, Mr. Barros has been continuously held in various restrictive statuses.[3]  Over those eight years, Mr. Barros has routinely been subjected to prolonged isolation and in-cell shackling, which have exacerbated his mental illnesses and led to acts of self-harm, including multiple suicide attempts.

---

[2] Mr. Barros is listed in the CDOC system as Deja Paschal.  He legally changed his name to Kyle Lamar Paschal-Barros in February 2017.

[3] The only period that Mr. Barros was not confined in a restrictive status was from April 12, 2021 to May 21, 2021, during which he was voluntarily admitted to Whiting Forensic Hospital for a psychiatric evaluation.

Mr. Barros, because of his mental illness, is particularly vulnerable to the psychological and physical effects of prolonged isolation and in-cell shackling.

133.    Mr. Barros has a long and complex history of serious mental illness, dating back to childhood.  From the time he was eight years old, Mr. Barros has been diagnosed with and treated for bipolar disorder, major depressive disorder, borderline personality disorder, PTSD, attention deficit hyperactivity disorder ("ADHD"), obsessive-compulsive disorder, depersonalization disorder, mood disorder, and psychotic disorder.  Some of these diagnoses occurred in community treatment settings, and many of the diagnoses resulted from evaluation by DOC mental health practitioners.  All of these diagnoses were made by qualified Connecticut mental health practitioners.

134.    Mr. Barros's mental illnesses are impairments that substantially limit one or more major life activities, he has a record of such impairments, and DOC has regarded him as having such impairments.

135.    Before and during his incarceration, Mr. Barros has been prescribed numerous medications to treat his mental illnesses, including Prozac, Vistaril, prazosin, Paxil, Ritalin, Abilify, and lithium.  Before his incarceration, Mr. Barros received intensive individualized treatment plans for his mental illnesses.

136.    Shortly after Mr. Barros entered DOC custody in 2012, DOC practitioners identified Mr. Barros's profound mental health needs and transferred him to Garner, DOC's designated facility for "male offenders with significant mental health issues."
*Garner Correctional Institution*, Connecticut State Department of Correction, https://portal.ct.gov/DOC/Facility/Garner-CI (last visited Mar. 29, 2022).

137.     While at Garner, DOC practitioners diagnosed Mr. Barros with numerous mental illnesses, including bipolar disorder, PTSD, and ADHD.  He was placed on a number of psychiatric medications that provided some relief from the symptoms of his mental illnesses.

138.     Even so, Mr. Barros struggled at Garner.  When situations became unmanageable for him, Mr. Barros decompensated.  He engaged in multiple acts of self-harm, including banging his head against the wall.

139.     In January 2017, overwhelmed by symptoms of his mental illnesses, Mr. Barros attempted suicide by hanging himself.  He was subsequently placed on suicide watch.  Mere days later, ignoring that its own staff recognized that Mr. Barros was experiencing a mental health crisis, DOC placed Mr. Barros in Administrative Segregation and transferred him to Northern.

140.     This was the first of two periods that Mr. Barros was incarcerated at Northern.

141.     At Northern, despite Mr. Barros's well-documented history of serious mental illness and his recent suicide attempt, DOC staff discontinued all of Mr. Barros's psychiatric medications — including those he had been prescribed at Garner.  DOC staff also ignored Mr. Barros's requests to resume his medications.  At the time that Mr. Barros was first taken off his medications, the injuries from his head-banging were still fresh.

142.     In total, Mr. Barros was held at Northern for over 43 months.  At Northern, Mr. Barros was confined to his cell for 22 to 24 hours per day.

143.     DOC subjected Mr. Barros to in-cell and four-point restraints ***more than ten times***.  On almost every occasion that Mr. Barros was subjected to restraints, he was experiencing a mental health crisis and had sought treatment.  Instead of treatment, DOC responded by forcibly shackling him.

NY-2377600

144.    Sometimes, Mr. Barros covered his window as a desperate call for mental health intervention and was subsequently cited for a disciplinary violation and subjected to in-cell shackles.  Once, in early 2018, he was shackled after a suicide attempt that DOC medical staff deemed "nonlethal."

145.    DOC's use of isolation and shackling on Mr. Barros served only to worsen his mental health crises.  DOC's own mental health staff recognized that the use of isolation and shackling against Mr. Barros exacerbated his mental illness.

146.    Mr. Barros's experience of being shackled was dehumanizing and degrading. Each time he was subjected to in-cell shackling, Northern staff left Mr. Barros naked (but for a safety gown) and chained in an unsanitary and cold "strip cell."  Mr. Barros felt as though he was trapped in a "cold cement doghouse," where he was forced to dump his food onto wax paper on the floor and eat like a dog.

147.    As a result of being subjected to shackles, Mr. Barros experienced traumatic flashbacks of childhood abuse and sexual assault.  DOC staff sometimes compounded his distress by playing continuous bell sounds over the intercom into the strip cell where he lay shackled.

148.    The abusive treatment, trauma-related flashbacks, and lack of necessary psychiatric care caused Mr. Barros to rapidly decompensate.  He experienced intensifying paranoia, delusions, hopelessness, and despair.

149.    As Mr. Barros decompensated, instead of providing mental health treatment, DOC repeatedly punished Mr. Barros for his symptoms of mental illnesses.  This left Mr. Barros trapped in devastating cycles of punishment, near-total isolation and social deprivation, dehumanizing restraints, and further decompensation.  DOC issued Mr. Barros an excess of

28

disciplinary sanctions for behaviors such as covering his cell window with paper and failing to comply with orders.  Mr. Barros engaged in these behaviors as a direct response to the symptoms he was experiencing.  However, DOC characterized Mr. Barros's erratic and self-injurious behaviors as short-term behavioral problems rather than symptoms of his underlying mental illnesses.

150.    In May 2018, Mr. Barros reached Phase II of Administrative Segregation and was transferred to Walker.  He continued experiencing debilitating symptoms of mental illness.  For example, he hallucinated that his cell was on fire and cut his arm with a sharp lid.  Mental health personnel at Walker resumed his psychiatric medication and transferred him to Garner.

151.    From Garner, Mr. Barros returned to Phase II of Administrative Segregation at Walker.

152.    Shortly after his arrival at Walker, DOC staff informed Mr. Barros that they "lost" many of his books, which were a significant source of solace and a key coping mechanism for him.  Mr. Barros was aware that the loss of his property triggered his mental illness.  Sensing his destabilized mental state, Mr. Barros asked for mental health staff to help him cope but was ignored.  After being ignored, Mr. Barros covered his cell window with paper in an attempt to communicate his distress and urgent need for a mental health intervention.

153.    Instead of responding to Mr. Barros's mental health crisis with psychiatric supervision and treatment, DOC staff performed a violent cell extraction.  DOC confiscated Mr. Barros's remaining books and regressed him back to Phase I of Administrative Segregation at Northern.

154.    Mr. Barros was incarcerated at Northern from October 2018 to April 2021.[4]  At Northern, he was once again subjected to extreme prolonged isolation and in-cell shackling.

155.    Mr. Barros repeatedly alerted mental health and custodial staff about the traumatizing impacts of isolation and in-cell shackling.  DOC's own records acknowledge the serious mental health impacts that Mr. Barros suffers as a result of being subjected to long-term isolation.  However, DOC disregarded these impacts and continued subjecting him to prolonged isolation and in-cell shackling.

156.    In April 2021, Mr. Barros was admitted to Whiting Forensic Hospital for a mental health evaluation.  Whiting staff confirmed the negative effects that prolonged isolation had on Mr. Barros, the severity of his mental illness, and his need for a hospital level of care.  During his stay at Whiting, Mr. Barros had limited access to mental health services, including therapy groups and a clinical support team.  Whiting staff noted that Mr. Barros was well related with staff and peers.

157.    From Whiting, Mr. Barros was transferred to Garner.  Despite Mr. Barros struggling with serious mental health difficulties upon his return to prison, DOC reduced Mr. Barros's mental health score to MH-3.

158.    In March and April 2021, medical staff repeatedly alerted DOC that Mr. Barros' mental health was further deteriorating because of the harsh conditions of his confinement. Despite this information, DOC failed to provide Mr. Barros access to a more therapeutic environment required to treat his mental illness and failed to reasonably modify its policies, practices, or procedures to ensure Mr. Barros was not disciplined or subjected to isolation and in-cell shackling on the basis of his mental illness.

---

[4] During this period, Mr. Barros left Northern once in 2019 for two months of mental health treatment at Garner.

159.    Mr. Barros was eventually sent back to Administrative Segregation Phase I in Walker, where he is currently incarcerated.

160.    The absence of rehabilitative or other meaningful programming in Administrative Segregation has further impaired Mr. Barros' parole eligibility.  Under his "Offender Accountability Plan," in order to be eligible for parole, Mr. Barros is required to participate in classes on anger management, "good intentions, bad choices," and restorative relationship building with victims.  While these programs are offered at other DOC facilities, they are not offered in Administrative Segregation.

161.    While Mr. Barros has been stuck in Administrative Segregation status, the parole board notified him that, so long as he is on Administrative Segregation status, he has "no opportunity for a parole hearing."  Mr. Barros has never had a chance to be heard in front of the parole board.  As a result, Mr. Barros has not been able to explain how his mental illnesses contributes to his placement in Administrative Segregation.  The lack of consideration given to Mr. Barros' mental illnesses and experiences made him feel trapped and experience further anxiety.

162.    To this day, Mr. Barros suffers from long-term psychological harm caused by his experiences in isolation and shackles.  Mr. Barros suffers from panic attacks and anxiety as a result of being cycled in and out of severe isolation and subjected to in-cell shackles and is perpetually frightened and traumatized by the possibility of being shackled or placed in isolation. He also experiences recurring nightmares about Northern and its extremely harmful and dangerous practices.

163.    The recent lockdowns at Walker have triggered multiple panic attacks and make Mr. Barros feel as though he is back in Northern.  Mr. Barros fears that even under DOC policy

NY-2377600

and Public Act 22-18, he could still be violently subjected to in-cell shackling or forced to cycle in and out of periods of isolated confinement, despite the fact that he is living with serious mental illness and still has psychological scars from his past experiences in isolation and in-cell shackles.  His experiences lead him to wonder: "Do I have any significance, and why am I being forced to endure such torment?"

164.    Despite the closure of Northern and changes made pursuant to the Executive Order and Public Act 22-18, Mr. Barros feels that he "can't escape Northern" and that he never truly leaves isolation.

### (3)     Kezlyn Méndez

165.    Kezlyn Méndez is a 35-year-old man currently incarcerated at the Cheshire Correctional Institution in Cheshire, Connecticut.  Mr. Méndez is a DRCT Constituent who has mental illness, as defined in 42 U.S.C. § 10802(2)(4).  He is also a qualified individual with a disability, as defined in 42 U.S.C. § 12131 and 29 U.S.C. § 705(20).

166.    Mr. Méndez first entered DOC custody in 2005, at age 18.  Mr. Méndez has engaged in acts of self-harm and has attempted suicide multiple times while in DOC custody. Over his time in DOC custody, Mr. Méndez has spent more than five years at Northern, where he was subjected to prolonged isolation and repeated in-cell shackling.

167.    Mr. Méndez has struggled with mental illness his entire life.  Beginning in early childhood, he received many psychiatric diagnoses, including bipolar disorder and PTSD.  Many of these diagnoses were made by mental health practitioners within the State of Connecticut, and some of these diagnoses were made or confirmed by DOC mental health personnel.

168.    Mr. Méndez has a significant history of childhood trauma and mental illness that leaves him highly vulnerable to stressful triggers.

NY-2377600

169.    At age six, Mr. Méndez was hit by a police car and sustained catastrophic physical injuries, including a head injury that left him unconscious.  He underwent over three years of rehabilitation, and had to relearn to read, write, speak, and walk.  He has a minor speech impediment and continues to experience blackouts.

170.    Mr. Méndez received both inpatient and outpatient psychiatric treatment in several Connecticut institutions throughout his childhood.

171.    Mr. Méndez, because of his mental illness, is particularly vulnerable to the harmful psychological and physical effects of prolonged isolation and in-cell shackling.

172.    Between 2005 to the present, Mr. Méndez has served four sentences in DOC custody, totaling almost 14 years.  Throughout his time in custody, Mr. Méndez has consistently experienced symptoms of his mental illnesses, such as attempting suicide, paranoia, flashbacks to previous violent events, anxiety, sleep disturbances, anhedonia, and depression.

173.    When Mr. Méndez initially entered DOC custody at age 18, DOC clinicians recognized his mental illnesses and transferred him to Garner for intensive treatment following a suicide attempt.  Mr. Méndez was at Garner from approximately December 2005 to April 2006.

174.    In July 2006, despite its awareness of Mr. Méndez's mental illnesses, DOC sent Mr. Méndez to Northern.  This transfer came less than three months after Mr. Méndez left Garner.

175.    The prolonged isolation that Mr. Méndez experienced at Northern led to a significant deterioration in his mental health.  He became ambivalent about human interaction, wavering between a strong desire for human connection and a pronounced fear and mistrust of others.  He also experienced hallucinations, hearing disembodied voices, and having conversations with people that were not there.

176.    In 2012, DOC again placed Mr. Méndez at Garner in light of his deteriorating mental health.  Nonetheless, DOC returned Mr. Méndez to isolation at Northern in 2013. Mr. Méndez was most recently incarcerated at Northern from December 2017 to May 2018.

177.    All told, DOC cycled Mr. Méndez in and out of Northern on six separate occasions, from 2005 to the present.  He spent more than five years there.

178.    Mr. Méndez's experiences in isolated confinement exacerbated his mental illnesses, and he often found compliance with DOC policies more difficult.  For example, desperate for human interaction, he would put his hand through the trap of his cell door, in violation of DOC policy.  In addition, Mr. Méndez accumulated disciplinary sanctions as his mental health deteriorated, ranging from disobeying direct orders to physical altercations with DOC staff.  These disciplinary violations prolonged Mr. Méndez's confinement at Northern and resulted in additional punishments, such as in-cell shackling.

179.    DOC subjected Mr. Méndez to in-cell shackling at Northern on three occasions. On each occasion, DOC left Mr. Méndez shackled for between 24 and 72 hours.  Each time, Mr. Méndez was also strip searched and left to wear only a jumper (with no boxers or socks) while chained in cold and unsanitary environments, including in a strip cell that had feces on the wall and smelled of ammonia.  While shackled, Mr. Méndez was unable to physically wipe himself after using the bathroom and had to urinate in the sink because the toilet in the cell was left unflushed.

180.    In one particularly violent instance, DOC staff subjected him to sexual and physical abuse while forcefully restraining him after ordering him to take off his clothes.  One officer punched him in the stomach, and a second grabbed and twisted Mr. Méndez's testicles.

181.     Mr. Méndez experiences lasting negative psychological and physiological effects as a result of his repeated placement in isolated confinement and repeated in-cell shackling.  He experiences heightened anxiety and paranoia, which has led to episodes where he experiences difficulty breathing, heart palpitations, and an inability to concentrate.  He feels deep discomfort with living in close proximity to other people and has struggled with frequent suicidal thoughts.  He has frequent flashbacks to his experiences of being held in shackles and in prolonged isolation.  These experiences have left him with "a lifelong scar."

182.     The possibility of being sent back to isolated confinement or being placed in in-cells causes Mr. Méndez to feel fear and anxiety because these practices "destroyed" his mental health.  To this day, Mr. Méndez jumps whenever he hears the sound of keys jangling or the loud pop of cell doors opening, as he now associates those sounds with the threat of being shackled.  Mr. Méndez lives in a traumatizing and constant state of fear.  He is aware that in-cell shackles are being used at Cheshire, including for over 24 hours and with short-shackling, and he fears and expects that further deterioration of his mental health would occur should he subjected again to in-cell shackles.

**(4)     Tyrone Spence**

183.     Tyrone Spence is a 30-year-old man in DOC custody currently incarcerated at Garner Correctional Institution in Newtown, Connecticut.  Mr. Spence is a DRCT Constituent who has mental illness, as defined in 42 U.S.C. § 10802(2)(4).  He is also a qualified individual with a disability, as defined in 42 U.S.C. § 12131 and 29 U.S.C. § 705(20).

184.     Mr. Spence has been in DOC custody since July 2010, when he was 19 years old.  Throughout his time in custody — including over three years at Northern — Mr. Spence was subjected to prolonged isolation and repeated in-cell shackling.

35

185.    Mr. Spence has a long history of serious mental illness, including PTSD, anxiety, bipolar disorder, depression, and dissociation.  His mental health symptoms include suicidal ideation and self-injurious behaviors.  He has attempted suicide on multiple occasions while incarcerated.

186.    Mr. Spence suffered prenatal exposure to cocaine and significant neglect and physical abuse in early childhood.  Throughout his childhood and adolescence, Mr. Spence received psychiatric care for his mental illnesses at numerous facilities, including the Institute of Living, Riverview Children's Hospital, and Yale New Haven Hospital.

187.    Before and during his incarceration, Mr. Spence had been prescribed medication to treat his mental illness, including, but not limited to chlorpromazine (Thorazine), clonazepam (Klonopin), clonidine, and guanfacine.

188.    Mr. Spence, because of his mental illness, is particularly vulnerable to the harmful psychological and physical effects of prolonged isolation and in-cell shackling.

189.    Isolation, abusive in-cell shackling, and lack of mental health care have contributed to Mr. Spence's incidents of self-harm and attempted suicide.  For instance, on May 6, 2018, Mr. Spence asked to be seen by Northern mental health staff through written requests and subsequent verbal appeals to his custody officers, but mental health staff refused to see him until the following day.  On May 7, 2018, Mr. Spence cut his wrists and ingested pills and battery acid, attempting suicide.  He was given a disciplinary ticket for "interfering with safety and security" because of his suicide attempt.

190.    In 2019, Mr. Spence's mental illness continued to manifest in self-harm and suicide attempts.  Mr. Spence was hospitalized at least three times in 2019.  Despite Mr. Spence's history of severe mental illness, DOC isolated Mr. Spence at Northern Correctional

NY-2377600

Institution from June to September of 2019.  DOC transferred Mr. Spence to another facility only after he was once again hospitalized for attempting suicide via an overdose.

191.    In approximately March of 2021, Mr. Spence received a ticket for refusing housing because he did not want to live with his cellmate anymore.  Mr. Spence has a history of difficulty living with cellmates, which results from experiencing sexual abuse as a child and in prison.

192.    The disciplinary ticket required Mr. Spence to spend time in punitive segregation. Mr. Spence's mental health rapidly declined after he learned that he would be isolated, intensely fearing a return to the traumatic conditions he previously suffered.  When Mr. Spence told mental health staff that extended isolation would cause him to decompensate, he was rebuffed.

193.    From April to June 2021, Mr. Spence was sent to the inpatient medical unit at Garner.  The social isolation and lack of access to any of his own personal property or programming caused Mr. Spence to decompensate further.  Mr. Spence's intense distress at the prospect of going to segregation after leaving the inpatient unit also exacerbated his mental health.

194.    Mr. Spence was in and out of the hospital several times during this period due to injuries from cutting himself.  In one incident, Mr. Spence sliced an artery while cutting his arm. He nearly died.  Mr. Spence was hospitalized for several days and required blood transfusions.

195.    DOC staff have subjected Mr. Spence to in-cell shackling in response to Mr. Spence's frequent instances of self-harm, which DOC staff have characterized as not worthy of medical intervention.  In fact, Mr. Spence's instances of self-harm were a direct outgrowth of his mental illnesses and his worsening condition due to DOC's isolating, abusive, and discriminatory environment.

196.     In the inpatient medical unit at Garner, Mr. Spence was put on four-point shackles every time he harmed himself, even after he went to the hospital and calmed down.  The shackles were used explicitly as punishment for Mr. Spence's mental health crises.  When Mr. Spence told an administrator that shackles were not supposed to be used for punishment, the administrator replied, "How else am I supposed to discipline you?"

197.     Mr. Spence recalls being shackled more than 50 times while in DOC custody. Mr. Spence also recalls being shackled with four-point shackles on many occasions.  Mr. Spence recounts that the experience on four-point shackles can be excruciating, as his arms are chained in a position that nearly pulls each limb out of the socket.  He has also been subjected to black box shackles, an experience he remembers as "the worst": "You can't sit down without hurting your hands or your wrists.  When you sit down it pushes the chain into your wrist.  The only way you can be comfortable is if you stand up."

198.     Medical checks have been insufficient to prevent the pain and physical harm DOC's shackles practices have caused to Mr. Spence.  In one instance in 2021, Mr. Spence's shackles were so tight that they were cutting off circulation to his foot and turning it purple. Medical staff ignored his pain and did not loosen the shackles.  Another in-cell shackling incident in 2020 caused Mr. Spence lasting nerve damage overly tight shackles.

199.     Mr. Spence has suffered from acute anxiety because of his experiences being shackled.  He has found that seeing shackles or experiencing shackling can quickly trigger feelings of anxiety.  He continues to fear experiencing violence when he is around DOC staff.

200.     DOC staff also attempted to give Mr. Spence disciplinary sanctions for behaviors that are symptoms of his mental illness, including instances of self-harm and attempted suicide. As a result, he lost various privileges, such as phone and commissary access.

201.     Throughout Mr. Spence's time in DOC custody, Mr. Spence has tried to gain access to programming and proactive support.  His requests have been routinely ignored by DOC staff.  Only after Mr. Spence nearly died in 2021 did mental health staff take Mr. Spence's needs seriously.  DOC staff worked with Mr. Spence to produce a plan to move him back and forth between segregated and non-segregated units, but refused to reasonably modify policies, practices, and procedures to ensure Mr. Spence was not subjected to in-cell shackling or prolonged isolation.

202.     Mr. Spence now has the opportunity to meet with mental health staff weekly and is provided with worksheets.  Mr. Spence says these resources have helped him remain stable.

203.     Messrs. McLaurin, Barros, Méndez, and Spence all suffered because of the unnecessarily harsh and punitive in-cell shackling.  For example, the imposition of such shackling has caused them all to suffer physical and psychological harm.  Throughout their time in DOC custody, DOC has not made reasonable modifications to its polices, practices, or procedures to ensure that they are not subjected to in-cell shackling in response to manifestations of his mental illness.

**E.     Recent Reforms Have Not Ended DOC's In-Cell Shackling of Prisoners with Mental Illness**

204.     On February 8, 2021, Connecticut Governor Ned Lamont announced plans to close Northern by June 30, 2021.  On June 11, 2021, DOC transferred the final prisoners from Northern into restrictive statuses at other facilities, principally Walker, which, along with Garner Correctional Institution ("Garner") and Corrigan Correctional Institution ("Corrigan"), maintains prisoners in Administrative Segregation and Security Risk Group status.  Even before those transfers were completed, DOC had retrofitted cells at Walker, removing furniture for "strip cells" and installing equipment used for imposing "four-point restraints."  And after prisoners

were transferred from Northern to other facilities, the DOC's practice of in-cell shackling

actually increased at those other facilities.

205.    In early June 2021, the Connecticut General Assembly passed Public Act

No. 21-110, known as the PROTECT Act, with a bipartisan vote.  The PROTECT Act would

have required DOC to guarantee every person in prison in Connecticut, including those in

restrictive statuses, at least six and a half hours per day out of their cells, with extremely limited

exceptions.  The PROTECT Act would also have imposed substantial limits on the use of in-cell

shackling.

206.    But, on June 30, 2021, Governor Lamont vetoed the PROTECT Act.  The same

day, Governor Lamont signed Executive Order 21-1 (the "Executive Order").  Governor Lamont

indicated that he intended the Executive Order as an alternative to the vetoed PROTECT Act.

But the Executive Order was not legislation, can be rescinded at any time, and fails to protect

prisoners with mental illness from the abuse of continued in-cell shackling at the hands of DOC.

207.    The Executive Order does not require DOC to make any substantive changes to or

place limits on the use of in-cell shackling.  The Executive Order also does little to protect

prisoners with mental illness from the isolation of restrictive statuses where their illness is

exacerbated, their symptomatic behaviors increase, and those symptomatic behaviors are then

used as justification to subject them to in-cell shackling.

208.    The Executive Order does direct DOC "to make policy changes to limit the use of

isolated confinement on members of vulnerable populations to the greatest extent possible," but

"vulnerable populations" includes only those people with mental illness who have "a mental

health needs score or four or five."  (Executive Order at p. 2.)  This reliance on DOC's own

internal mental health needs scores excludes many individuals with mental illness from its

limited protections.  For example, DOC falsely presumes that former-Axis II disorders in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), such as borderline personality disorder and antisocial personality disorder, do not constitute true mental illness.

209.    The Executive Order does not exempt DRCT's Constituents (or anyone else) from restrictive statuses.  The Executive Order also does nothing to prohibit sending someone to restrictive status in response to a disciplinary violation that indicates a mental health crisis or that the behavior is a manifestation of mental illness.

210.    Moreover, the Executive Order allows persons already in restrictive statuses to be further isolated on disciplinary status in RHU for more than 20 hours per day.  The Executive Order limits time on disciplinary status in RHU to no more than 15 consecutive days, or more than 30 days in a 60-day period, but it does not prevent individuals from cycling in and out of such status.  In other words, under the Executive Order and the implementing directives, prisoners with mental illness already trapped in restrictive statuses can spend repeated 15-day periods isolated on disciplinary status in RHU, interspersed with 15-day periods off the status, indefinitely.  In fact, these persons are often left in RHU even when they are not on disciplinary status.

211.    Repeated cycling in and out of such isolated confinement, over weeks, months, and years, is a hallmark of life for people with mental illness in Connecticut prisons.  Mental health experts have concluded that this repeated cycling in and out of isolation may be as harmful, and potentially even more harmful, to those with mental illness as consecutive stints in isolation.

212.    On May 10, 2022, Governor Lamont signed into law Public Act 22-18, which largely codified portions of the Executive Order but still does nothing to prevent the continued

in-cell shackling of prisoners with mental illness.  Public Act 22-18, like the Executive Order,

also limits the time that persons with mental illness can spend in "isolated confinement" of

22 hours per day to 15 consecutive days or no more than 30 days out of 60 days.  But, again, it

leaves persons with mental illness vulnerable to repeated cycling in and out of such isolated

confinement which exacerbates their mental illness and leads to increased decompensation,

mental health crises, and symptomatic behaviors met with in-cell shackling.

213.    Significantly, the use of in-cell shackling increased following the closure of

Northern and after the Executive Order went into effect.  DOC data, produced in response to a

Freedom of Information request, reflects that DOC used in-cell shackling at Northern on 24

occasions in the six months before it closed (December 2020-May 2021).  At Walker, where

DOC transferred Phase I of both Administrative Segregation and Security Risk Group when

Northern closed, DOC used in-cell shackling on 91 occasions from July-December 2021, nearly

four times the prior six-month period.

214.    Accordingly, the closure of Northern, signing of the Executive Order, and passage

and signing of Public Act 22-18 have failed to end the horror of DOC's in-cell shackling of

prisoners with mental illness.

     **F.     DOC Has Rebuffed DRCT's Requests that DOC Commit to Ending the
In-Cell Shacking of Prisoners with Mental Illness**

215.    On November 23, 2020, DRCT raised its grave concerns over DOC's prolonged

isolation and in-cell shackling of prisoners with mental illness in a letter sent to then-Acting

Commissioner Quiros.  In that letter, DRCT specifically emphasized DOC's in-cell shackling of

prisoners with mental illness in restrictive statuses.

216.     Nearly two months later, on January 22, 2021, DOC responded that the letter had been received but was delayed in reaching the Commissioner's Office, and that the allegations were being reviewed.  But DRCT never received a substantive response.

217.     Accordingly, on February 4, 2021, DRCT commenced this action.  (ECF No. 1.) On February 18, 2021, DRCT filed its First Amended Complaint which highlighted the risks of in-cell shackling of prisoners with mental illness in Connecticut prisons.  (ECF No. 24.)

218.     DRCT explained how the closure of Northern and signing of the Executive Order did not end the abusive and discriminatory in-cell shackling of prisoners with mental illness. DRCT repeatedly sought assurances that Defendants would work with DRCT to end the in-cell shackling of prisoners with mental illness.

219.     On April 30, 2021, the Court ordered the parties to mediation.  (ECF No. 55.) Over the course of May, June, July, and August 2021, the parties engaged in extensive mediation before Magistrate Judge Fitzsimmons in an attempt to address DRCT's concerns.  The parties exchanged hundreds of pages of mediation submissions and met with Magistrate Judge Fitzsimmons on at least five different occasions.  But at no time did Defendants commit to end the in-cell shackling of prisoners with mental illness.

220.     Accordingly, DRCT has been forced to file this Second Amended Complaint to end Defendants' continuing, unrelenting, discriminatory, and cruel and unusual in-cell shackling of prisoners with mental illness.

221.     DRCT has no adequate remedy at law.

## CAUSES OF ACTION

### First Cause of Action
(42 U.S.C. § 1983: Eighth and Fourteenth Amendments;
in-cell shackling of individuals with mental illness)

222.    This claim is brought against Defendant Quiros in his official capacity. Defendant Quiros acted under color of state law at all times relevant hereto and in connection with all events described herein.

223.    Defendant Quiros and his agents, officials, employees, and others acting in concert with him under color of state law, by and pursuant to DOC's policy, custom, and practice, violated and continue to violate the rights of DRCT's Constituents by depriving them of their right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution, as applied to the State of Connecticut through the Fourteenth Amendment to the United States Constitution.

224.    Defendant Quiros and his agents, officials, employees, and others acting in concert with him under color of state law, by and pursuant to DOC's policy, custom, and practice of in-cell shackling of DRCT's Constituents, have subjected DRCT's Constituents to dangerous and degrading mistreatment, caused them serious pain and injury, placed them at substantial risk of serious injury, acted contrary to standards of decency, and denied them the minimal civilized measure of life's necessities.  Defendant Quiros and his agents, officials, employees, and others acting in concert with him under color of state law by and pursuant to DOC's policy, custom, and practice of in-cell shackling of DRCT's Constituents, continue to subject DRCT's Constituents to dangerous and degrading mistreatment, cause them serious pain and injury, place them at substantial risk of serious physical and psychological injury, deny them the minimal civilized measure of life's necessities, and act contrary to standards of decency.

NY-2377600

225.     Defendant Quiros and his agents, officials, employees, and others acting in concert with him under color of state law, by and pursuant to DOC's policy, custom, and practice of subjecting DRCT's Constituents to in-cell shackling (1) have unnecessarily and wantonly inflicted, and continue to unnecessarily and wantonly inflict, pain upon them; (2) have acted and continue to act with deliberate indifference to their health, safety, and serious medical needs; and (3) knew and continue to know the risk to the health, safety, and serious medical needs of DRCT's Constituents but have disregarded that risk and failed to take any reasonable measures to abate that risk.

226.     Defendant Quiros and his agents, officials, employees, and others acting in concert with him under color of state law, by and pursuant to DOC's policy, custom, and practice, subjected and continue to subject DRCT's Constituents to in-cell shackling maliciously and sadistically, and for punitive or retaliatory purposes.  In many instances, they use in-cell shackling to punish DRCT's Constituents for behavior that predictably arises from their own actions — that is, from subjecting people with mental illness to prolonged isolation and by exacerbating psychological deterioration by repeatedly responding to manifestations of mental illness with in-cell shackling, creating a continued downward spiral for people with mental illness.

227.     Defendant Quiros and his agents, officials, employees, and others acting in concert with him under color of state law, did not and do not instigate or continue to subject DRCT's Constituents to in-cell shackling in a good faith effort to maintain or restore discipline, to ensure the safety or security of others, or to ensure their own safety or security.

228.     Defendant Quiros authorized, condoned, and failed to exercise his supervisory authority to prevent, the illegal in-cell shackling of DRCT's Constituents by his agents, officials,

employees, and others acting in concert with him under color of state law, and continues to authorize, condone, and fail to exercise his supervisory authority to stop that illegal practice.

229.    Defendant Quiros and his agents, officials, employees, and others acting in concert with him under color of state law by in-cell shackling prisoners with mental illness, have inflicted, and continue to inflict, cruel and unusual punishment on DRCT's Constituents in violation of the Eighth Amendment to the United States Constitution, as applied to the State of Connecticut through the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983.

230.    Defendant Quiros and his agents, officials, employees, and all persons acting in concert with him under color of state law are the proximate cause of the ongoing deprivation of the constitutional rights of DRCT's Constituents.

231.    As a result of the actions of Defendant Quiros and his agents, officials, employees, and others acting in concert with him under color of state law, DRCT's Constituents have suffered and continue to suffer irreparable harm.

232.    Unless enjoined, Defendant Quiros and his agents, officials, employees and others acting in concert with him under color of state law, will continue the in-cell shackling of DRCT's Constituents in violation of the Eighth and Fourteenth Amendments, and to inflict injuries for which such prisoners have no adequate remedy at law.

233.    DRCT is entitled to an injunction against the in-cell shackling of DRCT's Constituents by Defendant Quiros and his agents, officials, employees, and others acting in concert with him under color of state law.

**Second Cause of Action**
(Violation of Title II of the Americans with Disabilities Act,
42 U.S.C. § 12131, *et seq.*)

234.    DRCT incorporates by reference all allegations contained in the preceding

paragraphs as if alleged herein, and asserts this claim against DOC.

235.    On July 12, 1990, Congress enacted the ADA, 42 U.S.C. § 12101, *et seq.*,

establishing the most important civil rights laws for persons with disabilities in our nation's

history.

236.    Congress stated in its findings that "historically, society has tended to isolate and

segregate individuals with disabilities, and, despite some improvements, such forms of

discrimination against individuals with disabilities continue to be a serious and pervasive social

problem."  42 U.S.C. § 12101(a)(2).

237.    Congress found that "discrimination against individuals with disabilities persists

in . . . institutionalization . . . and access to public services."  42 U.S.C. § 12101(a)(3).  Congress

found that "individuals with disabilities continually encounter various forms of discrimination,

including outright intentional exclusion . . . , segregation, and relegation to lesser services,

programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. § 12101(a)(5).

238.    Congress further concluded that "[i]ndividuals with disabilities are a discrete and

insular minority who have been faced with restrictions and limitations, subjected to a history of

purposeful unequal treatment, and relegated to a position of political powerlessness in our

society, based on characteristics that are beyond the control of such individuals and resulting

from stereotypic assumptions not truly indicative of the individual ability of such individuals to

participate in, and contribute to, society."  42 U.S.C. § 12101(a)(7).

239.     A major purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, and to provide clear, strong, consistent and enforceable standards addressing discrimination against individuals with disabilities.  42 U.S.C. § 12101(b)(1)&(2).

240.     Title II of the ADA prohibits disability-based discrimination by a public entity. 42 U.S.C. §§ 12131-12132.

241.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

242.     The ADA is implemented through regulations promulgated by the United States Department of Justice, 28 C.F.R. § 35.101 *et seq*., providing, inter alia, that public entities (a) shall not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service," 28 C.F.R. § 35.130(b)(1)(i) and (b) "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the [DOC] can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7).

243.     DRCT's Constituents are qualified individuals with disabilities within the meaning of the ADA, 42 U.S.C. § 12131, and 28 C.F.R. § 35.104.  DRCT's Constituents have a mental illnesses that substantially limits their ability to perform one or more major life activities, including, but not limited to, thinking, concentrating, self-care, working, and interacting with

others, which in turn includes their ability to control their behavior.  Many of DRCT's

Constituents also have records of mental illness and are regarded as having mental illness.

244.    As people incarcerated by DOC, DRCT's Constituents meet the essential

eligibility requirements for the receipt of services or the participation in programs or activities

provided by Defendant DOC, and thus are qualified individuals entitled to the protections of the

ADA. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

245.    DOC is a public entity within the meaning of and subject to Title II of the ADA.

42 U.S.C. § 12131(1).  DOC is responsible for operating and managing Connecticut's

correctional facilities, and subject to the ADA's and its implementing regulations.

42 U.S.C. § 12131 *et seq.*; 28 C.F.R. § 35.152 *et seq.*  DOC is legally responsible for ADA

violations committed by DOC staff and contractors who provide programs, services, or activities,

including, but not limited to, mental health services, to DOC prisoners, including DRCT's

Constituents.  28 C.F.R. Part 35.

246.    DOC's services, programs, and activities are covered by the ADA.  The services,

programs, and activities that DOC provides to individuals in its custody include, but are not

limited to, sleeping, eating, showering, toileting, communicating with those outside the prison by

mail and telephone, exercising, the DOC's administrative, disciplinary, and classification

systems and proceedings, medical and mental health services, educational, vocational, substance

abuse, and anger management classes, and discharge services.

247.    DOC's failure to make reasonable modifications to policies, practices, and

procedures to prevent DRCT's Constituents from being subjected to in-cell shackling results in

DRCT's Constituents being discriminated against by reason of their disabilities.  DRCT's

Constituents, as individuals with mental illness, are particularly ill-suited to endure in-cell

shackling, and are most harmed by it.  DRCT's Constituents are often subjected to in-cell shackling in response to decompensation, mental health crises, and symptomatic behaviors.

248.    DOC fail to make reasonable modifications to policies, practices, and procedures to prevent DRCT's Constituents from being subjected to in-cell shackling.  As exemplified by Messrs. Barros, McLaurin, Méndez, and Spence, DOC's failure to make reasonable modifications results in DRCT's Constituents being subjected to in-cell shackling in response to symptoms of their mental illness, including but not limited to responses to suicide attempts and other mental health crises.  DOC's failure to make reasonable modifications to their policies, practices, and procedures with respect to the use of in-cell shackling of DRCT's Constituents has, and continues to, cause them to suffer irreparable harm including exacerbation of their mental illness and concomitant symptoms.

249.    By subjecting DRCT's Constituents to in-cell shackling by reason of their mental health disabilities, DRCT's Constituents have suffered, and continue to suffer, irreparable harm.  DOC's failure to make reasonable modifications to polices, practices, and procedures regarding the use of in-cell shackling to prevent discrimination on the basis of mental illness results in disability discrimination.

250.    It would not fundamentally alter DOC's programs, services, or activities to provide DRCT's Constituents with reasonable modifications to DOC's policies, practices, and procedures to ensure that they are not subjected to in-cell shackling as a result of symptoms of their mental illnesses.

251.    DOC's failure to meet their obligations under the ADA and its implementing regulations results in an ongoing and continuous violation of the right of DRCT's Constituents to be free from disability discrimination.  Unless restrained from doing so, DOC will continue to

violate the ADA.  Unless enjoined, DOC will continue to inflict injuries for which DRCT's

Constituents have no adequate remedy at law.

     252.    The ADA authorizes injunctive relief as appropriate to remedy acts of

discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(1).

     253.    DRCT is entitled to injunctive relief to prevent DOC's continued violation of the

ADA, as well as reasonable attorneys' fees and costs incurred in connection with bringing this

action.

**Third Cause of Action**
(Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a);
failure to provide reasonable accommodation for persons with mental illness)

     254.    DRCT incorporates by reference all allegations contained in the preceding

paragraphs as if alleged herein, and brings this claim against DOC.

     255.    Section 504 mandates that "[n]o otherwise qualified individual with a disability in

the United States . . . shall, solely by reason of her or his disability, be excluded from

participation in, be denied benefits of, or be subjected to discrimination under any program or

activity receiving federal financial assistance."  29 U.S.C. § 794(a).

     256.    Section 504 defines "program or activity," in pertinent part, as "all of the

operations of a department, agency, special purpose district, or other instrumentality of a State or

of a local government; or the entity of such State or local government that distributes such

assistance and each such department or agency (and each other State or local government entity)

to which the assistance is extended, in the case of assistance to a State or local government …."

*Id*. § 794(b)(1).

     257.    DRCT's Constituents are individuals with disabilities within the meaning of

Section 504.  29 U.S.C. § 794(a).  DRCT's Constituents have a mental illness that substantially

51

limits their ability to perform one or more major life activities, including, but not limited to, thinking, concentrating, self-care, working, and interacting with others, which in turn includes their ability to control their behavior.  Many of DRCT's Constituents also have records of mental illness and are regarded as having mental illness.

258.    As people incarcerated by the DOC, DRCT's Constituents meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by DOC, and thus are qualified individuals entitled to the protections of Section 504. *See* 29 U.S.C. § 794(a).

259.    DOC s receives federal grants, contracts, and other financial assistance, and DOC administers a program or activity that receives federal financial assistance, thereby subjecting themselves to the requirements of Section 504 and its implementing regulations. *See* 29 U.S.C. § 794(a).

260.    DOC's programs and activities for individuals in its custody include, but are not limited to, sleeping, eating, showering, toileting, communicating with those outside the prison by mail and telephone, exercising, medical and mental health services, educational services, vocational training, substance abuse counseling, anger management classes, discharge services, and the DOC's administrative, disciplinary, and classification systems and proceedings.

261.    DOC's failure to make reasonable modifications to policies, practices, and procedures to prevent DRCT's Constituents from being subjected to in-cell shackling results in DRCT's Constituents being discriminated against solely by reason of their disabilities.  DRCT's Constituents, as individuals with mental illness, are particularly ill-suited to endure in-cell shackling and are most harmed by it.  DRCT's Constituents are often subjected to in-cell shackling by virtue of mental health crises.

262.     DOC fails to make reasonable modifications to policies, practices, and procedures to prevent DRCT's Constituents from being subjected to in-cell shackling.  As exemplified by Messrs. Barros, McLaurin, Méndez, and Spence, Defendants' failure to make reasonable modifications results in DRCT's Constituents being subjected to in-cell shackling in response to symptoms of their mental illness, including but not limited to responses to suicide attempts and other mental health crises.  DOC's failure to make reasonable modifications to their policies, practices, and procedures with respect to the use of in-cell shackling of DRCT's Constituents has, and continues to, cause them to suffer irreparable harm including exacerbation of their mental illness and concomitant symptoms.

263.     By subjecting DRCT's Constituents to in-cell shackling solely by reason of their mental health disabilities, DRCT's Constituents have suffered, and continue to suffer, irreparable harm.  DOC's failure to make reasonable modifications to polices, practices, and procedures regarding the use of in-cell shackling and prolonged isolation to prevent discrimination solely on the basis of mental illness results in disability discrimination.

264.     It would not fundamentally alter DOC's programs, services, or activities to provide DRCT's Constituents with reasonable modifications to DOC's policies, practices, and procedures to ensure that they are not subjected to prolonged isolation and/or in-cell shackling as a result of symptoms of their mental illnesses.

265.     DOC's failure to meet their obligations under Section 504 and its implementing regulations results in an ongoing and continuous violation of the right of DRCT's Constituents to be free from disability discrimination. Unless restrained from doing so, DOC will continue to violate Section 504.  Unless enjoined, DOC will continue to inflict injuries for which DRCT's Constituents have no adequate remedy at law.

53

266.     Section 504 authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities.  29 U.S.C. § 794a(a)(2).

267.     DRCT is entitled to injunctive relief to prevent DOC's continued violation of Section 504, as well as reasonable attorneys' fees and costs incurred in connection with bringing this action.

## REQUEST FOR RELIEF

WHEREFORE, in order to stop the ongoing psychological and physical tormenting of and discrimination against DRCT's Constituents, DRCT respectfully requests that the Court:

(a)     Declare that the in-cell shackling of DRCT's Constituents constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

(b)     Declare that DOC's failure to provide reasonable modifications to policies, practices, and procedures in order to prevent DRCT's Constituents from being subjected to in-cell shackling violates the ADA and Section 504;

(c)     Permanently enjoin Defendants, their subordinates, agents, employees, and all other persons acting in concert with them under color of state law from subjecting DRCT's Constituents to in-cell shackling;

(d)     Permanently enjoin DOC and its agents, employees, and all other persons acting in concert with them under color of state law from subjecting DRCT's Constituents to disability discrimination in violation of the ADA and Section 504 by requiring Defendants to make reasonable modifications to prevent DRCT's Constituents from being subjected to in-cell shackling by reason of their disabilities;

54

(e)      Grant DRCT's reasonable attorneys' fees, litigation expenses, and costs

pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 12205, 28 C.F.R. § 35.175,

29 U.S.C. § 794a(b), and other applicable law; and

(f)      Grant such other relief as the Court considers just and proper.

DATED: May 18, 2022

By: */s/ Kyle Mooney*
Kyle Mooney (*pro hac vice*)
Eric Lin (*pro hac vice*)
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Phone: (212) 468-8000
Fax: (212) 468-7900
Email: kmooney@mofo.com
          elin@mofo.com

Dan Barrett (ct29816)
Elana Bildner (ct30379)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
Phone: (860) 471-8471
Email: e-filings@acluct.org

Hope Metcalf (ct424312)
Ali Gali (Law Student Intern)
Karen Chikezie (Law Student Intern)
Luke Connell (Law Student Intern)
Lowenstein International Human Rights
Clinic
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Phone: (203) 432-9404
Email: hope.metcalf@ylsclinics.org

Kasey Considine (ct30756)
Disability Rights Connecticut (DRCT)
846 Wethersfield Avenue
Hartford, CT 06114
Phone: (860) 297-4300
Fax: (860) 296-0055
Email: kasey.considine@disrightsct.org

*Counsel for Plaintiff Disability Rights*
*Connecticut, Inc.*